1   BARRY J. PORTMAN
    Federal Public Defender
2   NED SMOCK
    Assistant Federal Public Defender
3   KERAMET REITER
    Law Clerk
4   555 - 12th Street
    Suite 650
5   Oakland, CA 94607-3627
    Telephone: (510) 637-3500
6
    Counsel for Defendant Villegas-Villanueva
7

8

9               IN THE UNITED STATES DISTRICT COURT

10            FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA,        )    No. CR-08-0230 CRB
                                     )
13                  Plaintiff,       )    DEFENDANT'S NOTICE OF MOTION,
                                     )    MOTION, AND MEMORANDUM IN
14  vs.                              )    SUPPORT OF MOTION TO SUPPRESS
                                     )    EVIDENCE
15  JOSE LEOPOLDO VILLEGAS-          )
    VILLANUEVA,                      )    Hearing Date: August 6, 2008
16                                   )    Time: 10:00 a.m.
                    Defendant.       )    Courtroom: Hon. Charles R. Breyer
17  _____)

18
        TO:    THE UNITED STATES OF AMERICA, PLAINTIFF; AND JOSEPH P.
19             RUSSONIELLO, UNITED STATES ATTORNEY; AND DEREK
               OWENS, ASSISTANT UNITED STATES ATTORNEY
20

21          PLEASE TAKE NOTICE that on August 6, 2008, at 10:00 a.m., defendant

22  Leopoldo Villegas-Villanueva, will, and hereby does, move this court for an order granting

23  his motion to suppress all evidence seized and statements made on March 17, 2008, as a

24  result of both the search of the residence at 1911 Hilfiker Lane, Apt. 20, Eureka, CA, and

25  the subsequent interrogation of Mr. Villegas-Villanueva.

26          The motion is based on this notice and motion, the following memorandum of

1 points and authorities and accompanying exhibits, the Fourth and Fifth Amendments to the

2 United States Constitution, all other applicable constitutional, statutory and case authority,

3 and such evidence and argument as may be presented at the hearing of this motion.  Mr.

4 Villegas-Villanueva respectfully requests an evidentiary hearing.

5 <center>**MEMORANDUM OF POINTS AND AUTHORITIES**</center>

6 **I.    <u>FACTUAL BACKGROUND</u>**

7 On March 17, 2008, Eureka Police Department (EPD) officers, Humboldt County

8 Sheriff's deputies, and Federal Bureau of Investigations (FBI) agents from the Humboldt

9 County Drug Task Force arrested Mr. Villegas-Villanueva on charges related to the

10 possession of guns, marijuana, and methamphetamine.  What follows is a summary of the

11 events surrounding the arrest and questioning of Mr. Villegas-Villanueva.  This summary

12 is drawn from a declaration by Mr. Villegas-Villanueva as well as police, sheriff, and FBI

13 reports provided in discovery.  Mr. Villegas-Villanueva does not concede the accuracy of

14 these reports.

15 On March 17, 2008, around 9:15 a.m., a 911 dispatcher in Eureka received a

16 telephone call originating from 1911 Hilfiker Lane, apartment 20.  The caller said nothing

17 and hung up.  The dispatcher attempted to call back, but the line was busy.  Officers from

18 the Eureka Police Department were then dispatched to the residence.  *Exhibit A,*

19 *Supplemental Report of Officer Altic at V00037.*

20 Officers Altic, Kalis, and Goodale of the EPD knocked on the front door of the

21 residence.  A woman, later identified as Esmeralda Toledo-Paz, opened the door slightly,

22 but she did not remove the chain securing the door to the frame.  Officer Altic immediately

23 began pushing the door to try to get into the apartment.  *Exhibit B, Declaration of*

24 *Leopoldo Villegas-Villanueva at 2 ¶3.*  A man, later identified as Mr. Villegas-Villanueva,

25 appeared behind the woman.  Officer Altic reports that he asked Ms. Toledo-Paz whether

26 there was an emergency, but she responded only in Spanish.  Officer Altic noted that Ms.

1   Toledo-Paz did not appear to understand English.  Officer Altic did not, however, note any

2   signs of an emergency.  For example, he saw no indication that Ms. Toledo-Paz appeared

3   to be either distressed or injured.  *Exh. A at V00037.*

4          Nonetheless, the three EPD officers announced that they needed to enter the

5   apartment.  At this point, Officer Altic reports that both the man and the woman walked

6   away from the front door.  Officer Altic then threatened to force his way into the house,

7   yelling: "Stop! Come back, and open this door or I am coming through this chain!"  *Id.*

8   Mr. Villegas-Villanueva, recognizing that the officers would break through the door if he

9   did not comply, walked to the front door and removed the chain.  *Exh. B at at 2 ¶ 3.*

10          As soon as the door opened, the three EPD officers entered the apartment and

11   began giving orders to the residents.  Officer Altic directed Mr. Villegas-Villanueva to sit

12   in a chair in the living room.  *Exh. A at V00037.*  When Mr. Villegas-Villanueva got up to

13   ask why they were searching the apartment, Officer Altic had him handcuffed

14   immediately.  *Exh. B at 2 ¶ 4.*  Officer Kalis, and later FBI Special Agent Fagetan,

15   detained Mr. Villegas-Villanueva on the couch in the living room for more than four hours.

16   *Exhibit C, FD-302 Report of Agent Fagetan at V00001-2*

17          Meanwhile, Officer Altic reports that he performed a sweep to "clear" the house –

18   including the kitchen, the laundry room, the bathroom, and one bedroom – ostensibly

19   looking for any other suspects or individuals in need of assistance.  He opened the door of

20   a closet in the laundry room to look for possible suspects, determined there was no one in

21   the closet, and continued his search of the house.  *Exh. A at V00038.*  In the bedroom,

22   Officer Altic looked in a closet.  He claims that in an effort to look under the bed, he knelt

23   down and rested his hand on the bed.  *Id.*  The bed is a simple mattress atop a box spring,

24   which is covered by a dust ruffle.  *See Exh. D.*  Officer Altic reports that when he put his

25   hand on the bed, he felt a hard object under the blankets.  He removed the blanket covering

26   the bed and saw several guns.  *Exh. A at V00038.*

1    Once he found the guns in the bedroom, Officer Altic decided to also place Ms.

2    Toledo-Paz in handcuffs.  When he placed her in handcuffs, he noticed for the first time

3    that she appeared to have a cut on her wrist, and he radioed for medical assistance.  *Id.*

4    After he had entered the apartment and handcuffed Mr. Villegas-Villanueva, Officer Altic

5    had noticed a "small patch of what appeared to be fresh blood" on Ms. Toledo-Paz's shirt.

6    However, this patch of blood was innocuous enough that Officer Altic did not at first see

7    any need to call for medical assistance.  *Id.*  Agent Richardson of the Humboldt County

8    Drug Task Force later met with Ms. Toledo-Paz, who said she cut her hand cleaning the

9    bathroom.  She also said she called 911 for an unrelated reason; one of her children was

10    sick.  *Exhibit E, Investigation Report of Agent Kirkpatrick ¶ 14.*

11    Officer Jones and Officer Whitmer of the EPD then arrived at the apartment and

12    searched the garage and attic purportedly to "make sure no one was in need of assistance."

13    *Exh.  E ¶ 8; Exh. A at V00038.*  Officer Altic remembered that he had smelled marijuana

14    when he opened the door of the laundry room closet during his initial sweep.  He went

15    back to the laundry room and opened the door to the closet.  He saw two garbage cans and

16    says that in one can he saw bags of green marijuana.  *Exh.  A at V00038.*  At 10:20 a.m.,

17    more than one hour after they were dispatched to the 1911 Hilfiker Lane apartment, the

18    officers decided to seek a search warrant.  Officer Altic called the Humboldt County Drug

19    Task Force.  *Exh.  E ¶ 1.*  Representatives of the Humboldt County Drug Task Force

20    arrived at the apartment approximately fifteen minutes later and met with Officer Altic in

21    order to prepare an application for a search warrant.  While Agent Kirkpatrick prepared a

22    search warrant, four Humboldt County Drug Task Force agents and an unidentified

23    number of EPD officers stood by at the apartment at 1911 Hilfiker Lane.  *Id. ¶ 15-16.*

24    While Drug Task Force agents prepared a search warrant, Mr. Villegas-Villanueva

25    remained on his couch, in handcuffs, under the supervision of four Drug Task Force agents

26    and at least three EPD officers.  Mr. Villegas-Villanueva had been handcuffed and

Defendant's Motion to Suppress Evidence            4

1    detained throughout the warrantless search of his apartment.  He remained in handcuffs,

2    detained with several agents and officers assigned to monitor him, over the course of the

3    next approximately four hours.  *Exh. E ¶ 16.*

4         FBI Special Agent Fagetan arrived at the apartment while the agents sought a

5    search warrant, and he was assigned to "watch over" Mr. Villegas-Villanueva.  Agent

6    Fagetan proceeded to engage Mr. Villegas-Villanueva in a lengthy conversation, during

7    which Agent Fagetan reports that Mr. Villegas-Villanueva made inculpatory statements.

8    *Exh. C at V0001.*  During the conversation, Agent Fagetan spoke with Mr. Villegas-

9    Villanueva about seemingly innocuous topics including decorations on his wall and the

10   agent's salary.  *Exh. B at 2 ¶ 5.*  Agent Fagetan also told Mr. Villegas-Villanueva that the

11   guns and drugs found in the apartment meant that he was going to be in a lot of trouble.

12   He told Mr. Villegas-Villanueva that the sentence for possession of a silencer was ten

13   years.  He asked Mr. Villegas-Villanueva where his "stash" was located, and also

14   commented that although he did not relish seeing Villegas-Villanueva in handcuffs, he

15   "hate[s] what [Mr. Villegas-Villanueva] do[es]."  *Id. at ¶ 6.*  Further, Agent Fagetan

16   encouraged Mr. Villegas-Villanueva to cooperate with law enforcement.  He told Mr.

17   Villegas-Villanueva that he could help himself by setting up a narcotics transaction by

18   telephone.  He also asked Mr. Villegas-Villanueva whether he knew one individual who

19   Mr. Villegas-Villanueva assumed must be a suspected drug dealer.  *Id. at ¶ 7.*

20        During the course of this conversation, Agent Fagetan reports that Mr. Villegas-

21   Villanueva explained that Ms. Toledo-Paz called 911 after she and he argued about his

22   other girlfriend.  He stated that all the items discovered in the bedroom belonged to him,

23   and that he knew the firearms were going to cause him trouble.  He expressed concern for

24   Ms. Toledo-Paz and for his infant son.  *Exh. C at V00001-2.*  At no time before or during

25   this conversation was Mr. Villegas-Villanueva informed of his *Miranda* rights.

26        Based on the guns and marijuana discovered during the initial search of the house,

1   Agent Kirkpatrick of the Humboldt County Drug Task Force obtained a search warrant,

2   which was signed at 2:16 p.m..  Several officers then performed a further search of the

3   apartment.  At the conclusion of the execution of the search warrant, more than five hours

4   after he was first detained, officers read Mr. Villegas-Villanueva his *Miranda* rights.  As

5   soon as Mr. Villegas-Villanueva heard his *Miranda* rights, he stated that he wanted to have

6   a lawyer present.  *Exh.  E ¶ 30.*

7   **II.    ARGUMENT**

8   **A.    Mr. Villegas-Villanueva has Standing to Challenge the Search of 1911 Hilfiker Lane, Apt. 20**

9
10  Mr. Villegas-Villanueva lived in apartment 20 at 1911 Hilfiker Lane, and he was

11  present throughout the warrantless search on March 17, 2008.  Therefore, he has standing

12  to assert his Fourth Amendment right to be free from unreasonable searches and seizures

13  within his home and primary residence.  *See Brown v. United States*, 411 U.S. 223 (1973).

14  **B.    Both the Forced Entry and Warrantless Search of 1911 Hilfiker Lane, Apt. 20 were Illegal, and all Evidence Obtained Therefrom Must be Suppressed**

15  First, the initial, warrantless entry of the Hilfiker Lane apartment was illegal.  Any

16  warrantless search and seizure inside a home is presumptively unreasonable.  *Payton v.*

17  *New York*, 445 U.S. 573, 585 (1980).  The government can only overcome this

18  presumption by asserting and establishing that an exception to the warrant requirement

19  applies.  *Mincey v. Arizona*, 437 U.S. 385, 390 (1978).  In this case, no exception to the

20  warrant requirement applies.  The sole basis for the EPD officers' forced entry into the

21  apartment at 1911 Hilfiker Lane was a 911 hang-up call.  The officers did not have

22  permission to search the apartment, nor did the officers have a reasonable belief that

23  anyone inside the residence was in immediate danger.  *See United States v. Cervantes*, 219

24  F.3d 882, 890 (9th Cir. 2000) (adopting the narrow "emergency exception" to the warrant

25  requirement).

26  Second, even were one to assume that the initial warrantless entry was permissible,

1   the scope and the manner of the search performed by officers were both broader and more

2   intrusive than necessary.  *United States v. Snipe*, 515 F.3d 947, 951 (9th Cir. 2008).  The

3   search far exceeded the scope of a protective sweep aimed at seeking possible victims or

4   suspects.  Third, the guns seized from under the blankets on the bed in the bedroom of the

5   Hilfiker Lane apartment must be suppressed for an additional reason, namely that they

6   were not in plain view when they were seized.  Therefore, the fruits of the search and

7   seizure, including both physical evidence and statements, must be suppressed.  Fourth,

8   because the information and evidence gathered pursuant to these illegal searches and

9   seizures were the only basis for obtaining the search warrant that was later executed, the

10  fruits obtained pursuant to that search warrant also must be suppressed.

11          **1.     The Police had No Reasonable Grounds to Believe there was an
                     Emergency at 1911 Hilfiker Lane, so their Warrantless, Forced Entry
12                   into Apartment 20 was Illegal**

13          EPD officers had no grounds to force their way into the apartment occupied by Mr.

14  Villegas-Villanueva and Ms. Toledo-Paz without a warrant.  While the Ninth Circuit

15  recognizes an emergency exception to the warrant requirement, that exception is a narrow

16  one.  It may only be invoked when, "considering the totality of the circumstances," police

17  had "an objectively reasonable basis for concluding that there was an immediate need to

18  protect others or themselves from serious harm." *Snipe*, 515 F.3d at 951.  In the instant

19  case, the only information known to Officer Altic when he made the warrantless entry was

20  that someone had called 911 and hung up the telephone before speaking.  This call alone is

21  not an objectively reasonable foundation for assuming that there was any immediate

22  danger justifying a warrantless entry into apartment 20.

23          No court has held that a hang-up call to 911 followed by a busy signal at the

24  residence from which the call came constitutes an objectively reasonable basis for

25  concluding that an immediate danger exists so as to justify a warrantless entry.  In *United*

26  *States v. Cohen*, 481 F.3d 896, 900 (6th Cir. 2007), the court specifically noted that a 911

1    hang-up call, "standing alone without . . . other information, is most analogous to an

2    anonymous tip."  As another court concluded, where there is no evidence that there was

3    someone else in the house in need of assistance, immediate or otherwise, a warrantless

4    emergency entry cannot be justified solely based upon a 911 hang up call.  *United States v.*

5    *Meixner*, 128 F. Supp. 2d 1070, 1075 (E.D. Mich. 2001).

6          No published case in the Ninth Circuit specifically addresses the nexus between a

7    911 hang-up call and a potential emergency.  However, a number of Ninth Circuit cases

8    have addressed the "additional steps" police must take to determine whether a 911 phone

9    call relates to an emergency, and therefore justifies a warrantless entry.  *See, e.g., United*

10   *States v. Russell*, 436 F.3d 1086, 1092 (9th Cir. 2006) (upholding legality of entry where

11   officers went to residence following a 911 call, observed a gunshot victim outside, and

12   expressed concern that other people in the house could be injured).  For instance, in *United*

13   *States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005), the police responded to a 911 call

14   reporting a domestic violence disturbance, but they only entered the house after hearing

15   screams coming from within.

16         In general, Ninth Circuit decisions describing valid warrantless entries pursuant to

17   the emergency exception to the warrant requirement identify exactly what officers were

18   concerned they might find inside the residence, and who the officers were seeking to

19   protect – whether a domestic violence victim, a potential shooting victim, a murder victim,

20   or an abandoned child.  The combination of information and observation must be sufficient

21   to establish that the officers had objectively reasonable grounds to believe someone within

22   the residence searched was facing imminent danger.  *See, e.g.*, *United States v. Black*, 482

23   F.3d 1035, 1039 (9th Cir. 2007) (upholding legality of entry where officers knew the

24   resident's girlfriend had just experienced domestic violence); *Russell*, 436 F.3d at 1090

25   (upholding legality of entry where officers responded to a 911 call from a man who

26   claimed to have shot himself); *United States v. Najar*, 451 F.3d 710 (10th Cir. 2006)

1    (upholding entry where officers responded to a 911 hang-up call, and resident at door

2    claimed to be the only person at home, but denied calling 911); *United States v. Stafford*,

3    416 F.3d 1068, 1072 (9th Cir. 2005) (upholding legality of entry where "officers

4    responded to a report of a possible dead body inside what witnesses described as a blood-

5    spattered apartment"); *United States v. Bradley*, 321 F.3d 1212, 1215 (9th Cir. 2003)

6    (upholding legality of entry where officers were concerned there was a nine-year-old in the

7    house in the middle of the night without any adult supervision).  The information officers

8    collect about a potential emergency, based on both 911 calls and on-the-scene

9    observations, is critical to the totality of the circumstances analysis.

10        In the instant case, there were no reasonable grounds to believe that anyone in the

11    residence needed immediate assistance at the time officers made their warrantless entry.

12    EPD Officers responded to a 911 hang-up call that had been traced to apartment 20 at 1911

13    Hilfiker Lane.  Although a 911 hang-up call alone has been compared to an anonymous tip

14    and is insufficient to justify entry, the EPD officers took no additional steps to determine

15    whether there was actually an emergency at apartment 20.  When the officers approached

16    the door of apartment 20, they did not describe any sounds of disturbance, such as

17    screaming, gunshots, or bullet holes.  Nothing suggested that there had been a domestic

18    violence situation.  Officer Altic describes observing two adults, neither of whom appeared

19    to be in danger or distress.  The woman at the door was not crying or upset, and she did not

20    appear to be injured.  The officers did not notice or express concern about the possibility of

21    children being present in the residence.

22        In contrast to the facts of the Ninth Circuit cases set forth above, not only did

23    officers observe no indications of an emergency, but they did not describe any suspicious

24    activity.  For instance, neither Mr. Villegas-Villanueva nor Ms. Toledo-Paz lied about

25    whether they had called 911.  Neither did Mr. Villegas-Villanueva or Ms. Toledo Paz lie

26    about who was present in the residence.  Indeed, when officers entered the apartment at

1   1911 Hilfiker Lane, they had no indication of who had called 911.  In fact, the police did

2   not even know whether the caller was calling about something taking place inside his or

3   her own residence.  Given the scant information the police had and the absence of any

4   indications of an emergency, an injury, distress, or even suspicious activity when they

5   arrived at the apartment, a reasonable assumption might have been that the residents called

6   911 accidentally, or that they were calling to report something going on outside of their

7   residence, perhaps on the street or next door. Despite the apparent calm and the absence of

8   indications of an emergency, Officer Altic began pushing the door open and demanding

9   that the chain be taken off the door when Ms. Toledo-Paz opened the door.  *Exh. B at 2 ¶*

10  *3.*  He acknowledges threatening to "come through" the chain if it was not removed to let

11  him in.  *Exh. A at V00037.*  He entered without permission when Mr. Villegas-Villanueva

12  relented to his commands and removed the chain on the door.

13        In sum, a 911 hang-up call, in which no details about any emergency are conveyed,

14  does not constitute an objectively reasonable indication of immediate danger so as to

15  justify a warrantless entry into a residence.  Accordingly, all fruits of the warrantless entry,

16  including physical evidence and statements, must be suppressed.

17  **2.      The Pre-Warrant Search Conducted by Officers Went Well Beyond the**
        **Accepted Scope of a Protective Sweep**
18
        Even if this court were to determine that the officers' initial entry itself was legal,
19
    the emergency exception to the warrant requirement limits what and where officers may
20
    search before obtaining a warrant.  The scope and manner of the search must be
21
    "reasonable to meet the need." *Snipe*, 515 F.3d at 951.  The officers far exceeded these
22
    limitations in the search of Mr. Villegas-Villanueva's residence.  The search Officer Altic
23
    conducted first, as well as the searches conducted by subsequent agents before a warrant
24
    was obtained, were considerably more extensive and thorough than those countenanced
25
    under the emergency exception to the warrant requirement.
26

Defendant's Motion to Suppress Evidence          10

1    A protective sweep "is narrowly confined to a cursory visual inspection of those

2    places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 327 (1990). In

3    those cases where the Ninth Circuit has upheld warrantless emergency searches, the court

4    has emphasized the necessarily quick and cursory nature of that search. For instance, in

5    *Black*, 482 F.3d at 1039, the court noted that the officer "entered and made a quick sweep

6    of the apartment to see if anyone was there." During this "quick sweep," the officer

7    noticed a gun, in plain view, on the bed. *Id.* Similarly, in *Russell*, the court noted that the

8    officers "swept through the house in less than two minutes." 436 F.3d at 1093.

9    These quick sweeps are for the specific purpose of looking for people – either to

10    ensure that everyone is safe, or to ensure that no potential attackers are present. For

11    instance, in *Russell*, the court specifically noted that the two-minute sweep was people-

12    centered, and "a style of search clearly inconsistent with an intent to discover and seize

13    evidence." *Id.* Indeed, a valid warrantless emergency search is not only quick and

14    cursory, but it ends as soon as the officers conclude that everyone in the residence is safe.

15    *See, e.g., Martin v. City of Oceanside,* 360 F.3d 1078, 1082 (9th Cir. 2004) ("Once the

16    officers identified Traci and were able to see that she was not in trouble, they left the

17    residence shortly thereafter."). In general, an extended search, involving multiple officers

18    present in a residence for more than a few minutes at a time, requires a warrant. *See, e.g.,*

19    *Thompson v. Louisiana,* 469 U.S. 17, 22 (1984) ("A 2-hour general search remains a

20    significant intrusion on petitioner's privacy and therefore may only be conducted subject to

21    the constraints – including the warrant requirement – of the Fourth Amendment.").

22    The search Officer Altic conducted of apartment 20 was not a quick sweep,

23    oriented towards finding people in danger. Rather, it was extensive and beyond the

24    reasonable scope of an emergency search. The record does not indicate the exact duration

25    of the initial, warrantless search of the 1911 Hilfiker Lane apartment, but more than one

26    hour passed between the 911 hang-up call noted by the dispatcher, and the time Officer

1  Altic contacted Humboldt County Drug Task Force personnel, who ultimately met with

2  Officer Altic in order to prepare an application for a search warrant.  The duration of the

3  search of the apartment at 1911 Hilfiker Lane is just one indication of the fact that the

4  search was far outside the scope authorized pursuant to an emergency exception to the

5  warrant requirement.

6      Before even conducting a sweep, Officer Altic paused to detain Mr. Villegas-

7  Villanueva in handcuffs.  Then, he walked through the kitchen and laundry room.  He

8  looked into the closet in the laundry room and determined there were was no one inside.

9  *Exh. A at V00038.*  He entered the bedroom and looked in the closet.  Then, he knelt down

10  to look under a bed that was actually a mattress stacked on top of a box spring.  Next, he

11  lifted blankets from on top of the bed and looked at what was under those blankets.  Then,

12  he paused again to detain Ms. Toledo-Paz in handcuffs.  Officer Altic then waited for two

13  more officers to arrive on the scene before he searched the garage and attic.  He then

14  checked the laundry room closet a *second time*, despite the fact that he had already

15  determined there was no one hiding therein.  On this second check of the closet, he looked

16  into garbage cans in the closet and looked up on shelves above the garbage cans.  *Id.*

17      Officer Altic, and later Officers Jones and Whitmer, conducted this extended search

18  without any articulation of who was in danger – in fact, they had already handcuffed the

19  two adult residents of the apartment.  The search was not a quick sweep; it lasted far longer

20  than "two minutes."  The officers continued the search even after ascertaining that no one

21  inside the residence was in trouble.  The fact that Officer Altic re-entered the laundry room

22  closet a *second time* after his initial search confirms that he was engaged in a search for

23  evidence.  In his report describing his second entry into the laundry room, Officer Altic

24  wrote: "In the laundry room closet, where I had noticed the odor of marijuana, there were

25  two garbage cans.  One of the garbage cans did not have a lid on and I saw that it was full

26  of gallon sized clear plastic bags full of marijuana buds."  *Exh. A at V00038.*  Officer

1    Altic's own report, therefore, reveals his motivation behind reentering the closet: he

2    wanted to find the source of the marijuana smell.  As such, the search exceeded the scope

3    of a warrantless emergency sweep, and the fruits of the search, including the marijuana

4    found inside a garbage can in a closet, must be suppressed.

5        **3.    Police Moved Objects and Looked Under Blankets in Violation of the**
         **Plain View Doctrine**

6

7        Where an initial entry is illegal, the plain view exception to the warrant

8    requirement does not apply.  *United States v. Bulacan*, 156 F.3d 963, 968 (9th Cir. 1998)

9    (citing *Horton v. California*, 496 U.S. 128, 136 (1990)).  Therefore, even evidence that

10   was in plain view when the police illegally entered the apartment at 1911 Hilfiker Lane

11   must be suppressed.  However, even if this court determines that the officers' initial entry

12   itself was legal, the officers violated the plain view doctrine once they entered the

13   apartment.  Specifically, the guns the officers seized from the bedroom of the Hilfiker

14   Lane apartment were not in plain view, so they must be suppressed.

15       Evidence seized under the plain view exception to the warrant requirement must

16   satisfy two conditions.  First, the officers who seized the evidence must have been lawfully

17   searching the area where the evidence was found.  *Stafford*, 416 F.3d at 1076 (citing *Roe v.*

18   *Sherry*, 91 F.3d 1270, 1272 (9th Cir. 1996); *Horton*, 496 U.S. at 135-37).  Second, the

19   incriminatory nature of the evidence must have been "immediately apparent."  *Id.*

20       Courts have found that guns and ammunition represent "immediately apparent"

21   incriminating evidence if they are in obvious view of an officer who has lawfully entered a

22   residence.  For instance, in *Stafford*, the court noted that while looking for either a body or

23   an injured person, officers saw an "armor-piercing bullet in the living room."  416 F.3d at

24   1076.  Noticing a bullet in the living room constituted a valid plain view search.  Similarly,

25   in *Black*, while officers were quickly sweeping a house in search of a potential domestic

26   violence victim, they "noticed a gun on the bed." 482 F.3d at 1039.  The *Black* court

1  specifically noted that the officers never touched the gun and sought a warrant before

2  seizing it. *Id.* Again, in *Martinez*, officers entered a living room while investigating a

3  domestic violence disturbance and, immediately "[u]pon entering the living room, [the

4  officer] noticed two rifles and a shortened barrel shotgun resting on the couch." 406 F.3d

5  at 1163. In each of these cases, the guns that were seized were noticed in plain view by

6  officers conducting a walk-through. The officers did not touch anything, or move any

7  coverings aside, in order to discover the guns.

8       In the instant case, the guns were not in plain view until the officer felt the bed, and

9  then removed the blankets. Officer Altic had no reason to either look under the bed, or to

10  feel the blankets on the bed. The bed was actually a mattress on top of a box spring, not

11  the kind of structure under which a person could hide. There was a simple dust ruffle

12  around the box spring, which could easily have been moved aside with a foot or a baton.

13  An officer would have no reason to kneel down, into a vulnerable position, and then lower

14  his head, into an even more vulnerable position, in order to look at a box spring.

15       The defense contests Officer Kalis' justification for resting his hand on the bed and

16  asserts that the explanation is offered to justify conduct that exceeds the accepted scope of

17  a warrantless protective sweep. Moreover, once Officer Altic put his hand on the bed, in

18  violation of both the scope of an emergency search and the plain view doctrine, the defense

19  denies that he could have reliably concluded that an object he had rested his hand on under

20  the blankets was a firearm. Indeed, he had to remove the blankets before he established

21  what was lying on the bed, thereby breaching the very terms of the *plain view* doctrine.

22  Because these guns were found in violation of both the scope of a warrantless emergency

23  search and a plain view search, they must be suppressed.

24       **4.      The Search Warrant Based on Evidence Seized or Observed During the
           Warrantless Searches is Tainted by Illegality**

25

26       The exclusionary rule generally prohibits the government from introducing tangible

1  or testimonial evidence that it obtained as a direct or indirect result of an unlawful search.

2  *Murray v. United States*, 487 U.S. 533, 536-37 (1988).  Thus, if a search warrant affidavit

3  includes information that is the fruit of a prior unlawful search or seizure, the resulting

4  warrant is invalid.  *Id.* at 542.  When police conduct a warrant search after first conducting

5  an illegal search, the question is whether the warrant search was actually independent of

6  the illegal search.  *Id.*  The warrant search is not independent "if the agents' decision to

7  seek the warrant was prompted by what they had seen during the initial entry, or if

8  information obtained during that entry was presented to the Magistrate and affected his

9  decision to issue the warrant."  *Id.*

10       Here, the warrant permitting officers to search the apartment was obtained entirely

11  based upon an account of what was found during the initial illegal entry.  Accordingly, the

12  fruits of the search pursuant to that warrant must be suppressed.

13  **C.    Police Detained and Interrogated Mr. Villegas-Villanueva without *Miranda***

14  **Warnings**

15       The officers who questioned Mr. Villegas-Villanueva only had access to him in the

16  first instance because they entered his home without a warrant.  Therefore, the statements

17  Mr. Villegas-Villanueva made to Agent Fagetan should be suppressed as the fruits of an

18  illegal search and seizure.  *Reid*, 226 F.3d at 1025 (holding that evidence recovered

19  following an illegal entry into a home is inadmissible and must be suppressed).

20       Even if this court finds that the initial entry of Mr. Villegas-Villanueva's residence

21  was legal, his statements must be suppressed because he was detained and interrogated in

22  violation of the Fifth Amendment.  *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

23  *Miranda* requires specific procedural safeguards if a defendant is in custody and subject to

24  interrogation.  *Id.*  Although Mr. Villegas-Villanueva was detained and interrogated over

25  the course of five hours, he was not read his *Miranda* rights until after the conclusion of

26  multiple searches of his apartment.

1    In order for *Miranda* safeguards to apply, a suspect must be in custody.  A person

2  is in custody for *Miranda* purposes if, under all the objective circumstances, "there was a

3  formal arrest or restraint on freedom of movement of the degree associated with a formal

4  arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994).  Mr. Villegas-Villanueva was

5  handcuffed throughout the duration of the search of his apartment.  He was also

6  continuously under the supervision of law enforcement officers – first Officer Kalis, and

7  later Agent Fagetan.  As such, his freedom was unequivocally restrained and he was in

8  custody.

9    In addition to being in custody, a suspect must be subject to questioning, or

10  interrogation, before *Miranda* safeguards apply.  Interrogation is questioning, or its

11  functional equivalent, including any words or actions on the part of police that they should

12  know are reasonably likely to elicit an incriminating response.  *See Rhode Island v. Innis*,

13  446 U.S. 291, 301 (1980).

14    Interrogation is not limited to questions.  *See id.* at 301 n.6.  For instance, courts

15  have held that both discussing evidence against a defendant and parading evidence in front

16  of a defendant can constitute interrogation.  *See, e.g.*, *United States v. Orso*, 266 F.3d

17  1030, 1033-34  (9th Cir. 2001) (en banc) (suppressing statements made in response to

18  interrogation, which consisted of an agent describing incriminating evidence to a

19  defendant).  Courts have also held that discussing the possibility of cooperation can

20  constitute interrogation.  For instance, in *United States v. Padilla*, 387 F.3d 1087, 1093

21  (9th Cir. 2004), an agent met with a defendant and informed him it was his "last chance to

22  cooperate," without giving the defendant *Miranda* warnings.  The court held that this was

23  unequivocally interrogation, designed to elicit a response.  *Id.*  In general, police practices

24  that are designed to elicit incriminating responses qualify as interrogation.  *See United

25  States v. Thierman*, 678 F.2d 1331, 1335 (9th Cir. 1982) (citing *Innis,* 446 U.S. at 301-02

26  n.7).  Even ostensibly "objective" or "neutral" information might be intended to

Defendant's Motion to Suppress Evidence        16

1    "deliberately elicit an incriminating statement." *United States v. Booth*, 669 F.2d 1231,

2    1238 (9th Cir. 1981).

3        Agent Fagetan conducted an ongoing pre-*Miranda* conversation with Mr. Villegas-

4    Villanueva while he was handcuffed and supervised by several officers in his living room

5    over a period of hours.  This interaction amounted to interrogation because a reasonable

6    law enforcement officer would have recognized that his words were likely to elicit an

7    incriminating response.  During this extended conversation, Agent Fagetan broached a

8    number of innocuous topics with Mr. Villegas-Villanueva, including discussing wall decor

9    and the agent's salary. *Exh. B. at 2 ¶ 5.*  However, Agent Fagetan interspersed these

10   neutral conversation topics with allegations of guilt and direct questions about

11   incriminating evidence and the possibility of cooperation.  Agent Fagetan discussed the

12   incriminating evidence officers had found in the apartment with Mr. Villegas-Villanueva.

13   Agent Fagetan described the guns specifically and said the silencer could result in prison

14   sentences of ten years. *Exh. B at 2 ¶ 6.*  According to Agent Fagetan, Mr. Villegas-

15   Villanueva told him that he "knew that the firearms were going to cause him a great deal

16   of trouble." *Exh. C at V00002.*  A simple description of incriminating evidence has been

17   held to constitute an interrogation that requires the procedural safeguard of a *Miranda*

18   warning. *See Orso*, 266 F.3d at 1033-34.

19       After suggesting that Mr. Villegas-Villanueva was in trouble and could be

20   sentenced to ten or more years in prison, Agent Fagetan described numerous ways Mr.

21   Villegas-Villanueva might cooperate. *Exh. B at 2 ¶ 6, 7.*  Agent Fagetan acknowledges

22   that he discussed with Mr. Villegas-Villanueva both the items officers had discovered in

23   the bedroom of apartment 20 during their warrantless search and the possibility of

24   cooperation. *Exh. C at V00001-2.*  Discussions of cooperation, like descriptions of

25   incriminating evidence, have been held to constitute an interrogation, which triggers a

26   suspect's Fifth Amendments rights. *See Padilla*, 387 F.3d at 1093.  Finally, Agent Fagetan

1   asked Mr. Villegas-Villanueva direct questions about where his "stash" was located and

2   whether he knew specific drug dealers. *Exh. B. at 2 ¶ 6, 7.* Such direct questions are the

3   very essence of interrogation.

4       In sum, the ongoing conversation between Mr. Villegas-Villanueva and Agent

5   Fagetan, while Mr. Villegas-Villanueva was handcuffed and detained in his house,

6   constituted an interrogation. This interrogation included a discussion of the evidence

7   against Mr. Villegas-Villanueva, encouragement to cooperate and to set up a narcotics

8   transaction, and questions about where more evidence might be found. Therefore, Mr.

9   Villegas-Villanueva should have received *Miranda* warnings. Because he did not, the

10  statements he made during and after the search of his apartment must be suppressed.

11  //

12  //

13  //

14

15  **III.    <u>CONCLUSION</u>**

16      For the foregoing reasons, this Court should suppress all evidence recovered in the

17  search of 1911 Hilfiker Lane, apartment 20, as well as the statements made by Mr.

18  Villegas-Villanueva while he was in custody.

19

20

    Dated: July 9, 2008
21
                                    Respectfully submitted,
22
23                                  BARRY J. PORTMAN
                                    Federal Public Defender
24                                          /S/
25                                  NED SMOCK
                                    Assistant Federal Public Defender
26

Defendant's Motion to Suppress Evidence          18

# EXHIBIT A

*DTF*

**EUREKA POLICE DEPARTMENT**
604 C STREET    EUREKA, CA

**HC08-040**
PAGE #

CLASSIFICATION: H&S 11359, 11378, 11370.1
PC 12022(c), 12280(b), 12520, 12021(a), 496

SUSPECT(S):  Villegas, Jose  (aka – Villanueva, Leopoldo Villegas)

## SUPPLEMENTAL REPORT

On 03-17-08 at 0915 hours I was dispatched to 1911 Hilfiker apartment #20 for a 911 call.  Dispatched advised that the caller had hung up, and the line was busy when dispatch called back.  Officer Kalis and Officer Goodale arrived on scene.  There were two vehicles in the driveway but initially we did not get a response to knocking at either of the apartment doors.  Officer Kalis observed a female adult subject inside the apartment through the window.  The female opened what appeared to be an interior bedroom door, saw Officer Kalis outside the window and then closed the bedroom door shutting herself off from Kalis' view.

After knocking for approximately 2 minutes a HFA finally opened the front door of the apartment but left the chain in place.  I told the female subject that there had been a 911 call from this address and asked if there was an emergency.  The female spoke to me in Spanish and did not appear to understand English.

A HMA came into my view through the gap in the chained doorway.  I told the male that there had been a 911 call from this address and that I needed to come into the apartment to make sure there was no emergency.  The male appeared to understand and mumbled something in English that I could not understand, then spoke to the woman in Spanish, and both of the subjects turned and walked away from the door without releasing the chain.  The male subject walked slowly to my left toward an open bedroom doorway that was visible to me as I looked through the gap in the chained front door.  The female went out of my sight to the left of the front door into what I later learned was the kitchen.  I was concerned for my safety since I still had not determined the reason for the 911 call and I did not know the intentions of the subjects.

As the male walked away from me I yelled, "Stop! Come back, and  open this door or I am coming through this chain!"  The male stopped in the bedroom doorway, looked into the bedroom and then turned around and walked slowly back and unchained the front door for me.

I told the male to sit down in a chair in the living room near the front door as I followed the female around the corner to check for other subjects in the kitchen.  Officer Kalis

OFFICER: ALTIC    IBM# 0484    03/18/2008    _____ *kH*    APPROVED

| | | | | | | |
|---|---|---|---|---|---|---|
| 1.Cleared by Arrest | 6. Documentation | 11. Cleared Recovery | 16. To Property Clerk | 21. Cleared Crt. Bk |
| 2.Cited and Released | 7. Cleared: Admin | 12. Cleared Partial Recovery | 17. To D.A. | 22. Cleared Extradition |
| 3.Booked Cited Released | 8. Open | 13. Cleared: Other Agency | 18. To Other Agency | 23. CID |
| 4.PC849b | 9. Closed | 14. Cleared Restitution | 19. Owner Notified | 24. NOP |
| 5.Unfounded | 10. Suspended | 15. Warrant Request | 20. Medical Release Needed | *18* |

DISTRIBUTION    1. Briefing    3. D.A.    5. Probation    7.Coroner 9. Other    COPIED BY
                2. CID    4. Parole    6. CPS    8. ABC    *DTF*

**EUREKA POLICE DEPARTMENT**                                          **HC08-040**
604 C STREET    EUREKA, CA                                            PAGE #

stood by with the male while I walked through to the kitchen. I was walking past the
male subject when he got up from the chair that I had placed him in and shifted over to
the couch. I quickly walked to the male's right side and Officer Kalis assisted me in
detaining the male in handcuffs. I searched the couch area before seating the male back
down. I had the female sit down in the living room where Officer Kalis could watch
both subjects. I noticed that there was a small patch of what appeared to be fresh blood
on the female's shirt but I did not initially see where the blood was coming from.

I quickly cleared the kitchen and a room (possible laundry room) off the back of the
kitchen. I smelled the odor of marijuana in the laundry room, particularly when I
opened the door of a closet on the east wall of the room, but continued the protective
sweep for possible suspects. I located a door that led from the laundry room into the
garage but did not enter the garage by my self. I then went into the bedroom and
bathroom checking for possible additional subjects.

There was a baby sitting in a baby rocker/swing just inside the doorway at the foot of
the bed.

I cleared a closet that was beside the bed and then knelt down to look under the bed. I
placed my left hand on the bed and leaned down to look under the bed. My left hand
landed on a hard object hidden under the blanket that I immediately thought was the
stock of a gun. I flipped the blanket back and revealed numerous firearms and
ammunition lying on the bed under the blanket. There were two automatic assault type
weapons, a shotgun, a lever action rifle and several handguns laying on the mattress and
the butts of at least two more handguns visible between the mattress and box spring.

I immediately walked into the living room, detained the female in handcuffs and advised
Kalis of the guns. I still had not cleared the garage (accessed from the laundry room)
and the attic accessed from a closet right next to the bed. I radioed for additional units
to assist in clearing the remainder of the house. As I handcuffed the female I saw blood
on her wrist and a small amount dripping down her fingers but I did not have the time to
determine the extent of the injury. I radioed for medical aide to respond code 2 for the
female.

Officer Jones and Officer Whitmer arrived on scene and we cleared the garage and the
attic. In the laundry room closet, where I had noticed the odor of marijuana, there were
two garbage cans. One of the garbage cans did not have a lid on and I saw that it was
full of gallon sized clear plastic bags full of marijuana buds. There was a set of balance
type scales in plain view on the shelf above the garbage cans.

OFFICER: ALTIC    IBM# 0484    03/18/2008              APPROVED

| | | | | | |
|---|---|---|---|---|---|
| ..Cleared by Arrest | 6. Documentation | 11. Cleared Recovery | 16. To Property clerk | 21. Cleared Crt. Bk |
| .Cited and Released | 7. Cleared: Admin | 12. Cleared Partial Recovery | 17. To D.A. | 22. Cleared Extradition |
| ..Booked Cited Released | 8. Open | 13. Cleared: Other Agency | 18. To Other Agency | 23. CID |
| ..PC849b | 9. Closed | 14. Cleared Restitution | 19. Owner Notified | 24. NOP |
| .Unfounded | 10. Suspended | 15. Warrant Request | 20. Medical Release Needed | 18 |

DISTRIBUTION    1. Briefing    3. D.A.    5. Probation    7.Coroner  9. Other      | COPIED BY
                2. CID        4. Parole  6. CPS        8. ABC    DTF

**EUREKA POLICE DEPARTMENT**                                    **HC08-040**
604 C STREET      EUREKA, CA                                    PAGE #

Officer Whitmer took photographs of the weapons as they were positioned prior to officers making the weapons safe. I was advised later that all of the weapons were loaded, with rounds in the chamber, with the exception of one of the revolvers. Whitmer took photos of the apartment and the vehicles outside. I took photos of the male suspect and the marijuana and scales.

I unhandcuffed the female and allowed her to hold the baby while she sat in a patrol vehicle waiting for the ambulance to arrive. The cut on the female's wrist did not appear to be severe but I allowed the ambulance to continue and evaluate. There was a small cut on one of the female's fingers that she later told interpreters had occurred while she was cleaning. I later saw that the female had scars on her wrists from prior cuts that appeared similar to the current wrist injury. I learned that the parents also had a 4 year old daughter who was at the Alice Birney Head Start Preschool.

Officer Whitmer contacted DTF and I had dispatch contact CWS and advise them that both parents were in custody and that I was placing the children into protective custody.

DTF arrived and I advised Agent Gary Bates on the incident up to that point. I arrested the female (Toledo-Paz, Esmeralda – DOB 01-05-81) and arranged for CWS to respond for the children.

DTF handled the case against the male (Villegas, Jose  aka Villanueva, Leopoldo,  DOB 09-10-76,  HC08-040)

CWS social workers Amanda Winstead and Laura Power arrived on scene and took custody of the baby (Toledo, Miguel - DOB 08-06-07). Power acted as interpreter. CWS also told me that they would be going to Alice Birney and picking up the daughter (Toledo, Amy  -  DOB 08-21-03) I called Alice Birney and advised them of the arrangement.

Esmeralda asked Power why she was being arrested and her children were being taken and Power interpreted for me. I told Esmeralda, through Power, that she was being arrested for child endangerment because of the loaded firearms within reach of the children and because of the drugs within the house which created dangerous situations such as the risk of home invasion robberies. Esmeralda told Power that she did not know about the drugs and guns.

Although the baby, Miguel  -  8 months of age, was in a child swing at the time of the incident the weapons were accessible to a child who could pull themselves up and stand against furniture. The 4 year old daughter was at preschool at the time but she lives at 1911 Hilfiker #20 with her parents and is exposed to the same conditions.

OFFICER: ALTIC      IBM# 0484      03/18/2008          APPROVED

| | | | | | |
|---|---|---|---|---|---|
| 1.Cleared by Arrest | 6. Documentation | 11. Cleared Recovery | 16. To Property Clerk | 21. Cleared Crt. Bk |
| 2.Cited and Released | 7. Cleared: Admin | 12. Cleared Partial Recovery | 17. To D.A. | 22. Cleared Extradition |
| 3.Booked Cited Released | 8. Open | 13. Cleared: Other Agency | 18. To Other Agency | 23. CID |
| 4.PC849b | 9. Closed | 14. Cleared Restitution | 19. Owner Notified | 24. NOP |
| 5.Unfounded | 10. Suspended | 15. Warrant Request | 20. Medical Release Needed | 18 |

DISTRIBUTION   1. Briefing   3. D.A.   5. Probation   7.Coroner 9. Other | COPIED BY
                           2. CID       4. Parole   6. CPS       8. ABC    DTF

**EUREKA POLICE DEPARTMENT**                                   **HC08-040**
604 C STREET     EUREKA, CA                                      PAGE #

I transported Esmeralda to the HCCF and booked her for PC 273a.

DTF stood by with Villegas while they waited for their warrant. I returned later in the afternoon and transported Villegas/Villanueva to the HCCF and booked him for multiple weapons violations and H&S charges (listed above) – see DTF case number HC08-040)

See attached photographs. Photos taken by EPD officers were booked into EPD evidence under associated case number 3C08-2057.

**DISPOSITION:**   Forward to DTF ᴛᴏ
                   Attach to Original Report

CONTROLLED/CONFIDENTIAL

OFFICER: ALTIC    IBM# 0484    03/18/2008              APPROVED

| | | | | | |
|---|---|---|---|---|---|
| ..Cleared by Arrest | 6. Documentation | 11. Cleared Recovery | 16. To Property Clerk | 21. Cleared Crt. Bk |
| ..Cited and Released | 7. Cleared: Admin | 12. Cleared Partial Recovery | 17. To D.A. | 22. Cleared Extradition |
| ..Booked Cited Released | 8. Open | 13. Cleared: Other Agency | 18. To Other Agency | 23. CID |
| ..PC849b | 9. Closed | 14. Cleared Restitution | 19. Owner Notified | 24. NOP |
| ..Unfounded | 10. Suspended | 15. Warrant Request | 20. Medical Release Needed | 18 |

| DISTRIBUTION | 1. Briefing | 3. D.A. | 5. Probation | 7.Coroner 9. Other | COPIED BY |
|---|---|---|---|---|---|
| | 2. CID | 4. Parole | 6. CPS | 8. ABC  DTF | |

# EXHIBIT B

BARRY J. PORTMAN
Federal Public Defender
NED SMOCK
Assistant Federal Public Defender
555 - 12th Street
Suite 650
Oakland, CA 94607-3627
Telephone: (510) 637-3500

Counsel for Defendant Villegas-Villanueva

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | No. CR-08-0230 CRB |
|---|---|---|
| Plaintiff, | ) | DECLARATION OF LEOPOLDO VILLEGAS-VILLANUEVA |
| vs. | ) | |
| JOSE LEOPOLDO VILLEGAS-VILLANUEVA, | ) | |
| Defendant. | ) | |

I, Leopoldo Villegas-Villanueva, declare the following to be true under penalty of perjury:

1. On March 17, 2008, at approximately 9:15 a.m., I was in my bedroom with my partner, Esmeralda Toledo-Paz. The curtains on the front window in the living room were closed. I remember this because I looked at the window from the outside to see whether the curtains were closed when I got home from the store before this incident occurred.

2. We heard someone pounding on the front door very loudly. I did not hear anyone knocking on the kitchen door. I asked Esmeralda to get the door. I recall that the door to our bedroom was open at the time, and Esmeralda did not come in and out of the bedroom door.

3.  When Esmeralda opened the front door, the chain remained attached to the door frame, preventing the door from opening completely.  The police officer immediately started trying to push the door open. The officer told us to open the door or he was going to break in as he continued to push on the door and tried to get the chain off.  I went to the door and took the chain off because it was clear that the officer would break the chain off the door if I did not release the chain.

4.  When the officer came into our apartment, he ordered me to sit down, and when I got up to ask why he was searching the apartment, he handcuffed me.  He and other officers then proceeded to search the entire apartment.

5.  After the officers found the contraband, they kept me sitting in a chair in the living room, still handcuffed.  After what seemed like an hour or two, an FBI agent who I learned was named Special Agent Fagetan came in and sat in the room with me.  Special Agent Fagetan began to talk to me, and we were in the same room talking for a long time.  I wasn't able to keep close track of time, but it seemed like as much as two or three hours.  During some of our conversation, he asked me about things unrelated to my charges, like scorpions I have in plastic on my wall.  At one point, he asked me to guess how much money he makes per year.

6.  Special Agent Fagetan told me that the items they found in the apartment meant I was going to be in a lot of trouble.  I remember him telling me that the silencer that they found carries a sentence of ten years.  He asked me where my "stash" was, which I assumed meant he was asking where I was hiding illegal contraband.  I asked him at one point if he enjoyed seeing me in handcuffs.  He said that he did not, but that "I hate what you do."

7.  Special Agent Fagetan also asked me if I wanted to help myself.  He encouraged me to talk to him or other agents about what I know about illegal activity.  He told me that I could make a telephone call to set up a narcotics transaction with someone for them.  I remember him asking me about one particular individual I assumed must have been involved in narcotics trafficking.

1    8.    Neither before or during this conversation did anyone inform me that I had a right to have a

2    lawyer present during any questioning or that I had a right to remain silent.  Once I was

3    informed of those rights, I asked that I be provided a lawyer and told the officers that I did

4    not want to talk to them.

5

6    7 / 9 / 08                                    Leopoldo Villegas V

     DATED                                         JOSE VILLEGAS-VILLANUEVA

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Motion to Suppress Evidence                                3

# EXHIBIT C

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/21/2008

     As part of writer's ongoing participation on the Humboldt County Drug Task Force (HCDTF), writer assisted in the arrest and search warrant of Jose Leopoldo Villegas Villanueva, born September 10, 1976, at the address of 1911 Hilfiker Lane Apartment #20, Eureka, California.  An ounce of methamphetamine, 28 pounds of marijuana, and six firearms were seized during the search. Villanueva was arrested without incident and transported to Humboldt County Detention Facility.  All items of evidence in this matter are being maintained by (HCDTF).

     Prior to, and during the search of 1911 Hilfiker Lane, Apartment #20, Eureka, California, SA Dan Fagetan was assigned to watch over Juan Lopez Ontiveros.  During this time period, Ontiveros made numerous unsolicited pre-Miranda statements.

     Juan Lopez Ontiveros provided SA Dan Fagetan with his true name of Jose Leopoldo Villegas Villanueva.  Villanueva stated that law enforcement would eventually learn his true identity when they booked him at the jail.

     Villanueva stated that he remembered SA Fagetan from an incident that occurred at the Flamingo Motel, Eureka, California. Villanueva stated that SA Fagetan made a statement to the effect that Villanueva is a drug dealer and should get out of his town. SA Fagetan advised Villanueva that he made no such statement.

     Villanueva stated that his girlfriend, Esmiralda,(the one living with him at 1911 Hilfiker Lane, Apartment #20) called 911 after they had an argument regarding his other girlfriend. Villanueva attempted numerous times to dissuade Esmiralda from calling 911.  Villanueva said that Esmiralda was unaware of the consequences of calling 911.  Villanueva stated that his other girlfriend's vehicle was parked outside of his residence. Villanueva knew Esmiralda and his girlfriend from his hometown in Mexico.  Villanueva believes his girlfriend is expecting a child.

     Villanueva requested that he be able to see Esmiralda and his infant son before he was taken to jail.  SA Fagetan advised Villanueva that he would attempt to accommodate his request at the appropriate time.  A short time after Villanueva's request, Social Service employees entered the residence with Esmiralda and her

Investigation on    03/17/2008    at  Eureka, California

File # 4-SF-142909

Date dictated    03/21/2008

by    SA Dan Fagetan

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

V V00001

FD-302a (Rev. 10-6-95)

92C-SF-139127

Continuation of FD-302 of ___ Jose Leopoldo Villegas Villanueva ___ , On 03/17/2008 ___ , Page ___ 2 ___

infant son. The Social Service employees made arrangements with Esmiralda and Villanueva for their children to be taken care of. Esmiralda and one of the Social Service employees provided the infant son with a type of breathing treatment. As the Social Service employees were leaving the residence with Villanueva's son, SA Fagetan allowed Villanueva the opportunity to kiss his infant son. Esmiralda was escorted from the residence by a Eureka Police Department Officer just moments after the Social Service employees left with the infant son. Almost immediately after Esmiralda left the residence, Villanueva gestured towards his bedroom, and stated that all the items discovered there belonged to him, and not to Esmiralda. Villanueva stated numerous times that he knew the firearms were going cause him a great deal of trouble.

Villanueva stated on numerous occasions that he was uncomfortable with his hands handcuffed behind his back. SA Fagetan made arrangements for another Humboldt County Drug Task Force Agent to observe Villanueva while SA Fagetan obtained a pair of leg-cuffs from his vehicle. SA Fagetan and two other Task Force Agents placed Villanueva in leg-cuffs and hand-cuffed Villanueva in the front.

Villanueva stated he would be willing to cooperate only if he could first receive a promise in writing. SA Fagetan advised he could not provide such a promise. Villanueva stated he could not cooperate against drug dealers in and around the Eureka, Humboldt County vicinity. Villanueva stated that these drug dealers knew his family members in Mexico, and his cooperation against these individuals might jeopardize the safety of his family members. Villanueva stated he would only talk to SA Fagetan.

**EXHIBIT D**



**EXHIBIT E**

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT

| Investigation Title VILLEGAS-VILLANUEVA, JOSE | Report Type OPENING/CLOSING ARREST | Invest. Number HC08-040 |
|---|---|---|
| Report # 1 | Responsible Agent M. Kirkpatrick | Reporting Agent M. Kirkpatrick | Date 03-17-2008 |

**SUMMARY:**

On 03-17-2008, Agents from the Humboldt County Drug Task Force (HCDTF) obtained and executed a search warrant at 1911 Hilfiker Lane, Apartment 20, Eureka, California. During the search of the apartment, approximately 14,338 grams gross (approximately 31.5 pounds) of dried processed marijuana buds in individual bags, digital and triple-beam scales, packaging material, suspected pay and owes, a loaded Marlin 30-30 rifle, a loaded Maadi Co 7.62x39mm assault rifle, a Cobray 9mm machine-pistol (assault weapon), a suppressor (silencer), two Smith & Wesson .38 caliber pistols, one loaded, a loaded Remington 12-gauge pump shotgun, a hide-a-can containing 28.6 grams of suspected methamphetamine, and indicia for suspects were located and seized in the apartment.

The Remington 870 shotgun came back stolen in a Eureka Police Department burglary investigation (3C05-3897).

Jose VILLEGAS-VILLANUEVA was arrested and is a convicted felon. VILLEGAS-VILLANUEVA was arrested for 11359 H&S, 11378 H&S, 11370.1 H&S, 12022(c) P.C, 12280(b) P.C., 12520 P.C., 12021(a) P.C., 496(a) P.C. and 273a P.C. VILLEGAS-VILLANUEVA's, girlfriend Esmiranlda TOLEDO-PAZ, was also located in the residence and arrested for 11359 H&S, 11378 H&S, 11370.1 H&S and 273a P.C.

VILLEGAS-VILLANUEVA and TOLEDO-PAZ are illegal aliens and immigration holds were placed on them. VILLEGAS-VILLANUEVA and TOLEDO-PAZ's children were placed in protective custody.

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                     Page No. 2

Invest. Title: VILLEGAS-VILLANUEVA, JOSE     Invest. No. HC08-040

DETAILS OF INVESTIGATION:

1.  On 03-17-2008 around 1020 Hours, Humboldt County Drug Task
    Force (HCDTF) Special Agent Supervisor (SAS) Jack Nelsen
    received a telephone call from Eureka Police Department (EPD)
    asking for assistance with a investigation at 1911 Hilfiker
    Lane, Apartment 20, Eureka, California.  SAS Nelsen was told
    by EPD that officers had responded to a 9-1-1 call at 1911
    Hilfiker Lane, Apartment 20, Eureka, and that during their
    investigation, they found a large amount of marijuana and
    firearms.  SAS Nelsen told EPD that the HCDTF would be
    responding to assist them.

2.  Around 1034 hours, HCDTF SAS Nelsen, Agents David Miller, Dan
    Fagetan, Gary Bates, Cyrus Silva, Ryan Richardson and I
    arrived at the apartment.  After arrival, I met with EPD
    Officer Louis Altic.  Officer Altic told me Eureka Police
    Officer Daniel Kalis, his recruit Drake Goodale, and he
    received a call for service regarding a 9-1-1 call.  Officer
    Altic told me when the call came into the communications
    center, there was nothing heard and the caller hung up.  The
    9-1-1 call came from 1911 Hilfiker, Apartment 20, Eureka.

3.  Officer Altic told me that upon their arrival, he knocked on
    the front door of Apartment 20, and after a minute or two, a
    Mexican female (later identified as Esmeralda TOLEDO) opened
    the door.  Officer Altic told me when TOLEDO opened the door,
    it would not fully open because the inside chain on the door
    was being used.  Officer Altic told me he could see a Mexican
    male adult (later identified as Juan Lopez ONTIVEROS) behind
    TOLEDO.  Officer Altic told me that he told TOLEDO and
    ONTIVEROS about the 9-1-1 call and that he needed to come in
    to make sure no one was in the need of assistance.  Officer
    Altic told me ONTIVEROS walked back towards a bedroom from the
    living room area, and Officer Altic told them he was coming in
    to make sure no was in need of assistance.  Officer Altic told
    me he told ONTIVEROS to come back and remove the chain or he
    was going to force the door in.

V V00010

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 3

Invest. Title:  VILLEGAS-VILLANUEVA, JOSE      Invest. No. HC08-040

4.   Officer Altic told me ONTIVEROS slowly walked back to the
     front door and removed the chain.  Officer Altic told me he
     and Officer Kalis went into the residence to make sure no one
     else was in the residence that needed assistance.

5.   Officer Altic told me once inside the residence he placed
     handcuffs on ONTIVEROS to detain him.  Once ONTIVEROS was
     detained, he and Officer Kalis checked the residence for any
     other person(s) to see if they needed assistance.

6.   Officer Altic told me when he checked the bedroom closet, and
     then as he kneeled down to look under the bed, he placed one
     hand on top of the bed.  Once he placed his hand on the bed,
     he felt a hard object under the covers.  Officer Altic didn't
     find anyone under the bed, but when he pulled back the cover
     on top of the bed, he saw several firearms (pistols and
     rifles).

7.   Officer Altic told me he and Officer Kalis continued to check
     the apartment, and upon him walking into the kitchen area, he
     could smell a strong odor of green marijuana.  Officer Altic
     told me when he checked a closet door near the dining room
     area, he saw a garbage can approximately ¾-full of dried
     marijuana in clear bags.

8.   Officer Altic told me EPD Officer Jones arrived at the
     apartment to assist and was able to make sure no one was in
     need of assistance in the attached garage.  Officer Altic told
     me in the garage was a blue pickup with California license
     8M50022.

9.   TOLEDO was placed into a marked EPD unit and ONTIVEROS was
     left handcuffed in the apartment.

10.  Officer Altic told me for officer safety, Officer Jones
     unloaded the firearms located on the bed.

11.  Officer Altic told me Officer Kalis had patrolled this area by
     the apartment complex prior to the 9-1-1 service call coming

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 4

Invest. Title:  **VILLEGAS-VILLANUEVA, JOSE**    Invest. No. HC08-040

out and he saw ONTIVEROS exiting the silver four-door Acura, California license 4ZGT344, carrying a package of Huggies.

12.  I saw a black Chevrolet Silverado, California license 8A63962, and a gold Jeep Grand Cherokee, California license 3SYB555, parked in the carport for Apartment 20.

13.  I requested a vehicle registration check on California licenses 4ZGT344, 8A63962, 8M50022 and 3SYB555. California license 4ZGT344 came back to a 2001 Acura four-door, registered to Abelardo Gonzalez, 5 Newell Ct., Apt 5304, Palo Alto. California license 8A63962 came back to a 1992 Chevrolet, registered to Juan Ontiveroslopez, P.O. Box 3138, Eureka. California license 8M50022 came back to a 1990 Chevrolet, registered to Juan Lopez Ontiveros, P.O. Box 3138, Eureka. California license 3SYB555 came back to a 1994 Jeep, registered to Regina Cruz Hurtado, 1344 F Street, Eureka California.

14.  Agent Richardson told me he met with TOLEDO and she had a cut on her wrist. TOLEDO told Agent Richardson that she was cleaning the bathroom. TOLEDO told Agent Richardson she called 9-1-1 because one of her children was sick.

15.  After talking with Officer Altic and Agent Richardson, I left to prepare a search warrant and affidavit for search warrant.

16.  I had Agents Miller, Silva, Fagetan, Agent Bates and EPD officers stand-by at the apartment until I was able to obtain a search warrant. It should be noted the Mexican male who was located in the apartment was being detained in the apartment while I was obtaining a search warrant for the apartment. Officer Altic had placed the TOLEDO under arrest for 273a P.C. and contacted Humboldt County Child Welfare Services (CWS) regarding taking the children into protective custody.

17.  I prepared a search warrant and affidavit for search warrant. I sent the search warrant and affidavit for search warrant via e-mail to Humboldt County Deputy District Attorney (DDA) Maggie Fleming to review the search warrant and affidavit for

V V00012

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 5

Invest. Title: VILLEGAS-VILLANUEVA, JOSE        Invest. No. HC08-040

search warrant.  DDA Fleming reviewed the search warrant and affidavit for search warrant.

18.  After having the search warrant and affidavit for search warrant reviewed, I drove to the Humboldt County Superior Court to attempt to meet with a Humboldt County Superior Court Judge to have the search warrant and affidavit for search warrant reviewed and signed.  Upon arrival at the Humboldt County Superior Court, I found all the Humboldt County Superior Court Judges were on the bench and I would have to wait.  Around 1405 hours, I met with Humboldt County Superior Court Judge Bruce Watson.  I gave Judge Watson the search warrant and affidavit for search warrant for him to review. Judge Watson read the search warrant and affidavit for search warrant and then signed them.  The search warrant was signed at 1416 hours.

19.  After having the search warrant signed, I telephoned and talked with Agent Bates.  I told Agent Bates the search warrant had been signed for the apartment, all the vehicles at the apartment, and Ontiveros and TOLEDO's person.  I asked Agent Bates if he could start by taking outside and inside digital photographs of the apartment, vehicles parked outside of the apartment and in the garage.  I told Agent Bates that I should be at the location after he was finished taking the photographs.

20.  Upon my arrival, I met with Agent Bates and he told me he took the digital photographs as I requested.  Once the digital photographs were taken, we conducted a search of the apartment.

21.  During the search of the apartment, I found several firearms lying on the master bedroom floor along with other items of evidence.  The firearms had been placed on the floor after EPD Officer Jones unloaded them and made sure they were safe to handle.  All the firearms were originally located on top of the bed in the master bedroom.  Located on the bedroom floor was a Marlin 30-30 rifle (Exhibit 001-1000 ), when found, it was loaded with one cartridge in the chamber and five in the magazine); a silver Smith & Wesson .38-caliber pistol (Exhibit

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 6

Invest. Title: **VILLEGAS-VILLANUEVA, JOSE**     Invest. No. HC08-040

001-1001), when found, it was loaded with six cartridges); a
blue Smith & Wesson pistol (Exhibit 001-1002), when found, it
was unloaded); a black Cobray 9mm machine pistol with a laser
and outside area of barrel threaded (Exhibit 001-1003), when
found, it was loaded with one cartridge in the chamber and 29
cartridges in the magazine; a Maadi Co pistol-grip 7.62 x 39mm
semi-automatic rifle (Exhibit 001-1004), when found, it was
loaded with one cartridge in the chamber and 29 cartridges in
the removable magazine; a black Remington 870 12-gauge shotgun
(Exhibit 001-1005), when found, it was loaded with four shells
in the magazine; a silver suppressor (silencer) (Exhibit 001-
1003B), when found, it was between the mattress of the master
bed; miscellaneous live cartridges and shells (Exhibit 001-
1006), when found, they were on top of the master bed with the
firearms.

22.  Continuing to search the master bedroom, I found a green
notebook (Exhibit 001-1007).  Agent Richardson said it
contained suspected pay and owe records in Spanish.  A
Motorola cellular telephone (Exhibit 001-1009), a Squirt hide-
a-can containing 28.6 grams gross of suspected methamphetamine
(Exhibits 001-1009 and 001-1009A), two digital scales,
indicia, miscellaneous paperwork, and photographs (Exhibits
001-1010), Resident Alien card, Social Security Card, Mexico
passport, and not a government identification card, all for
TOLEDO (Exhibit 001-1011), and miscellaneous paperwork and
indicia (Exhibit 001-1012).

23.  In the bathroom area, I saw a drop of blood.  Digital
photographs were taken.

24.  In the living room/kitchen area, I found indicia for Ontiveros
and a checkbook (Exhibit 001-2000).  In a kitchen drawer
located on the west wall as one walks into the kitchen area,
I saw four boxes of unused clear plastic bags and oven bags
(packaging material).  Digital photographs of these boxes were
taken.

25.  In the second bedroom which was empty, I found in the closet
two black garbage cans containing 14,338 grams gross
(approximately 31.5 pounds) of dried processed marijuana buds

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 7

Invest. Title:  VILLEGAS-VILLANUEVA, JOSE      Invest. No. HC08-040

in individual bags (Exhibits 001-3000 to 001-3000F and 001-3001 to 001-3001Ac), digital scale (Exhibit 001-3000G), and a triple-beam scale (001-3002).

26. In the pickup parked in the garage, California license 8M50022, I found three Six Rivers Property Management rent receipts with the name of Juan on them (Exhibit 001-4000).

27. In Ontiveros' wallet, I found indicia, miscellaneous paperwork, a California driver's license with Ontiveros' name on it and the male who was being detained (Ontiveros) photograph on it (Exhibit 001-5000). On Ontiveros' person, a pager and cellular telephone were located (Exhibit 001-5001).

28. Digital photographs were taken of the items of evidence prior to them being seized pursuant to the search warrant. I filled out a property receipt form for the above items of evidence I seized from the apartment. It should be noted when Agent Fagetan filled out the personal history on the Mexican male, he identified himself as Juan Lopez Ontiveros, but during the search of the apartment, I found a Mexican Voters card with the name of Lepolodo Villegas Villanueva. Agent Fagetan told me after searching the apartment, the Mexican male told him Ontiveros was not his name and his real name is Leopoldo Villegas Villanueva, date of birth 09-10-1976.

29. TOLEDO had already been transported to Humboldt County Correctional Facility (HCCF) and booked for 273a P.C. by Officer Altic.

30. VILLEGAS-VILLANUEVA speaks and understands English. I told VILLEGAS-VILLANUEVA he was under arrest and not free to leave. I told VILLEGAS-VILLANUEVA that prior to me talking with him, I needed to read him his rights, Miranda Warning. I read VILLEGAS-VILLANUEVA his Miranda Rights, per Miranda Card, and after reading him his rights, he told me he wanted to have a lawyer present. I didn't ask VILLEGAS-VILLANUEVA any questions.

31. I gave copies of the property forms to the Mexican male in the apartment along with a copy of the search warrant.

V V00015

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 7

**Invest. Title:  VILLEGAS-VILLANUEVA, JOSE     Invest. No. HC08-040**

in individual bags (Exhibits 001-3000 to 001-3000F and 001-3001 to 001-3001Ac), digital scale (Exhibit 001-3000G), and a triple-beam scale (001-3002).

26.  In the pickup parked in the garage, California license 8M50022, I found three Six Rivers Property Management rent receipts with the name of Juan on them (Exhibit 001-4000).

27.  In Ontiveros' wallet, I found indicia, miscellaneous paperwork, a California driver's license with Ontiveros' name on it and the male who was being detained (Ontiveros) photograph on it (Exhibit 001-5000). On Ontiveros' person, a pager and cellular telephone were located (Exhibit 001-5001).

28.  Digital photographs were taken of the items of evidence prior to them being seized pursuant to the search warrant. I filled out a property receipt form for the above items of evidence I seized from the apartment. It should be noted when Agent Fagetan filled out the personal history on the Mexican male, he identified himself as Juan Lopez Ontiveros, but during the search of the apartment, I found a Mexican Voters card with the name of Lepolodo Villegas Villanueva. Agent Fagetan told me after searching the apartment, the Mexican male told him Ontiveros was not his name and his real name is Leopoldo Villegas Villanueva, date of birth 09-10-1976.

29.  TOLEDO had already been transported to Humboldt County Correctional Facility (HCCF) and booked for 273a P.C. by Officer Altic.

30.  VILLEGAS-VILLANUEVA speaks and understands English. I told VILLEGAS-VILLANUEVA he was under arrest and not free to leave. I told VILLEGAS-VILLANUEVA that prior to me talking with him, I needed to read him his rights, Miranda Warning. I read VILLEGAS-VILLANUEVA his Miranda Rights, per Miranda Card, and after reading him his rights, he told me he wanted to have a lawyer present. I didn't ask VILLEGAS-VILLANUEVA any questions.

31.  I gave copies of the property forms to the Mexican male in the apartment along with a copy of the search warrant.

VV00016

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 8

**Invest. Title: VILLEGAS-VILLANUEVA, JOSE    Invest. No. HC08-040**

32.   I filled out booking and probable cause forms.   I placed
      VILLEGAS-VILLANUEVA under arrest for 11359 H&S, 11378 H&S,
      11370.1 H&S, 11366.5(a) H&S, 12022( c) P.C., 12280(b) P.C.,
      12520 P.C. and 273a P.C.

33.   It should be noted that the suspects' children had access to
      the loaded firearms and suspected methamphetamine.  The eight-
      month-old child was in a swing at the time of incident.  The
      firearms were accessible to a child who could pull themselves
      up and stand against furniture.  The four-year-old child was
      at preschool at the time of the incident, but lives at 1911
      Hilfiker Lane, Apartment 20, Eureka with her parents.  Located
      in the master bedroom are the children's beds.  The suspected
      methamphetamine was located in the master bedroom headboard
      drawer in a Squirt hide-a-can with the lid undone.  The drawer
      had no lock.

34.   EPD Officer Altic transported VILLEGAS-VILLANUEVA to the HCCF
      for booking.  It should be noted that I placed on the booking
      form to confirm VILLEGAS-VILLANUEVA's identity.

35.   Prior to leaving the apartment, exit digital photographs were
      taken, and I made sure the doors to the apartment were locked.

36.   I telephoned Humboldt County Sheriff's Office and asked them
      to run the six firearms I had seized at 1911 Hilfiker Lane,
      Apartment 20, Eureka.  I was advised that the Remington 870
      shotgun (Exhibit 001-1005) came back stolen in an EPD burglary
      investigation (3C05-3897).  The rest of the firearms came back
      not stolen and not registered.  The two assault weapons
      (Exhibits 001-1003 and 001-1004) are not registered assault
      weapons.  I asked the communications center to place a locate
      on the shotgun.  I later contacted EPD and obtained a copy of
      the burglary investigation regarding the shotgun being stolen
      (EPD case number 3C05-3897).  I later received a copy of EPD
      case number 3C05-3897 and attached it to this investigation
      report.

37.   I received a telephone call from HCCF Correctional Officer
      (CO) Stan  Wickham.   CO Wickham told me the Mexican male's
      true name is Jose VILLEGAS-VILLANUEVA, date of birth 09-10-

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 9

Invest. Title: **VILLEGAS-VILLANUEVA, JOSE**    Invest. No. HC08-040

1976. CO Wickham told me VILLEGAS-VILLANUEVA has assumed the identity of Juan Lopez Ontiveros. CO Wickham told me VILLEGAS-VILLANUEVA has been identified by fingerprints and photograph as VILLEGAS-VILLANUEVA. CO Wickham told me the female Officer Altic brought in earlier (TOLEDO) was identified as Esmiranlda TOLEDO-PAZ. CO Wickham told me VILLEGAS-VILLANUEVA and TOLEDO-PAZ are illegal aliens and he has placed immigration holds on them.

38.  I ran a criminal history on Jose VILLEGAS-VILLANUEVA and it came back that he is a convicted felon for 245(a)(2) P.C., and upon an NCIC check, VILLEGAS-VILLANUEVA is a deported criminal/aggravated felon.

39.  Based on this information and the shotgun being stolen, I asked CO Wickham to add charges of 12021(a) P.C. and 496(a) P.C. on VILLEGAS-VILLANUEVA. TOLEDO-PAZ was arrested for 273a P.C. by Officer Altic. I am asking TOLEDO-PAZ be charged with 11359 H&S, 11378 H&S, 11370.1 and 11366.5(a) H&S.

40.  On 03-13-2008 around 1300 hours, I conducted function tests on the six firearms located and seized in this investigation (Marlin 30-30 rifle, Exhibit 001-1000; silver Smith & Wesson .38-caliber pistol, Exhibit 001-1001; blue Smith & Wesson .38-caliber pistol, Exhibit 001-1002; black Cobray 9mm machine pistol, Exhibit 001-1003; Maadi Co 7.62 x 39mm rifle, Exhibit 001-1004; and Remington 12-gauge shotgun, Exhibit 001-1005.) Based on the function test, I found all these firearms fired and are functional firearms. The safety on Marlin, Cobray, Maadi, and Remington all work. The Smith & Wesson pistols don't have safety switches. It should be noted that I put the suppressor (silencer) (Exhibit 001-1003B) on the Cobray when firing, and it suppressed the gunshot noise. Also, the laser affixed to the Cobray works.

41.  On 03-18-2008 around 1100 hours, I conducted a presumptive test on the suspected methamphetamine (Exhibit 001-1009A) and it screened positive for methamphetamine. I conducted the presumptive test as I have been trained, and followed the directions in the color screening kit provided by California Department of Justice. There were no problems with the test.

V V00018

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 10

Invest. Title: **VILLEGAS-VILLANUEVA, JOSE**    Invest. No. HC08-040

I filled out a controlled substances screening report regarding the presumptive test I conducted.

42. I later booked all the exhibits into evidence and they were later transported to EPD and released to the evidence section. EPD Officer's Altic investigation number for his investigation is 3C08-2057. I obtained a copy of his investigation report and attached it to this investigation report. Firearms were located and seized in this investigation. Firearms forms were filled out and attached to this investigation. All firearms were entered into AFS as being seized as evidence by the HCDTF.

**PHYSICAL DESCRIPTIONS:**

1. VILLEGAS-VILLANUEVA, Jose - see personal history form.

2. TOLEDO-PAZ, Esmiralda - see personal history form.

**EVIDENCE LIST:**

Finder:  Kirkpatrick            Recorder:  Kirkpatrick

Photographs Taken:  Yes - Bates      Number:  118

Firearms Seized:  Yes - 6           Stolen?  Yes - one

All evidence will be stored at the Eureka Police Department evidence storage facility unless noted below.

The following items of evidence were located and seized in the residence located at 1911 Hilfiker Lane, Apartment 20, Eureka, California.

V V00019