1  JOSEPH P. RUSSONIELLO (CNB 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CABN 163973)
3  Chief, Criminal Division

4  DEREK R. OWENS (CABN 230237)
   Assistant United States Attorney
5
       450 Golden Gate Avenue, 11th Floor
6      San Francisco, California  94102
       Telephone:  (415) 436-6488
7      Fax:  (415) 436-7234
       Email: Derek.Owens@usdoj.gov
8
   Attorneys for Plaintiff
9
                  IN THE UNITED STATES DISTRICT COURT
10
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
11
                     SAN FRANCISCO DIVISION
12

13  UNITED STATES OF AMERICA,           )    No. CR 08-0230 MAG
                                        )
14          Plaintiff,                  )    UNITED STATES' RESPONSE TO
                                        )    DEFENDANT'S MOTION TO SUPPRESS
15     v.                               )    EVIDENCE
                                        )
16  JOSE LEOPOLDO VILLEGAS-             )    Date: August 6, 2008
    VILLANUEVA,                         )    Time: 10:00 a.m.
17                                      )    Court: Hon. Charles R. Breyer
            Defendant.                  )
18  _____)
                                        )
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. The 911 Call and Emergency Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B. The Emergency Entry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    C. The Emergency Search . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    D. The Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    E. The Conversation Between Special Agent Fagetan and the Defendant . . . . . . . . . . 6

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A. The Officers' Entry into 1911 Hilfiker Lane, Apartment 20 Was a Valid Search
       Under the Emergency Exception to the Warrant Requirement. . . . . . . . . . . . . . . . 6

       1. The circumstances of the 911 call and the scene at the apartment justified
          the officers' entry as an emergency search. . . . . . . . . . . . . . . . . . . . . . . . . . 7

       2. The officers confined the scope and manner of their warrantless search to
          what was required by the circumstances of the emergency. . . . . . . . . . . . . . . 12

    B. The Discoveries of the Firearms and Marijuana from Positions Where Officer Altic
       Was Entitled to Be Were Valid Under the Plain View Doctrine and Variations
       Thereof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       1. Officer Altic had probable cause to seize the firearm he felt inadvertently while
          conducting a lawful emergency search. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       2. Officer's Altic's observations of the presence of marijuana in the residence
          while conducting a lawful emergency search provided him with
          probable cause to search further, to seize the marijuana, and to arrest the
          defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    C. The Firearms in the Bedroom, if Not Found During the Emergency Search, Would
       Have Been Inevitably Discovered During a Search of the Apartment Pursuant to a
       Warrant Based on the Observation and Smell of Marijuana in the Residence. . . . . 18

D. The Defendant's Statements to Special Agent Fagetan Before the Onset of Interrogation Were Not Obtained in Violation of the Defendant's Fifth Amendment Rights and, Therefore, Should Not Be Suppressed. . . . . . . . . . . . . . . . . . . . . . . . . . 21

    1. Defendant's statements regarding his true identity and the details surrounding the 911 call were voluntarily given and not obtained through interrogation. . . . 21

    2. Defendant's statements to Special Agent Fagetan following Fagetan's observation of the firearms seized were voluntarily given and not obtained through interrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

PAGE

## FEDERAL CASES

*Arizona v. Hicks,*
    480 U.S. 321 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Beaty v. Stewart,*
    303 F.3d 975 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Brigham City v. Stuart,*
    547 U.S. 398 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 13

*Fernandez v. United States,*
    321 F.2d 283 (9th Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Harris v. United States,*
    390 U.S. 234 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17, 18

*Madeiros v. Shimoda,*
    889 F.2d 819 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Maryland v. Buie,*
    494 U.S. 327 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Minnesota v. Dickerson,*
    508 U.S. 366 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Miranda v. Arizona,*
    384 U.S. 436 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Nix v. Williams,*
    467 U.S. 431 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Oregon v. Elstad,*
    470 U.S. 298 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Rhode Island v. Innis,*
    446 U.S. 291 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Shedelblower v. Estelle,*
    885 F.2d 570 (9th Cir. 1989), *cert. denied*, 498 U.S. 1092 (1991) . . . . . . . . . . 23, 24

*Terry v. Ohio,*
    392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States v. Barron,*
    472 F.2d 1215 (9th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Andrade*,
    784 F.2d 1431 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Booth*,
    669 F.2d 1231 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Bradley*,
    321 F.3d 1212  (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Cervantes*,
    219 F.3d 882 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 15

*United States v. Cohen*,
    481 F.3d 896 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Curran*,
    498 F.3d 30 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Elder*,
    466 F.3d 1090 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Foster*,
    227 F.3d 1096 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Hill*,
    55 F.3d 479 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Holloway*,
    290 F.3d 1331 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Jones*,
    303 F. Supp. 2d 702 (D.Md. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Leazar*,
    460 F.2d 982 (9th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Merriweather*,
    777 F.2d 503 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*United States v. Miles*,
    247 F.3d 1009 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Moreno-Flores*,
    33 F.3d 1164, 1169 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*United States v. Najar*,
    451 F.3d 710 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 12, 13, 16

*United States v. Orso*,
    266 F.3d 1030 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*United States v. Ramirez-Sandoval*,
    872 F.2d 1392 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Richardson,*
    208 F.3d 626 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Ross*,
    456 U.S. 798 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Russell,*
    436 F.3d 1086 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Snipe,*
    515 F.3d 947 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## STATE CASES

*People v. Mitchell,*
    383 N.Y.S.2d 246 (N.Y. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*State v. Frankel,*
    179 N.J. 586, 604 (N.J. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

# I. INTRODUCTION

On July 9, 2008, Jose Leopoldo Villegas-Villanueva ("Villegas-Villanueva" or "the defendant") filed a motion in the above-referenced matter to suppress physical evidence and statements obtained by law enforcement. The United States hereby files its opposition to the defendant's motion.

# II. SUMMARY OF ARGUMENT

The defendant contends that the Court must suppress evidence obtained by officers from Eureka Police Department ("EPD") and agents from the Humboldt County Drug Task Force on March 17, 2008 because of Fourth and Fifth Amendment violations.

The officers' warrantless entry into the defendant's residence was valid under the Fourth Amendment's emergency exception to the warrant requirement. The officers reasonably believed that there was an emergency occurring inside the defendant's apartment based on, among other facts, the following nine factors: 1) Emergency dispatch received a 911 hang-up call from the apartment; 2) they received a busy signal when attempting to return the call; 3) when the officers arrived and attempted to contact the occupants of the apartment, they observed female initially attempt to ignore and avoid the officers by retreating inside the bedroom; 4) it took an inordinate amount of time – more than two minutes – for anyone from the apartment to come to the door after the officers knocked and announced their presence; 5) even when the female eventually came to the door, she kept the chain on the door while interfacing with the uniformed officers; 6) the female did not understand English and could not communicate with officers to confirm or dispel the belief that an emergency was ongoing; 7) the defendant, who does speak and understand English, refused to answer any of the officers' inquiries or provide them with information of any kind relating to the 911 call, including the identity of the caller; 8) the defendant appeared to order the female in Spanish to walk away from the door in a way that reminded Officer Altic of his prior experiences with domestic violence and family disputes; and 9) both occupants turned and walked away from the officers, ignoring their requests for information and assurance that there was no emergency.

Once inside and conducting an emergency search for individuals who might be in danger,

1  the officers discovered contraband through the plain use of their senses.  After securing the
2  residence, the officers used the information they had gathered from the vantage point of their
3  emergency search to secure a warrant to search the entire residence.

4       The defendant made a series of inculpatory statements to Special Agent Daniel Fagetan
5  during the search of the residence by other officers.  While Special Agent Fagetan eventually
6  initiated interrogation of the defendant, the defendant made several incriminating statements
7  before the onset of interrogation as defined by the Supreme Court.  These statements were thus
8  obtained without violating the defendant's Fifth Amendment rights and should not be
9  suppressed.

10      Accordingly, the Court should deny the defendant's motion as to all physical evidence
11  and deny in part as to the defendant's statements.

### III. FACTUAL BACKGROUND

**A. The 911 Call and Emergency Response**

14      On March 17, 2008, at approximately 9:00 a.m., the Eureka Police Department
15  Communications Center received a 911 emergency call originating from 1911 Hilfiker Lane,
16  Apartment #20, Eureka, California ("the apartment").  Decl. of Detective Kalis, attached as
17  Exhibit 1, at VV00052.  The caller said nothing and hung up.  *Id.*  The 911 dispatch operator
18  made two attempts to call the originating residence back; however, both calls were met with
19  busy signals.  *Id.*  Three Eureka Police Department ("EPD") officers, Officers Louis Altic
20  ("Officer Altic") and John Goodale ("Officer Goodale") and Detective Daniel Kalis ("Detective
21  Kalis"), were then dispatched to the apartment at approximately 9:15 a.m.  Ex. 1 ¶ 3;  Decl. of
22  Officer Altic, attached as Exhibit 2, ¶ 3.

**B. The Emergency Entry**

24      After arriving at the apartment, the officers knocked and announced their presence,
25  Officer Altic at the front door and Detective Kalis at the side door.  Ex. 1 ¶ 5; Ex. 2 ¶ 5.  The
26  officers knocked for two minutes before any occupant came to the door.  Ex. 1 ¶¶ 6-7; Ex. 2 ¶¶
27  6-7.  While waiting for a response, Detective Kalis observed through the clear top half of the
28  side door an adult Hispanic female (later determined to be Esmiralda Toledo-Paz, "Toledo-Paz")

open an interior door and look at Detective Kalis. Ex. 1 ¶ 6. Detective Kalis motioned with his hands for Toledo-Paz to come to the door, at which point Toledo-Paz turned abruptly and closed behind her the same door from which she had just emerged. *Id.* Toledo-Paz ultimately opened the front door, though she kept the chain on the door. Ex. 2 ¶ 7. Officer Altic explained to Toledo-Paz, in English, that they were responding to the 911 call from the apartment and asked if there was an emergency. *Id.* Toledo-Paz responded in Spanish and it appeared to the officers that she did not speak English. *Id.*; Ex. 1 ¶ 7.

The officers then saw an adult Hispanic male (later identified as Jose Villegas-Villanueva, "the defendant") behind Toledo-Paz and informed him that there had been a 911 call from the apartment and that the officers needed to come into the apartment to make sure there was no emergency. Ex. 1 ¶ 8; Ex. 2 ¶ 8. The defendant appeared to understand the officers and mumbled something in English that the officers could not understand. *Id.* The defendant then started speaking to Toledo-Paz in Spanish in a way that appeared as if he were directing her to do something or giving her an order to do something. *Id.* Both the defendant and Toledo-Paz then turned and walked away from the door without releasing the chain. *Id.* The defendant walked to the officers' left, toward the same open doorway from which he had just emerged, while Toledo-Paz walked further to the left, beyond the officers' line of vision, toward what the officers later determined was the kitchen. *Id.* Still unaware of the reason for the 911 call and, therefore, concerned for his safety, Altic yelled to the defendant as the defendant walked away, "Stop! Come back and open this door or I am coming through this chain." Ex. 1 ¶ 9; Ex. 2 ¶ 10. The defendant stopped in the doorway of the bedroom, looked into the bedroom, and then returned to the front door and unchained it for the officers. *Id.*

**C. The Emergency Search**

Upon entering the apartment, Officer Altic told the defendant to sit in a specific chair that he had visually checked and determined was safe and free of any weapons or items that could be used against the officers. Ex. 2 ¶ 11. The defendant did not comply with the officers and he got up and moved from the area near the chair. *Id.* The officers responded by handcuffing the defendant for safety purposes and placing him on the couch after Officer Altic checked the couch

1    for dangerous objects.  *Id.*; Ex. 1 ¶ 10.  Officer Altic then found Toledo-Paz in another room and

2    directed her to sit in the living room in a place where Detective Kalis could watch both subjects.

3    Ex. 2 ¶ 11.  At this time, Altic noticed a patch of blood on Toledo-Paz's shirt, though he did not

4    at that time see where the blood was coming from.  *Id.*

5          Officer Altic then walked through the apartment to make sure no one in the apartment

6    needed assistance.  Ex. 2 ¶ 12.  He first walked through the kitchen area and into what appeared

7    to be the laundry room.  *Id.*  As he walked through this room and opened the door of a closet in

8    the room as part of his emergency search, Officer Altic smelled the odor of marijuana.  *Id.* ¶ 13.

9    Instead of investigating the marijuana at this time, however, Altic continued with the protective

10    sweep and walked toward the room where the officers had seen the defendant prior to the

11    officers' entry into the apartment.  *Id.*

12          Upon entering the room, which he determined was the master bedroom, Officer Altic saw

13    a baby sitting in a baby rocker/swing just inside the doorway at the foot of the bed.  *Id.* ¶ 14.

14    After checking the bedroom closet next to the bed, the officer turned to check underneath the

15    bed.  *Id.*  ¶ 4.  As the area underneath the mattress was shielded from view by a skirt of fabric,

16    and as the bed was not propped up high enough for the officer to see underneath without

17    lowering his line of vision, he knelt down to check underneath the bed.  *Id.* ¶ 15; *Id.* at VV0242;

18    *see also* Def. Ex. D.  Not wanting to put both of his hands on the ground and therefore make

19    himself vulnerable to attack, as he leaned down, Officer Altic placed his hand on top of the bed.

20    Ex. 2 ¶ 16.  As he was leaning down to look under the bed, he felt a hard object under a blanket

21    on the bed that he immediately suspected was the stock of a long gun.  *Id.*  Knowing that he had

22    his hand on a firearm, Officer Altic lifted the blanket that was covering it and observed

23    numerous firearms and ammunition on top of the mattress.  *Id.*  In total, he saw two automatic

24    assault weapons, a shotgun, a lever action rifle on the mattress, and two handguns in the visible

25    area between the mattress and box spring.  *Id.* at ¶ 16; *Id.* at VV00166.

26          After making this discovery, Officer Altic returned to the living room, told Detective

27    Kalis to place Toledo-Paz in handcuffs for safety reasons, informed Detective Kalis of the guns

28    found in the bedroom, and radioed for additional assistance in completing the emergency search.

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

1   Ex. 1 ¶ 13; Ex. 2 ¶ 17.  Officer Altic noticed blood on her wrist and a small amount of blood

2   dripping down her fingers.  Ex. 2 ¶ 17.   He immediately radioed for medical assistance for

3   Toledo-Paz, then continued conducting the emergency search.  *Id.*

4        Eureka Police Department Officers Jones ("Officer Jones") and Whitmer ("Officer

5   Whitmer") arrived on the scene shortly thereafter and assisted Officer Altic in completing the

6   emergency search, including searching the garage and attic for persons in need of assistance.  Ex.

7   2 ¶¶ 18-20.  After searching the garage, the officers came back into the apartment through the

8   laundry room.  *Id.* ¶¶ 18-19.  Once there, Officer Altic saw two garbage cans, one of which did

9   not have a lid and was full of gallon-sized clear plastic bags full of suspected marijuana buds, in

10  plain view in the laundry closet from which he had earlier detected the odor of marijuana.  *Id.* ¶

11  19.  Also in plain view in the laundry room closet was a balance-type scale on a shelf above the

12  garbage cans.  *Id.*  The three officers then left the laundry room and proceeded to the bedroom

13  closet, through which they climbed up into the attic.  *Id.* ¶ 20.

14        After the officers completed the emergency search, Officer Whitmer contacted the

15  Humboldt County Drug Task Force ("DTF") (*Id.* ¶ 21), and a short time later, members of the

16  DTF, including FBI Special Agent Dan Fagetan arrived at the apartment.  *See* Report of Agent

17  Marvin Kirkpatrick, attached as Exhibit 4, at VV00010.   Officer Altic described what had

18  transpired at the apartment to Kirkpatrick.  *Id.* at VV00011.  After speaking with several other

19  agents, Kirkpatrick left to prepare a search warrant and affidavit.  *Id.* at VV00012.

20  **D. Search Warrant**

21        After obtaining the search warrant, DTF agents searched the apartment, all of the

22  vehicles at the apartment, and the persons of the defendant and Toledo-Paz.  *Id.* at VV00013-

23  VV00015.  In addition to the assault weapons, the shotgun, the rifle, and the handguns, the

24  agents found controlled substances in the apartment during their search.  *Id.*  The garbage can

25  Altic had observed earlier contained 31.5 pounds of dried, processed marijuana separated into

26  individual bags.  *Id.* at VV00014-VV00015.  Agents also seized the balance-type scale seen

27  earlier on the shelf above the garbage cans.  *Id.*  In the master bedroom, officers recovered

28  approximately 28.6 grams of methamphetamine, two digital scales, suspected drug ledgers, and

1    packaging materials consistent with the possession and distribution of controlled substances. *Id.*

2    at VV00014.

3    **E. Conversation Between Special Agent Fagetan and the Defendant**

4        As other agents were conducting the search pursuant to the warrant, FBI Agent Fagetan

5    was assigned to stay with the defendant in the living room. Decl. of Special Agent Fagetan,

6    attached as Exhibit 3, ¶¶ 5-6. The defendant, who had earlier told officers that his name was

7    Juan Lopez-Ontiveros, told Agent Fagetan that his name was actually Jose Leopoldo Villegas-

8    Villanueva. *Id.* ¶¶ 5, 8. The defendant then explained that Toledo-Paz had called 911 after she

9    and the defendant had argued about the defendant's other girlfriend, whose car was parked

10   outside the apartment. *Id.* ¶ 9. The defendant to Agent Fagetan described how he tried to

11   convince Toledo-Paz not to call 911, as the defendant believed Toledo-Paz did not know the

12   consequences of calling 911. *Id.*

13       About ten to fifteen minutes into their encounter, Agent Fagetan walked into the master

14   bedroom where other officers were searching. *Id.* ¶ 10. He observed an officer securing

15   firearms on the floor and several guns on the bed. *Id.* Agent Fagetan then returned to the living

16   room without saying or doing anything to indicate what he had just seen. *Id.* ¶ 11. When Agent

17   Fagetan walked into the room, the defendant gestured toward the bedroom with his head and

18   stated that he "was in deep shit. I knew that stuff was going to get me in trouble." *Id.* ¶ 12.

19       After the defendant said this, Agent Fagetan told the defendant that he was probably right

20   and began a discussion about possible cooperation with law enforcement. *Id.* ¶ 13. Agent

21   Fagetan did not Mirandize the defendant at this time. Following completion of the search, Agent

22   Kirkpatrick placed the defendant under arrest and read him the *Miranda* warning. Ex. 4 at

23   VV00015. The defendant told Kirkpatrick that he wanted to have a lawyer present, and

24   Kirkpatrick did not ask the defendant further questions. *Id.*

25                              **IV. ARGUMENT**

26   **A. The Officers' Entry into 1911 Hilfiker Lane, Apartment 20 Was a Valid Search Under
     the Emergency Exception to the Warrant Requirement.**

27       "It is a basic principle of Fourth Amendment law that searches and seizures inside a

28

1  home without a warrant are presumptively unreasonable. . . .  Nevertheless, the warrant

2  requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)

3  (citations omitted) (upholding officers' warrantless entry in an emergency situation).  As one of

4  these exceptions, the Supreme Court has recognized that a warrant is not required to justify

5  entries and searches by law enforcement in emergency situations.  *Id.*  Earlier this year, in light

6  of the United States Supreme Court's decision in *Brigham City*, the Ninth Circuit adopted a new

7  test to determine the legality of warrantless entries and searches in emergency situations.  The

8  two-pronged test asks "whether: (1) considering the totality of the circumstances, law

9  enforcement had an *objectively* reasonable basis for concluding that there was an immediate need

10  to protect others or themselves from serious harm; and (2) the search's scope and manner were

11  reasonable to meet the need."  *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008)

12  (emphasis added).[1]

13      Applying the *Snipe* test to the present facts, the officers' entry and search did not violate

14  the defendant's Fourth Amendment rights.

15  **1.  The circumstances of the 911 call and the scene at the apartment justified the
       officers' entry as an emergency search.**

16

17      The officers meet the first prong of the *Snipe* test.  Applying the required totality of the

18  circumstances approach, the officers had an objectively reasonable basis for believing that there

19  was an immediate need to protect themselves or others inside the apartment from serious harm.

20      In *Snipe* itself, the court determined that an emergency call "by 'a hysterical male' who

21  instructed the dispatcher to '[g]et the police over here now'" and was then disconnected, though

22  it was not made on the department's 911 system, "*alone* largely justified their response."  *Snipe*,

23

24      [1]The test adopted in *Snipe* replaced the test set forth in *United States v. Cervantes*, 219 F.3d 882 (9th Cir.

25  2000), which required the government to prove three things to justify an emergency exception to the warrant
    requirement:

26      (1) The police must have reasonable grounds to believe that there is an emergency at hand and an
        immediate need for their assistance for the protection of life or property. (2) The search must not be
        primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis,
27      approximating probable cause, to associate the emergency with the area or place to be searched.

28  *Id.* at 888 (quoting *People v. Mitchell*, 383 N.Y.S.2d 246 (N.Y. 1976).

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS
CR 08-0230 MAG                    7

515 F.3d at 953 (emphasis added).  The officers had little other information.  They knew only that one of the officers, who lived down the street, did not recognize one of the cars parked in front of the house nor an individual walking into the house, and that the lights were on in the residence but not in any others on the street.  *Id.* at 949.  Once at the front door, the officers announced their presence, knocked on the door with enough force to open the door, and then stepped inside.  *Id.*  The court found that the first prong of its new test was satisfied, and the entry valid, under these circumstances and rejected Snipe's argument that the police "should have done something to verify the caller's identity or the facts at Snipe's home before entering the Snipe residence because of the possibility of prank calls."  *Id.*  In rejecting Snipe's arguments, the court wrote:

> [The court] will not impose a duty of inquiry on the police to separate a true cry for help from a less deserving call for attention because the delay may cost lives that could have been saved by an immediate police response.  The possibility that immediate police action will prevent injury or death outweighs the inconvenience we suffer when the police interrupt our ordinary routines in response to what turns out to be a non-emergency call.

*Id.* at 954.  While there are few lower court opinions applying the *Snipe* test as of yet, other circuits have previously employed the same reasoning to 911 calls.  *See, e.g.*, *United States v. Elder*, 466 F.3d 1090, 1090 (7th Cir. 2006) ("[The Defendant's] argument that police cannot take steps to protect a caller's safety unless they know the caller's identity and 'reliability' would require them to act *un*-reasonably.  Many 911 calls are brief, and anonymous, precisely because the speaker is at risk and must conceal the call.  These persons are more rather than less in need of assistance." (emphasis in original)).

The Tenth Circuit, facing facts very similar to the ones in the instant case and applying a test virtually identical to the *Snipe* test, found police entry valid in *United States v. Najar*, 451 F.3d 710 (10th Cir. 2006).  There, dispatch received a 911 call from the defendant's residence, but the call was terminated before the caller said anything.  *Id.* at 712.  Each of the four times the police dispatcher made attempts to return the call, someone picked up the phone and then hung up.  *Id.*  When officers knocked and announced upon arrival at the residence, they initially received no response, but observed the defendant moving around inside.  *Id.*  Eventually, the

1    defendant came to the door, said he was the only one home, and said that he had not called 911.

2    *Id.*  The court upheld the lower court's denial of the defendant's suppression motion.  Explaining

3    the majority's reasoning, the court explained that "[B]y the time the officers arrived, they were

4    aware dispatch had been unable to make contact with any occupant. . . .  A reasonable person

5    could well be concerned that someone was trying to prevent communication with safety officials,

6    not merely avoid it."  *Id.* at 720.

7          Here, the officers' belief that an emergency situation was possibly at hand was based on a

8    number of factors.  First, dispatch received a 911 hang-up call from the apartment.  Second, they

9    received a busy signal when attempting to return the call.  *See* Def. Ex. A.  Third, when the

10   officers arrived and attempted to contact the occupants of the apartment, they observed Toledo-

11   Paz initially attempt to ignore and avoid the officers by retreating inside the bedroom.  Ex. 2 ¶ 9.

12   Fourth, it took an inordinate amount of time – over two minutes  – for anyone from the

13   apartment to come to the door after the officers knocked and announced their presence.  *Id.*

14   Fifth, even when Toledo-Paz eventually came to the door, she kept the chain on the door while

15   interfacing with the uniformed officers.  *Id.*  Sixth, Toledo-Paz did not understand English and

16   could not communicate with officers to confirm or dispel the belief that an emergency was

17   ongoing.  *Id.*  Seventh, the defendant, who does speak and understand English, refused to answer

18   any of the officers' inquiries or provide them with information of any kind relating to the 911

19   call, including the identity of the caller.  *Id.*  Eighth, the defendant appeared to order Toledo-Paz

20   in Spanish to walk away from the door in a way that reminded Officer Altic of his prior

21   experiences with domestic violence and family disputes.  *Id.* ¶¶ 9-10.  Ninth and ultimately, both

22   occupants turned and walked away from the officers, ignoring their requests for information and

23   assurance that there was no emergency.  *Id.* ¶ 9. Applying the totality of the circumstances

24   analysis, these factors surely combined to provide the officers with a reasonable basis for their

25   entry to ensure that there was not an immediate threat to the safety of the officers themselves or

26   any other possible occupants of the apartment, including the individual who placed the 911 call.

27         In its brief, the defendant claims that Ninth Circuit case law "ha[s] addressed the

28   'additional steps' police must take to determine whether a 911 phone call relates to an

1    emergency, and therefore justifies a warrantless entry."  Def. Mot. Supp. at 8.  Although the

2    defendant relies on *United States v. Russell* to support this proposition, that case does not address

3    911 calls specifically.  *United States v. Russell*, 436 F.3d 1086, 1092 (9th Cir. 2006) (generally

4    stating "the police only must take additional steps if they otherwise lack reasonable grounds to

5    believe there is an emergency.").  The defense's analysis overlooks the weight of the 911 call,

6    and subsequent busy signal, in determining whether reasonable grounds to believe an emergency

7    exist.  In *United States v. Najar*, the court validated the officers' entry and emphasized the role

8    that 911 calls play in an emergency response.  *United States v. Najar*, 451 F.3d 710, 720 ("As

9    other courts have recognized, '911 calls are the predominant means of communicating

10   emergency situations.'"), quoting *United States v. Holloway*, 290 F.3d 1331,1339 (11th Cir.

11   2002) (internal citation omitted)); *see also United States v. Richardson*, 208 F.3d 626, 630 (7th

12   Cir. 2000) ("A 911 call is one of the most common–and universally recognized–means through

13   which police and other emergency personnel learn that there is someone in a dangerous situation

14   who urgently needs help."); *State v. Frankel*, 179 N.J. 586, 604 (N.J. 2004) ("An open line 9-1-1

15   call, by its very nature, may fairly be considered an SOS call, a *presumptive emergency*,

16   requiring an immediate response." (emphasis added)).

17          Moreover, and contrary to the defense's contention, the officers in this case did take

18   additional steps and did not enter the apartment based solely on the 911 hang-up call and failed

19   return calls by dispatch.  Detective Kalis and Officer Altic took the additional steps of knocking

20   and announcing their presence, attempting to contact the occupants of the residence, and

21   explaining the reason for their presence and need to enter.  Compare this to *Snipe*, where the

22   officers did not knock and did not announce their presence after a 911 call, but simply pushed

23   the door open and entered.  *Snipe*, 515 F.3d at 949.  Further, Officer Altic and Detective Kalis

24   were ignored by the defendant despite their best efforts to get any information about the

25   emergency call.  Compared to the emergency entry in *Najar*, where officers actually spoke with

26   the resident and were told that he did not call 911 and that no one else was home, here the

27   defendant's actions in disregarding the officers and walking away increased the officers' belief

28   that a real emergency was at hand.  Nothing the officers gained from their observations of, and

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS
CR 08-0230 MAG                              10

1   interactions with, the defendant and Toledo-Paz about the identity of the caller or the nature of

2   the emergency allayed their fears that they or persons in the apartment were in immediate

3   danger.

4        Notably, the defendant presents only one case where an emergency search based on a 911

5   call was actually suppressed.  *See* Def.'s Mem. Supp. Mot. Supp. at 7-8, citing *United States v.*

6   *Cohen*, 481 F.3d 896, 900 (6th Cir. 2007).  However in *Cohen*, the court examined a traffic stop

7   made on a vehicle down the street and around the corner from the source of a 911 call.  *Cohen*,

8   481 F.3d at 900. ("We believe that the 911 hang-up call, standing alone without *follow-up calls*

9   *by a dispatcher or* other information, is most analogous to an anonymous tip.") (emphasis added

10  to portion of quote left out of Def.'s Mem. Supp. Mot. Supp. at 7-8).[2]  As noted above, the

11  portion of that quote, "*follow-up calls by a dispatcher*" from *Cohen* is relevant and important to

12  our analysis in this case, where there were in fact follow up calls made by the dispatcher to the

13  defendant's residence.  *Id.*  Officer Altic knew of that follow-up call when he initially responded

14  to the emergency call.  Ex. 2, ¶ 3.  As implied by the court in *Cohen*, this is a factor that elevates

15  this case from a simple 911 call to a situation where attempts to contact the source of the

16  emergency were unsuccessful.  *Cohen*, 481 F.3d at 900.

17       The defendant relies on *United States v. Bradley* as an example of an entry that is valid.

18  *See* Def.'s Mem. Supp. Mot. Supp. at 9, citing *United States v. Bradley*, 321 F.3d 1212, 1213-14

19  (9th Cir. 2003).  However in *Bradley*, the factors contributing to the emergency entry by the

20  officers were far less than what we have in this case.  The Bradley court noted that there was no

21  //

22  //

23

24

25       [2] The "totality of the circumstances" in *Cohen* consisted of a limited set of facts.  At 4:52 a.m., Officer
    Pender and Officer Koenig were dispatched to 8502 Wooded Glen Court in response to a silent 911 hang-up call.
26  Wooded Glen Court is a cul-de-sac of five or six houses running off of Wooded Glen Road, which is a dead-end
    street.  At 4:56 a.m., Officer Pender saw one car make a right turn from Wooded Glen Court onto Wooded Glen
27  Road.  When Officer Pender stopped Cohen's car, he knew no other facts relevant to determining whether he could
    lawfully make an investigatory stop.  The *Cohen* court concluded that these facts did not provide reasonable
28  suspicion to make an investigatory stop of the vehicle.  *United States v. Cohen*, 481 F.3d 896, 900 (6th Cir. 2007).

911 call at all in that case.[3]  In fact, the officers conducted the emergency search based on a fraction of what Officer Altic knew when he entered the defendant's apartment in this case.

The defendant suggests that  "a reasonable assumption might have been that the residents called 911 accidentally, or that they were calling to report something going on outside of their residence, perhaps on the street or next door."  *See* Def.'s Mem. Supp. Mot. Supp. at 10.  If that were the case, a reasonable response to the officers would have been to say that the 911 call was an accident or that there was an emergency next door.  The defendant did neither.  In fact, he simply gave an order to his female companion and walked away without even confirming or denying that they placed the 911 call.  These facts are much more consistent with a "reasonable assumption" that "someone was trying to prevent communication with safety officials, not merely avoid it," than with either of these assumptions the defendant posits here.  *Najar*, 451 F.3d at 720.  Nothing the officers observed could in any way be construed to confirm either of the assumptions the defense deems "reasonable."  The defense must concede, then, that the evasive actions by Toledo-Paz and the defendant observed by the officers standing at the front and side doors were at the very least as consistent with a "reasonable assumption" that there was an ongoing emergency as with any other assumption.

Considering all of circumstances known to the officers while standing outside the chained door, it was certainly reasonable for the officers to demand entry into the apartment.  The Court, applying the first prong of the *Snipe* test, should thus find that the officers' entry was a valid search under the Fourth Amendment and should then move to the second prong.

**2.  The officers confined the scope and manner of their warrantless search to what was required by the circumstances of the emergency.**

In addition to the objectively reasonable basis for the immediate need to protect people,

---

[3] There was no 911 call in this case.  The officer knew from a previous incident involving the defendant that Williams also had a nine-year-old son.  When Officer Wetzel asked Williams where her son Christopher was, she told him that he was "at home with a friend." Wetzel and a second officer, Sergeant Contini, went to the home where Williams and Bradley resided. They knocked on the front door, but nobody answered their knocks.  The officers here knew that Christopher's mother was not caring for him, and they could not locate him in the places she said he was. They were also unaware of the safety conditions inside the house. *United States v. Bradley*, 321 F.3d 1212, 1213-14 (9th Cir. 2003).

1    the scope and manner of the officers' warrantless search must still be justified by the needs of

2    the emergency at hand.  *Snipe*, 515 F.3d at 952.  In *Snipe*, the court determined that the officers

3    acted reasonably in knocking and announcing their presence before entering (even though the

4    knock itself opened the door), identifying themselves and the reason for their presence to the

5    occupants, and confining their search "to the areas of the house likely to include individuals in

6    harm's way." *Id.* at 954.  It was during the course of this confined search that officers observed

7    drugs in plain view before obtaining a warrant for a full search of the residence.  *Id.* at 949.

8    Similarly, in *Najar*, the officers observed a firearm in plain view upon searching the house for

9    individuals in need of assistance.  The court found the scope of the search reasonable where the

10   officers had "observed [the defendant] walking to and from a specific place inside the trailer.

11   Upon entering, [the lead officer] went immediately to that area, while the two other officers

12   waited in the living room . . . .  [The lead officer] did not attempt to search any place beyond the

13   locations where a victim might likely be found." *Najar*, 451 F.3d at 720.

14       While an emergency search is analogous to a protective sweep, the two are not, as the

15   defense's papers suggest, one and the same.  A protective sweep is "a quick and limited search of

16   premises, *incident to an arrest and conducted to protect the safety of police and others*."

17   *Maryland v. Buie*, 494 U.S. 327, 327 (1990) (emphasis added).  A protective sweep is, as the

18   defense contends, "narrowly confined to a cursory visual inspection of those places in which a

19   person might be hiding." *Id.*; *see* Def. Mot. Supp. at 11.  As the search in this case was not

20   conducted incident to an arrest, however, the Supreme Court's language from *Buie* does not

21   control the Court's analysis of the *Snipe* test's second prong.[4]  Instead, the Court is to determine

22   simply whether the scope of the search was reasonable to meet the need of the emergency.

23   *Snipe*, 515 F.3d at 952.

24       In the instant case, the need was to find the source of the emergency by searching for

25   individuals in need of assistance or posing a danger to the occupants or the officers.  Detective

26

27       [4] Indeed, none of the courts that have recently discussed this issue have applied the *Buie* analysis to the

28   determination of the reasonableness of the scope of a warrantless emergency search.  *See, e.g.*, *Brigham*, 547 U.S.
     398; *Snipe*, 515 F.3d 947; *Najar*, 451 F.3d 710.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kalis observed Toledo-Paz open the bedroom door, look at him standing by the side door in full uniform and waiving her over to him, and then turn abruptly and close that same door as the officers continued to knock on the both the front and side doors. Ex. 1 ¶ 6. After the defendant came into the officers' view and mumbled something to the officers in English that they could not understand, he appeared to give an order to Toledo-Paz in Spanish. Ex. 2 ¶ 8. The officers then watched Toledo-Paz walk away from them and toward the kitchen. Ex.2 ¶ 10. The defendant then walked back toward the bedroom and looked inside before finally coming back to the door and allowing the officers to respond to the emergency 911 call. *Id.* Upon entering and still unaware of the identity or location of the emergency caller, the officers confined their search to areas where someone in need of assistance might be found. This included the kitchen, the laundry room and the closet inside that room, the closet in the bedroom where they had seen the defendant and Toledo-Paz, underneath the bed in the bedroom, the garage, and the attic. *See* Ex. 2. Notably, officers did not, before obtaining the warrant, search any containers or places too small to hold or hide a person. The scope of the search, therefore, was reasonable to meet the need defined by the circumstances of the situation and the information the officers had at the time of the search.

The defense argues that the duration of the search conducted by the responding officers should move the Court toward finding that its scope was unreasonable. Def. Mot. Supp. at 11-12. The defense overlooks, however, what Officer Altic found in conducting the emergency search. Officer Altic first detected the smell of marijuana coming from the laundry room, which, in and of itself, established probable cause for immediate seizure and arrest. *See infra* Section IV(B)(2). As he had not fully searched the house for individuals who might be in danger and did not find any such person in the area from which he smelled the marijuana, however, Officer Altic left the laundry room to continue his search. Ex. 2 ¶13.

As he continued searching for individuals in need of assistance by looking underneath a bed in the bedroom, Officer Altic inadvertently felt the barrel of a shotgun on top of the bed. Ex. 2 ¶16. As with the marijuana, this discovery gave the officer immediate probable cause both to

seize the firearm and arrest.  *See infra* Section IV(B)(1).  In attempting to seize the firearm, Officer Altic discovered numerous other firearms in plain view.  Ex. 2 ¶ 16.  Instead of seizing all of the guns at this point, however, Officer Altic returned to the living room and placed Toledo-Paz in handcuffs.  *Id.* ¶ 17.  Given that the officer had just uncovered a number of firearms which could have been loaded, it was certainly reasonable to detain the only other adult he was aware of in the residence.

Following his detention of Toledo-Paz, and consistent with the purpose of the emergency search and the discovery of firearms he had just made, Officer Altic then called for assistance to complete the search for individuals in danger.  *Id.*  Only after searching the garage did Officer Altic stop in the laundry room, the source of the marijuana smell, and observe, in plain view in the laundry room closet, an open garbage can full of bagged marijuana and a scale on the shelf directly above the garbage can.  *Id.* ¶ 19.  He did not, however, seize the marijuana at this time, but, rather, proceeded to the attic with the other officers to complete the emergency search.  *Id.* ¶ 20.

Given the developing facts during the emergency search, the volatility of the situation created by those facts, Officer Altic's persistence in searching the house for individuals in need of assistance, and the way the officers confined their search to areas where he could possibly find such individuals, the Court should find that the scope and manner of the search were reasonable under the *Snipe* test.

**B.  The Discoveries of the Firearms and Marijuana from Positions Where Officer Altic Was Entitled to Be Were Valid Under the Plain View Doctrine and Variations Thereof.**

After establishing the test stated and applied above, the *Snipe* court went on to hold that, "[u]nder [this] test . . . if law enforcement, while 'respond[ing] to an emergency, discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would be found.'"  *Snipe*, 515 F.3d at 952 (quoting *United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000) (modified on other grounds)).  As to the means of discovery, "[i]t has long been settled that objects falling in the plain view of an officer who has a

right to be in the position to have that view *are subject to seizure* and may be introduced as evidence." *Harris v. United States*, 390 U.S. 234, 236 (1968) (citations omitted) (emphasis added).

### 1. Officer Altic had probable cause to seize the firearm he felt inadvertently while conducting a lawful emergency search.

Rather than seeing the firearm in plain view, as the officers did in *Najar*, one of the officers in the instant case felt the stock of the shotgun on the bed as he checked the area underneath the bed for persons in need of assistance. Ex. 2 ¶ 16.  The Court should reach the same result here as in those cases, however, because the Supreme Court extended the plain-view reasoning to "tactile discoveries" in *Minnesota v. Dickerson*, establishing what has come to be referred to as the "plain-feel doctrine."  508 U.S. 366, 375 (1993) ("The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment . . . . The same can be said of tactile discoveries of contraband.").

While the "plain-feel doctrine" most often arises in <u>Terry</u>-frisks of defendants' persons, *see, e.g.*, *Dickerson*, 508 U.S. 366; *United States v. Miles*, 247 F.3d 1009 (9th Cir. 2001), the doctrine and its rationale are not limited to those situations.  In this case, as long as the officer was lawfully in a position to search underneath the bed and as long as the "incriminating nature character [of the object] [was] immediately apparent," then the seizure of the first weapon was valid, even if that called for pulling back the bedspread.  As to the first requirement, the search for persons in danger in the area underneath the bed fell within the scope of the emergency search.  *See supra* Section IV(A)(2).  From a standing position, Officer Altic observed a large enough space between the bottom of the mattress and the floor for a person to be found and the bed skirt obscured the area underneath the mattress. Ex. 2 ¶ 16.  Given these facts, it was reasonable for him to set his hand on the bed in order to position himself to search underneath the bed.  *Id.*  As to the second requirement, Officer Altic immediately thought, based both on his observation and his training and experience, that the object he felt underneath the blanket was

1  the stock of a gun. *Id.*

2      Significantly, the assumption that law enforcement officers are able to recognize

3  weapons immediately by tactile observation is at the heart of the justification for *Terry*-frisks.

4  *See Terry v. Ohio*, 392 U.S. 1 (1968). Accordingly, the "immediately apparent" analysis in

5  "plain-feel doctrine" cases is reserved for contraband that are not weapons. *See, e.g.*, *United*

6  *States v. Jones*, 303 F. Supp. 2d 702, 706 (D.Md. 2004) ("Although the plain feel doctrine

7  requires that the incriminating character be immediately apparent, it does not require absolute

8  certainty that the object is contraband. . . . [T]he plain feel doctrine, like the plain view doctrine,

9  only requires that the officer have probable cause to believe that the object is contraband *by the*

10 *time he realizes it is not a weapon*." (citing *Arizona v. Hicks*, 480 U.S. 321, 327 (1987);

11 *Dickerson*, 508 U.S. at 376) (emphasis added)).

12     Officer Altic's "tactile discovery" of the first firearm on the bed provided him with

13 probable cause to seize that firearm. To effect this seizure, he was justified in pulling back the

14 blanket that was covering it. When this action revealed additional firearms and ammunition, he

15 gained probable cause to seize them through the traditional plain view doctrine. *See Harris*, 390

16 U.S. at 236.

17

18     **2. Officer's Altic's observations of the presence of marijuana in the residence while**
       **conducting a lawful emergency search provided him with probable cause to**
19     **search further, to seize the marijuana, and to arrest the defendant.**

20     As Officer Altic began his emergency search of the apartment, he detected the odor of

21 marijuana in the laundry room. Ex. 2 ¶ 13. The Ninth Circuit has recognized that the detection

22 of the smell of marijuana by a law enforcement officer familiar with the odor, from a position

23 where he or she is entitled to be, is sufficient to establish probable cause for a search. *See, e.g.*,

24 *United States v. Barron*, 472 F.2d 1215, 1217 (9th Cir. 1973) ("[T]he fact that an agent familiar

25 with the odor of marijuana, smelled such an odor emanating from the automobile when he

26 jumped in to stop it, alone [is] sufficient to constitute probable cause for a subsequent search for

27 marijuana.") (citing *United States v. Leazar*, 460 F.2d 982 (9th Cir. 1972)); *Fernandez v. United*

28

1   *States*, 321 F.2d 283 (9th Cir. 1963)); *see also United States v. Curran*, 498 F.3d 30, 33 (9th Cir.

2   1974) ("[B]efore the officer could rely upon his smelling marijuana as probable cause, he would

3   have to justify his presence at the place . . . just as he would have to justify his presence at the

4   place from which he saw the contraband in order to rely on the doctrine of plain view.").  As

5   Officer Altic smelled the marijuana from a position in which he was legally allowed to be, *see*

6   *supra* Section IV(A), and as Officer Altic is familiar with the smell of processed marijuana, *see*

7   Ex. 2 ¶ 13, he had probable cause to search for the source of the odor at that time.

8       Although Officer Altic did not immediately search further for the marijuana following his

9   detection of the odor because of the primacy of the emergency search, he returned to the laundry

10  room later, after searching the garage. Ex. 2 ¶¶ 13, 19.  At that point, from a vantage point

11  justified by probable cause provided by the odor, the officer saw an open garbage can full of

12  marijuana in plain view in the closet in the laundry room. Ex. 2 ¶ 19.  The officer also saw a

13  balance-type scale on the shelf above the garbage can. *Id.*  These observations, clearly

14  "immediately incriminating," surely provided probable cause both for seizure of these items and

15  for arrest of the defendant and Toledo-Paz under the traditional plain view doctrine. *See Harris*,

16  390 U.S. at 236.

17  **C. The Firearms in the Bedroom, if Not Found During the Emergency Search, Would
18      Have Been Inevitably Discovered During a Search of the Apartment Pursuant to a
        Warrant Based on the Observation and Smell of Marijuana in the Residence**.

19

20      Even if the Court were to find that the removal of the blanket did not fall within the plain

21  feel doctrine, the guns should still be admitted through the inevitable discovery doctrine.  "This

22  rule . . . is in a sense a variation upon the 'independent source' theory. . . . [T]he question is . . .

23  whether evidence found because of an earlier violation would inevitably have been discovered

24  lawfully." LaFave, et. al., <u>Criminal Procedure</u> § 9.3(e) (3d ed. 2007-2008).  In *Nix v. Williams*,

25  the Supreme Court recognized the inevitable discovery doctrine, explained its rationale, and

26  instructed the lower courts' application of it when the Court held:

27          If the prosecution can establish by a preponderance of the evidence that the
28          information ultimately or inevitably would have been discovered by lawful
            means–here the volunteers' search–then the deterrence rationale has so little basis

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> that the evidence should be received.  Anything less would reject logic, experience, and common sense.

467 U.S. 431, 444 (1984); *see also United States v. Merriweather*, 777 F.2d 503, 506 (9th Cir. 1985) (adopting the inevitable discovery doctrine from *Nix* in the Ninth Circuit);[5] *see United States v. Ramirez-Sandoval,* 872 F.2d 1392, 1399 (9th Cir. 1989) ("[t]he government can meet its burden by establishing that, by following routine procedures, the police would inevitably have uncovered the evidence.") (citations omitted); *see, e.g.*, *United States v. Andrade*, 784 F.2d 1431, 1433 (1986) (holding that cocaine seized during an illegal search of the defendant's garment bag would have been inevitably discovered as part of a routine inventory search pursuant to his arrest).

This Court, therefore, should deny the defendant's motion to suppress all physical evidence seized from the department even if the initial discovery of the firearms was unlawful, as long as the Court is convinced by a preponderance of the evidence that the guns would have been inevitably discovered during a search pursuant to a warrant based on other evidence.  This would require first proving by a preponderance of the evidence that, had the guns not been found, the police still would have sought and received a warrant to search the apartment.  *See, e.g.*, *United States v. Hill*, 55 F.3d 479 (9th Cir. 1995) ("To be untainted by [a prior illegal search], the officers' decision to seek the warrant must not have been 'prompted by what they had seen during [the earlier unlawful search].' . . . [T]he district court must 'explicitly find that the agents would have sought a warrant if they had not earlier entered [defendant's house].'" (citations omitted)).  The Government would then have to prove by a preponderance of the evidence that such a search would have included uncovering the bedspread, or at least manipulating the bedspread in a way that would have revealed the guns on the bed.

Here, once the officers, from a lawful vantage point, observed the garbage can full of packaged marijuana and the scale in the laundry room closet in plain view, they had probable

---

[5] In *Nix*, the Court found that a dead body in a murder investigation was admissible even though the police learned of the location through illegal questioning of the defendant.  *Nix*, 467 U.S. at 449-50.  The Court explained that the inevitable discovery doctrine applied because a large volunteer search group that had already been looking in the area where the body was found, according to the Court, more likely than not would have discovered the body without the illegal questioning.  *United States v. Nix*, 467 U.S. 431, 449-50 (1984).

cause to seize the items. *See supra* Section IV(B)(2). Given that the Humboldt County Drug Task Force, a unit designed specifically to investigate drug crimes, was called to the scene, law enforcement would have sought a search warrant based on those plain view observations. Moreover, the large amount of marijuana discovered, the fact that the marijuana was packaged in individual plastic bags, and the association of scales with drug trafficking surely provided sufficient probable cause to support a search warrant for the apartment for further contraband and other evidence of drug trafficking.

Furthermore, the search warrant that did issue in this case allowed the officers to search the premises of the apartment based on probable cause to believe that property there was seizable because, among other things, it "is evidence, which tends to show a felony has been committed or a particular person has committed a felony." Search Warrant, attached as Exhibit 5, at VV00067. A warrant issued pursuant to the evidence of drug trafficking observed in plain view would certainly have included the premises of the apartment. As the Supreme Court has held, "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. *United States v. Ross*, 456 U.S. 798, 820-21 (1982). Such a warrant surely would have allowed officers to check underneath the bedspread in the master bedroom for evidence.

Finally, given the thoroughness of law enforcement searches in drug investigations and the expertise of the Drug Task Force, the firearms would have been discovered by following "routine procedures" of drug investigation. The Court should, therefore, deny the motion to suppress the firearms under the inevitable discovery doctrine despite how the Court decides the "plain-feel doctrine" issue.

//

//

**D. The Defendant's Statements to Special Agent Fagetan Before the Onset of Interrogation Were Not Obtained in Violation of the Defendant's Fifth Amendment Rights and, Therefore, Should Not Be Suppressed.**

In order for the requirements of *Miranda v. Arizona* to apply to an encounter between law enforcement and a suspect, the individual must be both in custody and subjected to interrogation. *Beaty v. Stewart*, 303 F.3d 975, 991 (9th Cir. 2002) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). While the defendant was clearly in custody as he sat, handcuffed in the living room of the apartment, his initial interaction with Special Agent Fagetan did not constitute interrogation as defined by the Supreme Court and the Ninth Circuit. The defendant's initial incriminating statements, therefore, should not be suppressed.

"'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. In the instant case, interrogation began when Special Agent Fagetan agreed with the defendant's statement that he was "in deep shit" and "knew [the guns found in the bedroom] w[ere] going to get [him] in trouble." Ex. 3 ¶ 12. The defendant's incriminating statements up to and including the language just quoted, however, were not made in response to words or actions reasonably likely to elicit an incriminating response. Spontaneous statements not made in response to interrogation are admissible. *Oregon v. Elstad*, 470 U.S. 298, 309, 318 (1985); *Innis*, 446 U.S. at 300-01; *Madeiros v. Shimoda*, 889 F.2d 819, 824-825 (9th Cir. 1989). As the defendant cannot establish that his initial statements were made in response to interrogation, the Court should find no *Miranda* violation and should not suppress these statements.

**1. Defendant's statements regarding his true identity and the details surrounding the 911 call were voluntarily given and not obtained through interrogation.**

As Special Agent Fagetan sat in the living room of the apartment with the defendant, the defendant offered, without solicitation, his full and true name as Jose Leopoldo Villegas-Villanueva. Ex. 3 ¶ 8. The defendant, who had told other officers that his true name was Juan

Lopez-Ontiveros, explained the reason for identifying himself truthfully, stating that he knew law enforcement would find out anyway because he knew he was going to jail. *Id.* The defendant also told Special Agent Fagetan that Toledo-Paz had called 911 following an argument the two had had over his other girlfriend, and that the defendant had tried to dissuade Toledo-Paz from calling 911. *Id.* ¶ 9. Agent Fagetan did not question the defendant about the reason for the 911 call or his identity, nor did he challenge the defendant's previous false statement regarding his true name. As spontaneous statements are not subject to the strictures of *Miranda*, the Court should not suppress these statements. *Elstad*, 470 U.S. at 298, 309, 318.

Moreover, even if Agent Fagetan had asked the defendant to identify himself, the Ninth Circuit has held that "[o]rdinarily, the routine gathering of background biographical data will not constitute interrogation." *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981) (finding that "[n]othing . . . indicates that the questions relating to [the defendant's] identity, age, and residence were at all likely to elicit an incriminating response. These routine, non-investigatory questions were totally unrelated to the crime, and the record does not reveal that Booth was 'particularly susceptible' to this line of inquiry."). There is nothing to suggest that Agent Fagetan's inquiry as to the defendant's name would elicit an incriminating response, nor that the defendant was "particularly susceptible" to this, or any, line of inquiry.

**2. Defendant's statements to Special Agent Fagetan following Fagetan's observation of the firearms seized were voluntarily given and not obtained through interrogation.**

Approximately ten to fifteen minutes after arriving at the apartment, Agent Fagetan walked into the bedroom to see what the other officers had found during the search. Ex. 3 ¶ 10. When he returned to the living room where the defendant sat, Agent Fagetan said nothing about what he had seen in the bedroom, nor did he make any gestures indicating what he had seen. *Id.* ¶ 11. The defendant then gestured with his head toward the bedroom and stated something to the effect of "I'm in deep shit. I knew that stuff was going to get me in trouble." *Id.* ¶ 12. As with his statements regarding his identity and the reason for the 911 call, *see supra* Section IV(D)(1), the defendant offered these statements spontaneously and without elicitation by law

1   enforcement.  Agent Fagetan did not ask the defendant any questions, nor did he do anything that

2   could be considered the functional equivalent of interrogation.  The admission into evidence of

3   these incriminating statements, therefore, would not violate the defendant's Fifth Amendment

4   rights.  *See Miranda*, 384 U.S. at 444 (requiring custody and interrogation); *Innis*, 446 U.S. at

5   300-01 (because "the police surely cannot be held accountable for the unforeseeable results of

6   their words or actions, the definition of interrogation can extend only to words or actions on the

7   part of police officers that they should have known were reasonably likely to elicit an

8   incriminating response").

9        The standard for determining whether an officer's comments or actions constitute the

10  "functional equivalent" of interrogation is very high in the Ninth Circuit.  *United States v.*

11  *Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000).  In *United States v. Shedelblower*, the court held

12  that statements to a suspect that his accomplice had been arrested and that the victim had

13  identified the suspect, even though the latter statement was untrue, did not constitute the

14  functional equivalent of interrogation.  *Shedelblower v. Estelle*, 885 F.2d 570, 572-73 (9th Cir.

15  1989), *cert. denied*, 498 U.S. 1092 (1991) (finding that those statements "did not call for nor

16  elicit an incriminating response.  They were not the type of comments that would encourage [the

17  suspect] to make some spontaneous remark.").

18       Furthermore, the Ninth Circuit has also declined to find that informing a suspect of the

19  evidence against him qualifies as the functional equivalent of interrogation.  In *United States v.*

20  *Moreno-Flores*, the court held that the suspect had not been subjected to interrogation where the

21  officer told him that "the agents had seized approximately 600 pounds of cocaine and that [the

22  suspect] was in serious trouble."  *United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir.

23  1994).  The court went on to explain that "[t]he fact that [the officer's statements] may have

24  struck a responsive chord, or even that they may have constituted a 'subtle compulsion' is

25  insufficient to find that they were the functional equivalent of interrogation."  *Id.* at 1169-70

26  (citing *Innis*, 446 U.S. at 303).  This reasoning suggests that, even if the defendant could

27  establish that Agent Fagetan had described what he had seen in the bedroom, the defendant could

28

1    not establish that he was therefore subjected to interrogation for the purpose of Fifth Amendment

2    analysis.

3        In its brief, the defense cites *United States v. Orso*, 266 F.3d 1030 (9th Cir. 2001), to

4    support its contention that an officer's description of incriminating evidence to a defendant

5    constitutes interrogation for *Miranda* purposes.  Def. Mot. Supp. at 16.  In *Orso*, however, the

6    officer did not merely describe incriminating evidence, but also "engaged [the defendant] in

7    several minutes of detailed discussion regarding the evidence against her, the witnesses against

8    her, and the statutory penalties for the crime of which she was suspected.  Indeed, he went so far

9    as to make up some of the evidence which he said existed against her."  266 F.3d at 1033.  In

10   addition, in finding that the officer should have known his statements would elicit an

11   incriminating response, the court pointed to the officer's hearing testimony in which he stated

12   that the officers "wanted to eventually speak with [the defendant] and thought that if [the

13   officers] Mirandized her right away that she may not want to speak with us." *Id.*

14       Agent Fagetan's actions preceding the defendant's incriminating statements consisted

15   simply of walking into the bedroom where the firearms had been found and then returning to the

16   living room, where the defendant was being held.  Surely, these actions fall well short of what

17   the Ninth Circuit found qualified as the functional equivalent of interrogation in *Orso* and even

18   of what the court found did not qualify in *Shedelblower* and *Moreno-Flores*.  The Court,

19   therefore, should deny the defendant's motion to suppress any statements made *prior* to Special

20   Agent Fagetan's expression of agreement with the defendant's assertion that the guns would "get

21   him trouble."

22                                    **V. CONCLUSION**

23

24       The Court should deny the defendant's motion to suppress the physical fruits of all

25   searches of the defendant's apartment, both before and after the government obtained the search

26   warrant.  Applying the Ninth Circuit's new test from *Snipe*, the initial entry and search were

27   justified by the emergency exception to the warrant requirement.  While conducting a search

28   within the scope of this exception, one of the officers discovered the first firearm by plain feel.

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

The other firearms, moreover, could then have been seized immediately via the plain view doctrine, as they appeared in plain view after Officer Altic removed the blanket, a necessary step in seizing the first firearm.  As the seizure of the firearms from the bed at that point would have been valid, the use of their discovery as a basis for the search warrant was also valid.  The full search of the apartment, therefore, was lawful as a valid warrant search.

Further, even if the Court rejects the plain feel argument, the guns should be admitted through the inevitable discovery doctrine.  While conducting the emergency search, Officer Altic discovered through the plain use of his senses and from a position he was entitled to be, a large quantity of marijuana and a scale commonly associated with drug trafficking, in the laundry room closet.  A warrant for a full search of the apartment could have been, and more likely than not would have been, obtained following these discoveries.  Pursuant to such a search, law enforcement more likely than not would have discovered the firearms in the bedroom.

The Court should also deny the defendant's motion to suppress his incriminating statements made to Special Agent Fagetan not obtained through interrogation.  While interrogation ultimately commenced following one of the defendant's incriminating statements, his initial statements were either made spontaneously or in response to words and actions that fall well short of the courts' definition of interrogation under the Supreme Court's decision in *Miranda* and its progeny.

In light of the above, the United States respectfully requests that the Court deny Villegas-Villanueva's motion as to all physical evidence and deny in part his motion as to his statements made to Agent Fagetan.

JOSEPH P. RUSSONIELLO
United States Attorney


DATED:  __7/23/2008_____          _/s/ Derek R. Owens_____
                                        DEREK OWENS
                                        Assistant United States Attorney
                                        KEVIN J. ROONEY
                                        Law Clerk

# Exhibit 1

1 | JOSEPH P. RUSSONIELLO (CABN 44332)
United States Attorney

2

BRIAN J. STRETCH (CABN 163973)
3 | Chief, Criminal Division

4 | DEREK R. OWENS (CASBN 230237 )
Assistant United States Attorney

5

KEVIN J. ROONEY
6 | Law Clerk

7 | 450 Golden Gate Avenue, Box 36055
San Francisco, CA 94102
8 | Telephone: (415) 436-6809
Facsimile: (415) 436-7234

9

10 | Attorneys for Plaintiff

11

12 |                   UNITED STATES DISTRICT COURT

13 |                   NORTHERN DISTRICT OF CALIFORNIA

14 |                       SAN FRANCISCO DIVISION

15

16 | UNITED STATES OF AMERICA,              )   No. CR 08-0230 MAG
                                          )
17 |              Plaintiff,               )   DECLARATION OF DETECTIVE
                                          )   DANIEL KALIS
18 |                                        )
          v.                              )   Date: August 6, 2008
19 |                                        )   Time: 10:00 a.m.
     JOSE LEOPOLDO VILLEGAS-              )   Court: Hon. Charles R. Breyer
20 | VILLANUEVA,                           )
                                          )
21 |              Defendant.               )
                                          )
22 | _____

23 |   I, Daniel Kalis, declare and state as follows:

24 |   1.  I am a detective with the Eureka Police Department.

25 |   2.  The following information is provided to the Court as a result of my personal

observations.

26

27 |   3.  On March 17, 2008, at approximately 9:15 a.m., while driving in my police cruiser in my

28 | police uniform, I was contacted by the Eureka Police Department dispatch.  Also in my cruiser

1   was Officer John Goodale, who was training with me after transferring from the Arcata Police

2   Department. Dispatch informed me that they had received a hang-up 911 call and got a busy

3   signal when they attempted to return the call. Dispatch informed me that the call originated from

4   1911 Hilfiker Lane, Apartment 20.

5      4.   When I arrived at the apartment, I made contact with Officer Louis Altic, also of the

6   Eureka Police Department, who had also just arrived on the scene. He and I walked to the front

7   door of the apartment and tried to see if we could hear anything coming from inside.

8      5.   While Officer Altic began knocking on the front door and announcing our presence, I

9   walked around to the side door, on the north side of the apartment. The document attached to

10  this declaration numbered VV00138 is a fair and accurate representation of the locations of both

11  doors and their proximity to one another. The front door is to the right in the document, while

12  the side door is to the left. The side door is wooden from about my waist level down and glass

13  from my waist level up. There was a white towel or shade about halfway down the glass, but I

14  was still able to see clearly into the apartment from this vantage point. The document attached to

15  this declaration numbered VV00141 provides a fair and accurate representation of the side door

16  and how it looked on the day in question.

17     6.   After Officer Altic had been knocking on the front door for between thirty seconds and a

18  minute, I observed an adult Hispanic female exit what appeared to be an interior bedroom and

19  look at me. She was approximately twelve to fifteen feet away from me when she exited the

20  room. When I saw she was making eye contact with me, I motioned with my hands for her to

21  come to me to open the door. Instead of walking toward me, however, the female turned very

22  abruptly and closed the door behind her. I verbally notified Officer Altic of what I had just seen.

23  Her actions were unusual given the fact that there had been a 911 call from the residence and that

24  she clearly saw me, in uniform with my badge visible, waive her over to the door. I did not know

25  what was going on, but I was concerned for officer safety, the female subject's safety, and the

26  safety of anyone else who might be inside.

27     7.   About a minute or ninety seconds after I saw the female close the interior door, I heard

28  what sounded like Officer Altic making verbal contact with an occupant of the residence. Upon

DECL. OF DANIEL KALIS
CR 08-0230 CRB                                    2

1    hearing this, I walked to the front door to join Officer Altic. I saw that he was attempting to

2    speak with the a female subject through an approximately four-inch gap in the door, as the

3    subject opened the door but kept the chain connected. I quickly saw that this female was the

4    same person I had seen from the side door. Officer Altic attempted to explain the reason for our

5    presence and ask the subject about the reason for the call and identity of the caller, but she did

6    not appear to understand English. The female subject had a confused look on her face and kept

7    looking behind her over each of her shoulders.

8        8. After about thirty or forty-five seconds of trying to talk to the female subject and ask her

9    if she needed assistance, an adult Hispanic male, later identified as Jose Villegas-Villanueva,

10   emerged from the same room from which the female had earlier emerged and stood behind the

11   female. Officer Altic attempted to explain the situation to, and ask for information from,

12   Villegas-Villanueva. Villegas-Villanueva appeared to understand English and mumbled

13   something in what sounded like English, but I could not understand what he said. Officer Altic

14   continued to ask Villegas-Villanueva questions, but Villegas-Villanueva did not answer him.

15   Instead, he said something to the female subject in Spanish, and then the two of them walked

16   away from the front door, leaving the chain connected. As I was standing behind Officer Altic at

17   this point and the door was still chained, I could not see exactly where the two subjects once they

18   walked away from the door.

19       9.    About three to five seconds after the subjects turned and walked away from the front

20   door, Officer Altic demanded that someone open the door or he was going to have to break

21   through the chain. Villegas-Villanueva stopped in the doorway of the room he was entering,

22   looked inside, and then turned around and opened the door to allow us to enter.

23       10. Upon entering the apartment, Officer Altic and I again explained the reason for our

24   presence and asked who called 911, but got no response. Officer Altic then asked Villegas-

25   Villanueva to sit in a chair in the living room. Villegas-Villanueva initially complied and Officer

26   Altic turned to walk toward the area where he had seen the female subject walk. As he did so,

27   Villegas-Villanueva got up from the chair and walked toward Altic. Officer Altic turned around

28   and we placed Villegas-Villanueva in handcuffs, explaining to him that we were doing this for

DECL. OF DANIEL KALIS
CR 08-0230 CRB           3

1  his safety. We then checked the couch for weapons before sitting him down on the couch.

2  11. After Villegas-Villanueva had been detained on the couch, Officer Altic again walked

3  to find the female subject. He found her and brought her back into the room. At this point,

4  Officer Altic and I noticed that the female had what appeared to be a blood stain on her white t-

5  shirt, about belly-button level on her left side. I tried to ask her if she was okay, but I could tell

6  she could not understand me, even when I tried to ask her in Spanish.

7  12. After Officer Altic had led the female subject back into the living room and left her

8  where I could view both subjects, he began to conduct the emergency search for persons in need

9  of assistance. I remained in the living room with the subjects while Officer Altic did this.

10  13. Several minutes later, Officer Altic exited the bedroom, the room from which we had

11  seen both subjects exit earlier. Officer Altic's eyes were big and he told me to handcuff the

12  female subject. He then told me he had found guns in the bedroom and he radioed for additional

13  officers to help him clear the rest of the apartment.

14  14. Two to three minutes later, Officers Jones and Whitmer arrived on the scene to help

15  Officer Altic complete the emergency search. As they did this, I detected the odor of processed

16  marijuana coming from another room. Processed marijuana has a distinct smell I have become

17  very familiar with as a police officer in Humboldt County. I underwent training in controlled

18  substance detection at the Police Academy at the College of the Redwoods and I have made

19  several arrests involving large amounts of processed marijuana. The odor I detected in the

20  apartment that day was consistent with what my training and experience have taught me is the

21  way processed marijuana smells.

22  14. After the other officers completed the emergency search and the Humboldt County Drug

23  Task Force was called in, I walked into the bedroom where the guns had been found. I saw guns

24  on top of a large mattress in the middle of the room. The mattress sat on top of a box spring,

25  which appeared to be raised up off the floor. I could not see underneath the bed from a standing

26  position.

27  //

28  //

DECL. OF DANIEL KALIS
CR 08-0230 CRB                    4

15. Through my training and experience with the Eureka Police Department, I have become familiar with the CAD reports that issue with each incident we investigate. These reports detail all contacts with dispatch relating to an incident, both from any private citizens involved and from all officers involved. The documents attached to this declaration, numbered VV00052 through VV00054, are a fair and accurate representation of the CAD report for the incident described above in this declaration at 1911 Hilfiker Lane, Apartment 20, Eureka, California.

I declare under penalty of perjury that the forgoing is true and correct.

Executed this 22nd day of July, 2008.

Daniel Kalis
Detective, Eureka Police Department

DECL. OF DANIEL KALIS
CR 08-0230 CRB                    5

```
3/19/08                          HTE    CAD                        PAGE    1
15:29:05                    CAD CALL INFORMATION                   080770080
```
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

```
Call Number: 080770080      Call Type.: 139 911 UNKNOWN            Police
Entry Day/Tm:  3/17/08  9:15:21         139 911 UNKNOWN            Police

CmnN: HILFIKER APARTMENTS           Agency.........: 001 Eureka
Location...:  1911    HILFIKER                    LN    Apt: APT-20
  City......: EUREKA           Block#:   1900  Loc ID:   Mapr: P69
Intersectn.: BROADWAY                    END

Caller Name: Last:              First:              Mid:  See Caller:
  Address...:                                         Apt:
  City/State:                   Phone#: 707-442-2794       Source:

Call Taker.:      578 STEWART         KRISTEN       EPDDISP1C
Dispatcher.:      579 IRELAND         KRISTEN       EPDDISP4A
```

                       N A R R A T I V E

```
    911 HANGUP - ATTEMPING CALLBACK                          9:16:47
    BUSY ON CALLBACK                                         9:16:57
    STILL BUSY                                               9:17:36

    89 INSIDE WITH MALE AND FEMALE MALE DETAINED C4          9:37:10
    89 REQ MED C2 FOR INJURY TO HAND FEMALE                  9:44:53

    AMB NOTIFIED                                             9:45:29

    89 BUILDING IS CLEAR - LARGE AMT MARIJUANA               9:56:34
    89 LARGE AMT OF FIREARMS - REQ DTF RESPOND               9:56:54
    N83 PAGED                                               10:00:16

    T71 MADE CONTACT WITH DTF                               10:13:23

    89 I DON'T KNOW WHO THE FEMALE IS YET REQ YOU CONTACT CWS FO   10:18:05
    R A BABY                                                10:18:05

    89 FEMALE IC                                            10:18:59
    89 TOLEDO,ESMERELDA                                     10:19:22

    89 CWS NOTIFIED                                         10:27:45

    89 EJ WITH AN X 0.0 1141                                11:41:35
    89 3.2 1150                                             11:50:51

    CASE NUMBER C082073 ISSUED IN ERROR                      7:42:02
```

                  V E H I C L E      I N F O

```
Vehicle Type: SUSP Suspect
License# 4HFC968          Year:      Make:          Model:
  State:                 VIN :                      Color:       /
Vehicle Type: SUSP Suspect
License# 3SYB555          Year:      Make:          Model:
  State:                 VIN :                      Color:       /
Vehicle Type: SUSP Suspect
License# 4ZGT344          Year:      Make:          Model:
  State:                 VIN :                      Color:       /
```

V V00052

~~~~~~~~~~~~ Case 3:08-cr-00230-CRB ~~ Document 15-2 ~~ Filed 07/23/2008 ~~ Page 8 of 11 ~~~~~~~~

3/19/08                                          HTE      CAD                          PAGE     2
15:29:05                            CAD CALL INFORMATION                              080770080
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## V E H I C L E      I N F O

```
Vehicle Type: SUSP Suspect
  License# 8A63962          Year:        Make:              Model:
  State:                    VIN :                           Color:     /
```

## P E R S O N      I N F O

```
Person Type: ALIS    Alias                          User ID: POWELLK
Race.:   Sex:   Age:     -    Hgt:      -    Wgt:      -      Person #:   1
Weapon:          Build.:            Hair...:            Eyes:
Hat..:           Jacket:            Shirt..:            Pants:
Shoes:           Facial:            Glasses:              SSN:         0
```

```
Flight Dir:                   Mode:            OL#: B8332964
Name: L: ONTIVEROS      F: JUAN          M: LOPEZ          DOB:  6241971
Addr:       0                                    Apt:             3/18/08
City:                       Phone#:     -    (    ) Last Changed:  6:41:45
Additional: IC 273A 530.5 C082073
Person Type: SUSP    Suspect                        User ID: OLSONM
Race.:   Sex:   Age:     -    Hgt:      -    Wgt:      -      Person #:   2
Weapon:          Build.:            Hair...:            Eyes:
Hat..:           Jacket:            Shirt..:            Pants:
Shoes:           Facial:            Glasses:              SSN: 594160000
```

```
Flight Dir:                   Mode:            OL#:
Name: L: TOLEDO         F: ESMERALDA     M:               DOB:  1051981
Addr:       0                                    Apt:             3/17/08
City:                       Phone#:     -    (    ) Last Changed: 11:59:19
Additional: ARRESTED PC 273A C082057
Person Type: SUSP    Suspect                        User ID: MILLERJ
Race.:   Sex:   Age:     -    Hgt:      -    Wgt:      -      Person #:   3
Weapon:          Build.:            Hair...:            Eyes:
Hat..:           Jacket:            Shirt..:            Pants:
Shoes:           Facial:            Glasses:              SSN: 594250000
```

```
Flight Dir:                   Mode:            OL#:
Name: L: VILLANUEVA     F: LEOPOLDO     M: VILLEGAS         DOB:  9101976
Addr:       0                                    Apt:             3/17/08
City:                       Phone#:     -    (    ) Last Changed: 17:00:26
Additional: IC 273A 530.5 C082073
```

NONE                          Unit Status History Information

3/17/08   9:17:41   18 Route Call Time      RT |

71                          Unit Status History Information

V V00053

| 3/19/08 | | HTE | CAD | | | PAGE | 3 |
|---------|--|-----|-----|--|--|------|---|
| 15:29:05 | | CAD CALL INFORMATION | | | | 080770080 | |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

```
    3/17/08  9:47:18   4 Dispatched          D         464 WHITMER      GARY
    3/17/08  9:47:18   6 On Scene            O
    3/17/08 10:12:20  15 Stop Unit Time Check SP
    3/17/08 10:28:39  20 Available           AV
```

67                    Unit Status History Information

```
    3/17/08  9:42:03   4 Dispatched          D         475 JONES        TIMOT
    3/17/08  9:47:14   6 On Scene            O
    3/17/08 10:12:15  15 Stop Unit Time Check SP
    3/17/08 11:02:53  20 Available           AV
```

89                    Unit Status History Information

```
    3/17/08  9:26:44   4 Dispatched          D         484 ALTIC        LOUIS
    3/17/08  9:26:44  11 Assigned as Primary PR
    3/17/08  9:31:57   9 Started Self-Initiat SC
    3/17/08  9:33:01  10 Ended Self-Initiated EC
    3/17/08  9:33:05   6 On Scene            O
    3/17/08  9:37:13  57 Code 4              C4
    3/17/08 10:12:12  15 Stop Unit Time Check SP
    3/17/08 10:19:03  43 In Custody/Arrested IC
    3/17/08 11:41:18  44 Enroute to Jail     EJ
    3/17/08 11:50:57  45 Out Jail            OJ
    3/17/08 12:32:20  20 Available           AV
```

93                    Unit Status History Information

```
    3/17/08  9:27:03   4 Dispatched          D         488 KALIS        DANIE
    3/17/08  9:32:16   6 On Scene            O
    3/17/08 10:12:17  15 Stop Unit Time Check SP
    3/17/08 10:37:38   9 Started Self-Initiat SC
```

CONTROLLED/CONFIDENTIAL

D I S P O S I T I O N S

```
    1  001  Report Taken        Case#  1 - 08-002057 Unit: 89
    2  001  Report Taken        Case#  1 - 08-002073 Unit: 89
```

V V00054



V V00138



V V00141

# Exhibit 2

1    JOSEPH P. RUSSONIELLO (CABN 44332)
     United States Attorney
2
     BRIAN J. STRETCH (CABN 163973)
3    Chief, Criminal Division

4    DEREK R. OWENS (CASBN 230237)
     Assistant United States Attorney
5
     KEVIN J. ROONEY
6    Law Clerk

7       450 Golden Gate Avenue, Box 36055
        San Francisco, CA 94102
8       Telephone: (415) 436-6809
        Facsimile: (415) 436-7234
9

10   Attorneys for Plaintiff

11

12                   UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                      SAN FRANCISCO DIVISION

15
     UNITED STATES OF AMERICA,              )   No. CR 08-0230 MAG
16                                          )
                                            )   DECLARATION OF OFFICER
17            Plaintiff,                     )   LOUIS ALTIC
                                            )
18                                          )   Date: August 6, 2008
         v.                                 )   Time: 10:00 a.m.
19                                          )   Court: Hon. Charles R. Breyer
     JOSE LEOPOLDO VILLEGAS-                )
20   VILLANUEVA,                            )
                                            )
21            Defendant.                    )
                                            )
22

23      I, Louis Altic, declare and state as follows:

24      1.  I am a police officer with the Eureka Police Department.

25      2.  The following information is provided to the Court as a result of my personal

26   observations.

27      3.  On March 17, 2008, at approximately 9:15 a.m., while driving in my police cruiser in my

28   police uniform, I was contacted by the Eureka Police Department dispatch. Dispatch informed

     DECL. OF LOUIS ALTIC
     CR 08-0230 CRB                             1

1   me that they had received a hang-up 911 call and got a busy signal when they attempted to return

2   the call. Dispatch informed me that the call originated from 1911 Hilfiker Lane, Apartment 20.

3       4.   When I arrived at the apartment, I made contact with Detective Daniel Kalis and Officer

4   John Goodale, also of the Eureka Police Department, who had also just arrived on the scene.

5   Detective Kalis and I walked to the front door of the apartment and tried to see if we could hear

6   anything coming from inside.

7       5.   When we did not hear anything, I began knocking on the front door and announcing our

8   presence. The document attached to this declaration labeled VV00248 is a fair and accurate

9   representation of the appearance of the front door of the apartment in question on that day. While

10   I knocked on the front door, Detective Kalis walked around to the side door, which is located on

11   the north side of the apartment.

12       6.   After knocking on the front door for over a minute with no response, I received word

13   from Detective Kalis over my radio that he had observed a woman inside the residence come out

14   of an interior room, look at him, and then retreat back inside the same room.

15       7.   I continued to knock on the front door in an attempt to contact someone within the house

16   for about another minute before an adult Hispanic female, later determined to be Esmiralda

17   Toledo-Paz, came to the door. She opened the door, but kept the chain attached so that my view

18   into the interior of the apartment was obstructed by the door. I attempted to explain the situation

19   to Toledo-Paz, including the reason for our presence, and asked if there was an emergency or if

20   she knew who called 911. Toledo-Paz did not appear to understand English and had the nervous

21   look that people often have when they don't understand the language someone is speaking to

22   them. She mumbled something in what sounded like English, but I could not understand what

23   she said.

24       8.   After about thirty or forty-five seconds of trying to talk to the female subject and ask her

25   if she needed assistance, I observed an adult Hispanic male, later identified as Jose Villegas-

26   Villanueva, appear behind the female from the direction of the room from which the female had

27   earlier emerged. I explained to Villegas-Villanueva why we were at the apartment and that we

28   needed to come in and check to see if anyone was in need of assistance due to the 911 call.

DECL. OF LOUIS ALTIC
CR 08-0230 CRB               2

1   Villegas-Villanueva smiled and seemed to understand English. He then appeared to mumble

2   something in English, but I could not hear what he said. He then turned to Toledo-Paz and

3   appeared to order or direct her in Spanish before they both turned and walked away from the

4   door, leaving the chain connected. Toledo-Paz walked back and to the left, toward what I later

5   determined was the kitchen, while Villegas-Villanueva walked in the direction from which he

6   had just come, toward the room from which I had seen Toledo-Paz emerge earlier.

7       9. At this point, I began to get more concerned about officer safety and the safety of

8   individuals inside the apartment. Numerous factors led me to be concerned. First was the 911

9   hang-up call to dispatch. Second was the fact that dispatch received a busy signal upon

10  attempting to return the hang-up call. Third, the delay of two minutes in answering the door was

11  unusually long for a response to a 911 call. Fourth, the two-minute delay was particularly

12  unusual given the actions of Toledo-Paz as observed by Detective Kalis and related to me. Fifth,

13  after coming to the door, Toledo-Paz left the chain on the door rather than opening it all the way

14  to speak to us. Sixth, Toledo-Paz's inability to communicate in English meant that she could not

15  confirm or dispel the assumption of the existence of an emergency that comes with a 911 call.

16  Seventh, Villegas-Villanueva's refusal to answer any of my inquiries or provide any information

17  relating to the 911 hang-up call or any emergency despite the fact that he appeared to understand

18  and speak English. Eighth, not only did the Villegas-Villanueva fail to confirm or deny the

19  existence of an emergency to police officers, but he also appeared to order Toledo-Paz to walk

20  away from the door and the officers. Ninth, both subjects ignored our requests and walked away

21  from the door where we were standing, leaving the door open but chained. All of these factors

22  combined to make me believe in the possibility of an emergency inside the apartment.

23      10. In my experience, 911 calls are often made from inside a residence against the interest of

24  someone else in the residence, particularly in domestic violence situations. Here, I was

25  concerned based on my observations that there was a domestic violence situation ongoing.

26  Villegas-Villanueva's actions were evasive and consistent with the actions of suspects in

27  domestic violence I have encountered before. He seemed very calm, seemed to express disregard

28  for the police, and seemed slightly sarcastic or flippant about the situation. The way he seemed

DECL. OF LOUIS ALTIC
CR 08-0230 CRB                                3

1    to order Toledo-Paz away from the door also reminded me of my previous experiences with

2    domestic violence, family disputes, and assaults.

3        10.   Given my concerns, when the subjects turned to walk away from me, I raised my voice

4    and ordered the occupants to open the door before I broke through the chain. Villegas-

5    Villanueva, who had walked back toward the room from which he had emerged earlier, stopped,

6    looked into that room, and then returned to the door and detached the chain so that we could

7    enter.

8        11.   Upon entering the apartment, I directed Villegas-Villanueva to sit in a particular chair

9    that I had visually checked for any dangerous objects. When he sat in this chair, I started to walk

10    in the direction where I had seen Toledo-Paz walk. As I did this, however, Villegas-Villanueva

11    stood up and moved toward the couch. Not having checked the couch for weapons, I detained

12    Villegas-Villanueva for safety purposes, checked the cushions of the couch for weapons, and sat

13    him down on the couch. I then found Toledo-Paz and directed her into the living room so that

14    Detective Kalis could watch both subjects at the same time. As I led Toledo-Paz back into the

15    living room, I noticed a blood spot on her shirt, which gave me even greater cause for concern

16    that there was something behind the 911 call.

17        12.   When I was satisfied that there was no danger in the living room, I began to check the

18    rest of the rooms in the apartment for persons in need of assistance. I began by quickly checking

19    the kitchen. The document attached to this declaration labeled VV00156 is a fair and accurate

20    representation of the kitchen area, including the interior side of the side door to the residence.

21    When I did not find anyone in the kitchen, I proceeded toward a small mud room or laundry

22    room that stands between the kitchen and the garage.

23        13.   The laundry room was fairly bare and I did not find anyone in the room. I did smell a

24    strong odor of processed marijuana in that room, which was especially strong when I opened a

25    closet in that room to check for individuals. Processed marijuana is common in our area of

26    California and I am very familiar with it from both my experience as a police officer and my

27    training at the academy. I was certain, based on this smell, that there was marijuana in the room

28    at this point. My primary concern at this time, however, was human safety, so I proceeded with

DECL. OF LOUIS ALTIC
CR 08-0230 CRB                              4

1    the emergency search.

2        14. The next room I checked was the room from which I had seen Villegas-Villanueva

3    emerge, which I discovered was the master bedroom. Once in the room, I saw a small baby in a

4    swing-type seat next to the bed. I quickly scanned the room with my eyes and then checked the

5    master bathroom. Walking back into the bedroom from the bathroom, I looked in the closet and

6    did not see anyone in need of assistance.

7        15. After checking the closet, I decided to check the area underneath the bed. In my

8    experience, people often hide underneath beds if there is enough space. The bed in this room had

9    a large mattress with what appeared to be a box spring underneath it. There was a bed skirt

10   around the border of the area directly underneath the mattress that extended to the floor so that

11   the area underneath the bed was not visible without moving it. The document attached to this

12   declaration numbered VV00242 is a fair and accurate representation of how the area under the

13   mattress appeared during my search.

14       16. At this point I had my gun drawn in my right hand with a light attached to help me see. I

15   had to lean down to look underneath the bed and wanted to use the light on my gun to do so, but I

16   also did not want to put both hands on the ground or lay on the ground because I was afraid of

17   the vulnerability of that position. Instead, I knelt down and braced myself by putting my left

18   hand on top of the mattress and leaning the majority of my weight on that hand. As soon as I did

19   so, I felt what I immediately recognized as the stock of a long gun. I have had considerable

20   experience and training with weapons as an officer and am especially familiar with long guns as

21   a patrol rifleman. Given this base of knowledge, my first impression was that the tapered shape I

22   felt was part of a heavy, longer object. I believed it to be the stock of a long gun as it leads to the

23   trigger mechanism of the gun. Based on this observation, I pulled back the blanket on top of the

24   bed, revealing not only the long gun I had felt, but numerous other guns and ammunition as well.

25   I could also see two handguns in the area between the mattress and the box spring. I observed all

26   of these guns mere feet away from where the infant was sitting near the foot of the bed. The

27   document attached to this declaration numbered VV00166 is a fair and accurate description of

28   the guns discovered in the bedroom on the day in question.

DECL. OF LOUIS ALTIC
CR 08-0230 CRB                                      5

17. I immediately returned to the living room and instructed Detective Kalis to detain Toledo-Paz in handcuffs because of the guns I found in the bedroom and my concern for officer and occupant safety. I noticed at this point there was blood on her wrist and a small amount of blood dripping down her fingers. I radioed for medical aide for Toledo-Paz, but I did not have time to investigate the injury further. At this point, I also radioed for backup to help me complete the check of the rest of the residence.

18. Several minutes later, Officers Jones and Whitmer arrived in response to my request for backup. The two officers and I first checked the garage, which we entered through the laundry room. Not finding anyone in need of assistance in the garage, we quickly exited the garage.

19. Upon re-entering the laundry room, I looked to the place from which I had earlier detected the odor of processed marijuana and saw two garbage cans inside a closet. One of the garbage cans was uncovered and I could see in plain view that it was full of plastic bags of processed marijuana. The document attached to this declaration labeled VV00185 is a fair and accurate representation of the uncovered garbage can with bags of marijuana inside as I saw it during the course of my emergency search. I also saw a balance-type scale on a shelf above the garbage cans. The document attached to this declaration labeled VV00187 is a fair and accurate representation of the scale on the shelf above the garbage cans in the laundry room closet as I saw it during the course of my emergency search.

20. As we had not yet searched the attic, I did not stop to investigate the marijuana further. Officers Jones and Whitmer and I worked together to enter the attic through the entrance in the bedroom closet. We first used mirrors and our flashlights to make sure things were clear and then physically entered the attic to make sure no one was in need of assistance.

//
//
//
//
//
//

DECL. OF LOUIS ALTIC
CR 08-0230 CRB                                    6

1    //

2     21. Following our completion of the emergency search, the other officers and I took steps to

3  secure the scene, including making the weapons safe, and Officer Whitmer contacted the

4  Humboldt County Drug Task Force.

5     I declare under penalty of perjury that the forgoing is true and correct.

6

7    Executed this 22nd day of July, 2008.

8

                       Louis Altic

9                        Officer, Eureka Police Department

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF LOUIS ALTIC
CR 08-0230 CRB           7



V V00156



V V00166



V V00185



V V00187



V V00242



V V00248

# Exhibit 3

1  JOSEPH P. RUSSONIELLO (CABN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CABN 163973)
3  Chief, Criminal Division

4  DEREK R. OWENS (CASBN 230237 )
   Assistant United States Attorney
5
   KEVIN J. ROONEY
6  Law Clerk

7     450 Golden Gate Avenue, Box 36055
      San Francisco, CA 94102
8     Telephone: (415) 436-6809
      Facsimile: (415) 436-7234
9

10 Attorneys for Plaintiff

11

12                 UNITED STATES DISTRICT COURT

13               NORTHERN DISTRICT OF CALIFORNIA

14                    SAN FRANCISCO DIVISION

15

16 UNITED STATES OF AMERICA,            )    No. CR 08-0230 MAG
                                        )
17          Plaintiff,                  )    DECLARATION OF SPECIAL AGENT
                                        )    DAN FAGETAN
18                                      )
      v.                                )    Date: August 6, 2008
19                                      )    Time: 10:00 a.m.
   JOSE LEOPOLDO VILLEGAS-              )    Court: Hon. Charles R. Breyer
20 VILLANUEVA,                          )
                                        )
21          Defendant.                  )
                                        )

22

23    I, Dan Fagetan, declare and state as follows:

24    1.  I am a Special Agent with the Federal Bureau of Investigations.

25    2.  I am also a member of the Humboldt County Drug Task Force, or DTF.

26    3.  The following information is provided to the Court as a result of my personal

27 observations.

28    4.  On March 17, 2008, at approximately 10:30 a.m., I received a call from DTF Special

   DECL. OF DAN FAGETAN
   CR 08-0230 CRB                          1

1   Agent Supervisor Jack Nelsen asking for me to respond to 1911 Hilfiker Lane, Apartment 20 in

2   Eureka, California.  Generally, DTF receives calls when police departments in the county find

3   drugs in locations they are investigating.

4       5.   Shortly after receiving the call, I arrived at the apartment in question, as did other DTF

5   agents.  I was assigned to watch over an adult Hispanic male who had identified himself to other

6   officers as Juan Lopez Ontiveros, but who was later identified as Jose Leopoldo Villegas-

7   Villanuevea.

8       6.   Once inside the residence, I stood by and watched over a handcuffed adult Hispanic

9   male subject, later determined to be Jose Leopoldo Villegas-Villanueva, while the other officers

10  and agents secured the area and prepared to seek a search warrant.  Mr. Villegas-Villanueva had

11  his hands behind his back in handcuffs and was sitting on a couch in the living room, which is

12  the room I entered immediately upon walking through the front door of the apartment.

13      7.   I noticed that there were several pieces of artwork on the wall of the living room

14  depicting scorpions.  I asked Mr. Villegas-Villanueva about the scorpion artwork and he talked

15  for several minutes about how small and powerful scorpions are.  Mr. Villegas-Villanueva and I

16  continued to make similar small talk for several minutes, though neither of us said anything

17  about the search of the residence or any criminal ramifications of the search at this time.

18      8.   Mr. Villegas-Villanueva told me that Jose Leopoldo Villegas-Villanueva was his true

19  name.  He stated that he knew we (law enforcement) would find out anyway because he knew he

20  was going to jail.

21      9.   Mr. Villegas-Villanueva also said that we (law enforcement) would not be at his

22  residence if his girlfriend, Esmiralda, had not made that 911 call.  He said that they had been

23  arguing about his other girlfriend, whose car was parked outside of the apartment.  He said that

24  he tried a number of times to convince her not to call 911.  He said that she does not speak

25  English and does not know what happens when you call 911.

26      10.  About ten to fifteen minutes after arriving at the residence, I asked one of the other

27  officers to stay with Mr. Villegas-Villanueva for a moment while I walked into the bedroom.  I

28  then walked into the bedroom and observed Officer Jim Jones of the Eureka Police Department

DECL. OF DAN FAGETAN
CR 08-0230 CRB                              2

1  making several guns safe on the floor, several other guns, including long guns, on the bed, and

2  what I recognized as a "hide-a-can" commonly used to conceal drugs on the nightstand next to

3  the bed.

4      11.    After observing these objects in the bedroom, I exited the room and walked back

5  toward where Mr. Villegas-Villanueva was sitting in the living room. I did not say anything

6  about what I had seen in the bedroom to anyone at this time, nor did I make any gestures toward

7  the bedroom when I returned to the living room.

8      12.    As I returned to the living room, Mr. Villegas-Villanueva gestured toward the

9  bedroom with his head, by cocking his neck in that direction, and said something along the lines

10  of "I'm in deep shit. I knew that stuff was going to get me in trouble."

11      13.    I told Mr. Villegas-Villanueva that he was probably right about getting into trouble and

12  at this point began to initiate a discussion about possible Mr. Villegas-Villanueva's cooperation

13  with law enforcement. I did not Mirandize Mr. Villegas-Villanueva at this point. He was later

14  read his *Miranda* rights by DTF Agent Marvin Kirkpatrick.

15

16  I declare under penalty of perjury that the forgoing is true and correct.

17

18  Executed this 22nd day of July, 2008.

19

20  Dan Fagetan
Special Agent
21  Federal Bureau of Investigation

22

23

24

25

26

27

28

DECL. OF DAN FAGETAN
CR 08-0230 CRB                          3

# Exhibit 4

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT

| Investigation Title | Report Type | Invest. Number |
|---|---|---|
| VILLEGAS-VILLANUEVA, JOSE | OPENING/CLOSING ARREST | HC08-040 |

| Report # | Responsible Agent | Reporting Agent | Date |
|---|---|---|---|
| 1 | M. Kirkpatrick | M. Kirkpatrick | 03-17-2008 |

## SUMMARY:

On 03-17-2008, Agents from the Humboldt County Drug Task Force (HCDTF) obtained and executed a search warrant at 1911 Hilfiker Lane, Apartment 20, Eureka, California. During the search of the apartment, approximately 14,338 grams gross (approximately 31.5 pounds) of dried processed marijuana buds in individual bags, digital and triple-beam scales, packaging material, suspected pay and owes, a loaded Marlin 30-30 rifle, a loaded Maadi Co 7.62x39mm assault rifle, a Cobray 9mm machine-pistol (assault weapon), a suppressor (silencer), two Smith & Wesson .38 caliber pistols, one loaded, a loaded Remington 12-gauge pump shotgun, a hide-a-can containing 28.6 grams of suspected methamphetamine, and indicia for suspects were located and seized in the apartment.

The Remington 870 shotgun came back stolen in a Eureka Police Department burglary investigation (3C05-3897).

Jose VILLEGAS-VILLANUEVA was arrested and is a convicted felon. VILLEGAS-VILLANUEVA was arrested for 11359 H&S, 11378 H&S, 11370.1 H&S, 12022(c) P.C., 12280(b) P.C., 12520 P.C., 12021(a) P.C., 496(a) P.C. and 273a P.C. VILLEGAS-VILLANUEVA's, girlfriend Esmiranlda TOLEDO-PAZ, was also located in the residence and arrested for 11359 H&S, 11378 H&S, 11370.1 H&S and 273a P.C.

VILLEGAS-VILLANUEVA and TOLEDO-PAZ are illegal aliens and immigration holds were placed on them. VILLEGAS-VILLANUEVA and TOLEDO-PAZ's children were placed in protective custody.

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 2

Invest. Title: VILLEGAS-VILLANUEVA, JOSE      Invest. No. HC08-040

DETAILS OF INVESTIGATION:

1.  On 03-17-2008 around 1020 Hours, Humboldt County Drug Task
    Force (HCDTF) Special Agent Supervisor (SAS) Jack Nelsen
    received a telephone call from Eureka Police Department (EPD)
    asking for assistance with a investigation at 1911 Hilfiker
    Lane, Apartment 20, Eureka, California. SAS Nelsen was told
    by EPD that officers had responded to a 9-1-1 call at 1911
    Hilfiker Lane, Apartment 20, Eureka, and that during their
    investigation, they found a large amount of marijuana and
    firearms.  SAS Nelsen told EPD that the HCDTF would be
    responding to assist them.

2.  Around 1034 hours, HCDTF SAS Nelsen, Agents David Miller, Dan
    Fagetan, Gary Bates, Cyrus Silva, Ryan Richardson and I
    arrived at the apartment.  After arrival, I met with EPD
    Officer Louis Altic.  Officer Altic told me Eureka Police
    Officer Daniel Kalis, his recruit Drake Goodale, and he
    received a call for service regarding a 9-1-1 call.  Officer
    Altic told me when the call came into the communications
    center, there was nothing heard and the caller hung up.  The
    9-1-1 call came from 1911 Hilfiker, Apartment 20, Eureka.

3.  Officer Altic told me that upon their arrival, he knocked on
    the front door of Apartment 20, and after a minute or two, a
    Mexican female (later identified as Esmeralda TOLEDO) opened
    the door.  Officer Altic told me when TOLEDO opened the door,
    it would not fully open because the inside chain on the door
    was being used.  Officer Altic told me he could see a Mexican
    male adult (later identified as Juan Lopez ONTIVEROS) behind
    TOLEDO.  Officer Altic told me that he told TOLEDO and
    ONTIVEROS about the 9-1-1 call and that he needed to come in
    to make sure no one was in the need of assistance.  Officer
    Altic told me ONTIVEROS walked back towards a bedroom from the
    living room area, and Officer Altic told them he was coming in
    to make sure no was in need of assistance.  Officer Altic told
    me he told ONTIVEROS to come back and remove the chain or he
    was going to force the door in.

V V00010

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 3

**Invest. Title: VILLEGAS-VILLANUEVA, JOSE    Invest. No. HC08-040**

4.    Officer Altic told me ONTIVEROS slowly walked back to the
front door and removed the chain.  Officer Altic told me he
and Officer Kalis went into the residence to make sure no one
else was in the residence that needed assistance.

5.    Officer Altic told me once inside the residence he placed
handcuffs on ONTIVEROS to detain him.  Once ONTIVEROS was
detained, he and Officer Kalis checked the residence for any
other person(s) to see if they needed assistance.

6.    Officer Altic told me when he checked the bedroom closet, and
then as he kneeled down to look under the bed, he placed one
hand on top of the bed.  Once he placed his hand on the bed,
he felt a hard object under the covers.  Officer Altic didn't
find anyone under the bed, but when he pulled back the cover
on top of the bed, he saw several firearms (pistols and
rifles).

7.    Officer Altic told me he and Officer Kalis continued to check
the apartment, and upon him walking into the kitchen area, he
could smell a strong odor of green marijuana.  Officer Altic
told me when he checked a closet door near the dining room
area, he saw a garbage can approximately ¾-full of dried
marijuana in clear bags.

8.    Officer Altic told me EPD Officer Jones arrived at the
apartment to assist and was able to make sure no one was in
need of assistance in the attached garage.  Officer Altic told
me in the garage was a blue pickup with California license
8M50022.

9.    TOLEDO was placed into a marked EPD unit and ONTIVEROS was
left handcuffed in the apartment.

10.   Officer Altic told me for officer safety, Officer Jones
unloaded the firearms located on the bed.

11.   Officer Altic told me Officer Kalis had patrolled this area by
the apartment complex prior to the 9-1-1 service call coming

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 4

Invest. Title: VILLEGAS-VILLANUEVA, JOSE     Invest. No. HC08-040

out and he saw ONTIVEROS exiting the silver four-door Acura, California license 4ZGT344, carrying a package of Huggies.

12. I saw a black Chevrolet Silverado, California license 8A63962, and a gold Jeep Grand Cherokee, California license 3SYB555, parked in the carport for Apartment 20.

13. I requested a vehicle registration check on California licenses 4ZGT344, 8A63962, 8M50022 and 3SYB555. California license 4ZGT344 came back to a 2001 Acura four-door, registered to Abelardo Gonzalez, 5 Newell Ct., Apt 5304, Palo Alto. California license 8A63962 came back to a 1992 Chevrolet, registered to Juan Ontiveroslopez, P.O. Box 3138, Eureka. California license 8M50022 came back to a 1990 Chevrolet, registered to Juan Lopez Ontiveros, P.O. Box 3138, Eureka. California license 3SYB555 came back to a 1994 Jeep, registered to Regina Cruz Hurtado, 1344 F Street, Eureka California.

14. Agent Richardson told me he met with TOLEDO and she had a cut on her wrist. TOLEDO told Agent Richardson that she was cleaning the bathroom. TOLEDO told Agent Richardson she called 9-1-1 because one of her children was sick.

15. After talking with Officer Altic and Agent Richardson, I left to prepare a search warrant and affidavit for search warrant.

16. I had Agents Miller, Silva, Fagetan, Agent Bates and EPD officers stand-by at the apartment until I was able to obtain a search warrant. It should be noted the Mexican male who was located in the apartment was being detained in the apartment while I was obtaining a search warrant for the apartment. Officer Altic had placed the TOLEDO under arrest for 273a P.C. and contacted Humboldt County Child Welfare Services (CWS) regarding taking the children into protective custody.

17. I prepared a search warrant and affidavit for search warrant. I sent the search warrant and affidavit for search warrant via e-mail to Humboldt County Deputy District Attorney (DDA) Maggie Fleming to review the search warrant and affidavit for

V V00012

**STATE OF CALIFORNIA**
**DEPARTMENT OF JUSTICE**
**HUMBOLDT COUNTY DRUG TASK FORCE**

**INVESTIGATION REPORT**
**CONTINUATION**                     Page No. 5

**Invest. Title: VILLEGAS-VILLANUEVA, JOSE     Invest. No. HC08-040**

search warrant.  DDA Fleming reviewed the search warrant and affidavit for search warrant.

18.  After having the search warrant and affidavit for search warrant reviewed, I drove to the Humboldt County Superior Court to attempt to meet with a Humboldt County Superior Court Judge to have the search warrant and affidavit for search warrant reviewed and signed.  Upon arrival at the Humboldt County Superior Court, I found all the Humboldt County Superior Court Judges were on the bench and I would have to wait.  Around 1405 hours, I met with Humboldt County Superior Court Judge Bruce Watson.  I gave Judge Watson the search warrant and affidavit for search warrant for him to review.  Judge Watson read the search warrant and affidavit for search warrant and then signed them.  The search warrant was signed at 1416 hours.

19.  After having the search warrant signed, I telephoned and talked with Agent Bates.  I told Agent Bates the search warrant had been signed for the apartment, all the vehicles at the apartment, and Ontiveros and TOLEDO's person.  I asked Agent Bates if he could start by taking outside and inside digital photographs of the apartment, vehicles parked outside of the apartment and in the garage.  I told Agent Bates that I should be at the location after he was finished taking the photographs.

20.  Upon my arrival, I met with Agent Bates and he told me he took the digital photographs as I requested.  Once the digital photographs were taken, we conducted a search of the apartment.

21.  During the search of the apartment, I found several firearms lying on the master bedroom floor along with other items of evidence.  The firearms had been placed on the floor after EPD Officer Jones unloaded them and made sure they were safe to handle.  All the firearms were originally located on top of the bed in the master bedroom.  Located on the bedroom floor was a Marlin 30-30 rifle (Exhibit 001-1000 ), when found, it was loaded with one cartridge in the chamber and five in the magazine); a silver Smith & Wesson .38-caliber pistol (Exhibit

V V00013

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 6

Invest. Title: VILLEGAS-VILLANUEVA, JOSE    Invest. No. HC08-040

001-1001), when found, it was loaded with six cartridges); a
blue Smith & Wesson pistol (Exhibit 001-1002), when found, it
was unloaded; a black Cobray 9mm machine pistol with a laser
and outside area of barrel threaded (Exhibit 001-1003), when
found, it was loaded with one cartridge in the chamber and 29
cartridges in the magazine; a Maadi Co pistol-grip 7.62 x 39mm
semi-automatic rifle (Exhibit 001-1004), when found, it was
loaded with one cartridge in the chamber and 29 cartridges in
the removable magazine; a black Remington 870 12-gauge shotgun
(Exhibit 001-1005), when found, it was loaded with four shells
in the magazine; a silver suppressor (silencer) (Exhibit 001-
1003B), when found, it was between the mattress of the master
bed; miscellaneous live cartridges and shells (Exhibit 001-
1006), when found, they were on top of the master bed with the
firearms.

22.  Continuing to search the master bedroom, I found a green
     notebook (Exhibit 001-1007).    Agent Richardson said it
     contained suspected pay and owe records in Spanish.    A
     Motorola cellular telephone (Exhibit 001-1009), a Squirt hide-
     a-can containing 28.6 grams gross of suspected methamphetamine
     (Exhibits 001-1009 and 001-1009A), two digital scales,
     indicia, miscellaneous paperwork, and photographs (Exhibits
     001-1010), Resident Alien card, Social Security Card, Mexico
     passport, and not a government identification card, all for
     TOLEDO (Exhibit 001-1011), and miscellaneous paperwork and
     indicia (Exhibit 001-1012).

23.  In the bathroom area, I saw a drop of blood.    Digital
     photographs were taken.

24.  In the living room/kitchen area, I found indicia for Ontiveros
     and a checkbook (Exhibit 001-2000).    In a kitchen drawer
     located on the west wall as one walks into the kitchen area,
     I saw four boxes of unused clear plastic bags and oven bags
     (packaging material).  Digital photographs of these boxes were
     taken.

25.  In the second bedroom which was empty, I found in the closet
     two black garbage cans containing 14,338 grams gross
     (approximately 31.5 pounds) of dried processed marijuana buds

V V00014

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                        Page No. 7

**Invest. Title:  VILLEGAS-VILLANUEVA, JOSE    Invest. No. HC08-040**

in individual bags (Exhibits 001-3000 to 001-3000F and 001-3001 to 001-3001Ac), digital scale (Exhibit 001-3000G), and a triple-beam scale (001-3002).

26.  In the pickup parked in the garage, California license 8M50022, I found three Six Rivers Property Management rent receipts with the name of Juan on them (Exhibit 001-4000).

27.  In Ontiveros' wallet, I found indicia, miscellaneous paperwork, a California driver's license with Ontiveros' name on it and the male who was being detained (Ontiveros) photograph on it (Exhibit 001-5000). On Ontiveros' person, a pager and cellular telephone were located (Exhibit 001-5001).

28.  Digital photographs were taken of the items of evidence prior to them being seized pursuant to the search warrant. I filled out a property receipt form for the above items of evidence I seized from the apartment. It should be noted when Agent Fagetan filled out the personal history on the Mexican male, he identified himself as Juan Lopez Ontiveros, but during the search of the apartment, I found a Mexican Voters card with the name of Lepolodo Villegas Villanueva. Agent Fagetan told me after searching the apartment, the Mexican male told him Ontiveros was not his name and his real name is Leopoldo Villegas Villanueva, date of birth 09-10-1976.

29.  TOLEDO had already been transported to Humboldt County Correctional Facility (HCCF) and booked for 273a P.C. by Officer Altic.

30.  VILLEGAS-VILLANUEVA speaks and understands English. I told VILLEGAS-VILLANUEVA he was under arrest and not free to leave. I told VILLEGAS-VILLANUEVA that prior to me talking with him, I needed to read him his rights, Miranda Warning. I read VILLEGAS-VILLANUEVA his Miranda Rights, per Miranda Card, and after reading him his rights, he told me he wanted to have a lawyer present. I didn't ask VILLEGAS-VILLANUEVA any questions.

31.  I gave copies of the property forms to the Mexican male in the apartment along with a copy of the search warrant.

V V00015

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 7

Invest. Title: VILLEGAS-VILLANUEVA, JOSE    Invest. No. HC08-040

in individual bags (Exhibits 001-3000 to 001-3000F and 001-3001 to 001-3001Ac), digital scale (Exhibit 001-3000G), and a triple-beam scale (001-3002).

26. In the pickup parked in the garage, California license 8M50022, I found three Six Rivers Property Management rent receipts with the name of Juan on them (Exhibit 001-4000).

27. In Ontiveros' wallet, I found indicia, miscellaneous paperwork, a California driver's license with Ontiveros' name on it and the male who was being detained (Ontiveros) photograph on it (Exhibit 001-5000). On Ontiveros' person, a pager and cellular telephone were located (Exhibit 001-5001).

28. Digital photographs were taken of the items of evidence prior to them being seized pursuant to the search warrant. I filled out a property receipt form for the above items of evidence I seized from the apartment. It should be noted when Agent Fagetan filled out the personal history on the Mexican male, he identified himself as Juan Lopez Ontiveros, but during the search of the apartment, I found a Mexican Voters card with the name of Lepolodo Villegas Villanueva. Agent Fagetan told me after searching the apartment, the Mexican male told him Ontiveros was not his name and his real name is Leopoldo Villegas Villanueva, date of birth 09-10-1976.

29. TOLEDO had already been transported to Humboldt County Correctional Facility (HCCF) and booked for 273a P.C. by Officer Altic.

30. VILLEGAS-VILLANUEVA speaks and understands English. I told VILLEGAS-VILLANUEVA he was under arrest and not free to leave. I told VILLEGAS-VILLANUEVA that prior to me talking with him, I needed to read him his rights, Miranda Warning. I read VILLEGAS-VILLANUEVA his Miranda Rights, per Miranda Card, and after reading him his rights, he told me he wanted to have a lawyer present. I didn't ask VILLEGAS-VILLANUEVA any questions.

31. I gave copies of the property forms to the Mexican male in the apartment along with a copy of the search warrant.

V V00016

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                          Page No. 8

Invest. Title: VILLEGAS-VILLANUEVA, JOSE    Invest. No. HC08-040

32. I filled out booking and probable cause forms.  I placed
    VILLEGAS-VILLANUEVA under arrest for 11359 H&S, 11378 H&S,
    11370.1 H&S, 11366.5(a) H&S, 12022( c) P.C., 12280(b) P.C.,
    12520 P.C. and 273a P.C.

33. It should be noted that the suspects' children had access to
    the loaded firearms and suspected methamphetamine.  The eight-
    month-old child was in a swing at the time of incident.  The
    firearms were accessible to a child who could pull themselves
    up and stand against furniture.  The four-year-old child was
    at preschool at the time of the incident, but lives at 1911
    Hilfiker Lane, Apartment 20, Eureka with her parents.  Located
    in the master bedroom are the children's beds.  The suspected
    methamphetamine was located in the master bedroom headboard
    drawer in a Squirt hide-a-can with the lid undone.  The drawer
    had no lock.

34. EPD Officer Altic transported VILLEGAS-VILLANUEVA to the HCCF
    for booking.  It should be noted that I placed on the booking
    form to confirm VILLEGAS-VILLANUEVA's identity.

35. Prior to leaving the apartment, exit digital photographs were
    taken, and I made sure the doors to the apartment were locked.

36. I telephoned Humboldt County Sheriff's Office and asked them
    to run the six firearms I had seized at 1911 Hilfiker Lane,
    Apartment 20, Eureka.  I was advised that the Remington 870
    shotgun (Exhibit 001-1005) came back stolen in an EPD burglary
    investigation (3C05-3897).  The rest of the firearms came back
    not stolen and not registered.   The two assault weapons
    (Exhibits 001-1003 and 001-1004) are not registered assault
    weapons.  I asked the communications center to place a locate
    on the shotgun.  I later contacted EPD and obtained a copy of
    the burglary investigation regarding the shotgun being stolen
    (EPD case number 3C05-3897).  I later received a copy of EPD
    case number 3C05-3897 and attached it to this investigation
    report.

37. I received a telephone call from HCCF Correctional Officer
    (CO) Stan Wickham.  CO Wickham told me the Mexican male's
    true name is Jose VILLEGAS-VILLANUEVA, date of birth 09-10-

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 9

Invest. Title:  VILLEGAS-VILLANUEVA, JOSE    Invest. No. HC08-040

1976.  CO Wickham told me VILLEGAS-VILLANUEVA has assumed the identity of Juan Lopez Ontiveros.  CO Wickham told me VILLEGAS-VILLANUEVA has been identified by fingerprints and photograph as VILLEGAS-VILLANUEVA.  CO Wickham told me the female Officer Altic brought in earlier (TOLEDO) was identified as Esmiranlda TOLEDO-PAZ.  CO Wickham told me VILLEGAS-VILLANUEVA and TOLEDO-PAZ are illegal aliens and he has placed immigration holds on them.

38.  I ran a criminal history on Jose VILLEGAS-VILLANUEVA and it came back that he is a convicted felon for 245(a)(2) P.C., and upon an NCIC check, VILLEGAS-VILLANUEVA is a deported criminal/aggravated felon.

39.  Based on this information and the shotgun being stolen, I asked CO Wickham to add charges of 12021(a) P.C. and 496(a) P.C. on VILLEGAS-VILLANUEVA.  TOLEDO-PAZ was arrested for 273a P.C. by Officer Altic.  I am asking TOLEDO-PAZ be charged with 11359 H&S, 11378 H&S, 11370.1 and 11366.5(a) H&S.

40.  On 03-13-2008 around 1300 hours, I conducted function tests on the six firearms located and seized in this investigation (Marlin 30-30 rifle, Exhibit 001-1000; silver Smith & Wesson .38-caliber pistol, Exhibit 001-1001; blue Smith & Wesson .38-caliber pistol, Exhibit 001-1002; black Cobray 9mm machine pistol, Exhibit 001-1003; Maadi Co 7.62 x 39mm rifle, Exhibit 001-1004; and Remington 12-gauge shotgun, Exhibit 001-1005.) Based on the function test, I found all these firearms fired and are functional firearms.  The safety on Marlin, Cobray, Maadi, and Remington all work.  The Smith & Wesson pistols don't have safety switches.  It should be noted that I put the suppressor (silencer) (Exhibit 001-1003B) on the Cobray when firing, and it suppressed the gunshot noise.  Also, the laser affixed to the Cobray works.

41.  On 03-18-2008 around 1100 hours, I conducted a presumptive test on the suspected methamphetamine (Exhibit 001-1009A) and it screened positive for methamphetamine.  I conducted the presumptive test as I have been trained, and followed the directions in the color screening kit provided by California Department of Justice.  There were no problems with the test.

V V00018

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 10

**Invest. Title:  VILLEGAS-VILLANUEVA, JOSE    Invest. No. HC08-040**

    I filled out a controlled substances screening report regarding the presumptive test I conducted.

42.   I later booked all the exhibits into evidence and they were later transported to EPD and released to the evidence section. EPD Officer's Altic investigation number for his investigation is 3C08-2057. I obtained a copy of his investigation report and attached it to this investigation report. Firearms were located and seized in this investigation. Firearms forms were filled out and attached to this investigation. All firearms were entered into AFS as being seized as evidence by the HCDTF.

**PHYSICAL DESCRIPTIONS:**

1.   VILLEGAS-VILLANUEVA, Jose - see personal history form.

2.   TOLEDO-PAZ, Esmiralda - see personal history form.

**EVIDENCE LIST:**

    Finder: Kirkpatrick           Recorder:  Kirkpatrick

    Photographs Taken:  Yes - Bates    Number:  118

    Firearms Seized:  Yes - 6        Stolen?  Yes - one

    All evidence will be stored at the Eureka Police Department evidence storage facility unless noted below.

    The following items of evidence were located and seized in the residence located at 1911 Hilfiker Lane, Apartment 20, Eureka, California.

V V00019

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                           Page No. 11

**Invest. Title:  VILLEGAS-VILLANUEVA, JOSE**        **Invest. No. HC08-040**

Exhibit 001-1000.        Marlin model 336 30-30 lever-action rifle,
                         serial number 25095145, with scope. When
                         rifle was found, it was loaded with one live
                         cartridge in chamber and five live cartridges
                         in the magazine. **Rifle was located on top of
                         the bed in the master bedroom.**

Exhibit 001-1000A.       Six live 30-30 cartridges. One from the
                         chamber of the 30-30 rifle and the other five
                         from the magazine area.

Exhibit 001-1001.        Silver Smith & Wesson .38-caliber, model
                         number 64, serial number D523486. When pistol
                         was found, it was loaded with six live .38
                         cartridges. **Pistol was located on top of the
                         bed in the master bedroom.**

Exhibit 001-1001A.       Six live .38 caliber cartridges.

Exhibit 001-1002.        Blue Smith and Wesson, model 38 Special,
                         serial number V141101. When pistol was found,
                         it was empty. **Pistol was located on top of
                         the bed in the master bedroom.**

Exhibit 001-1003.        Black Cobray, model number PM-11, 9mm machine
                         pistol with laser mounted and end of barrel
                         threaded (assault weapon), serial number 94-
                         0023659. When pistol was found, it was loaded
                         with one live 9mm cartridge in the chamber and
                         29 live 9mm cartridges in the magazine.
                         Affixed to the end of the barrel was a silver
                         suppressor (silencer). **Pistol was located on
                         top of the bed in the master bedroom.**

Exhibit 001-1003A.       Magazine for machine pistol.

Exhibit 001-1003A1.      Thirty live 9mm cartridges.

V V00020

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 12

**Invest. Title:  VILLEGAS-VILLANUEVA, JOSE**    | **Invest. No. HC08-040**

Exhibit 001-1003B.   Silver suppressor (silencer).   Per Officer
                     Altic, suppressor was sticking out between
                     mattresses.

Exhibit 001-1004.    Maadi Co, model 51A AKM, serial number
                     Cm01293, 7.62x39mm semi-automatic pistol grip
                     rifle (assault weapon).  When rifle was found,
                     it was loaded with one live cartridge in the
                     chamber and 29 live cartridges in the
                     magazine.  **Rifle was located on top of the bed
                     in the master bedroom.**

Exhibit 001-1004A.   Magazine for rifle.

Exhibit 001-1004A1.  Thirty live 7.62x39mm cartridges.

Exhibit 001-1005.    Remington, model 870 Express magnum, 12-gauge
                     pump shotgun, serial number D225328.   When
                     shotgun located, it was loaded with four live
                     12-gauge shells in the magazine.  **Shotgun was
                     located on top of the bed in the master
                     bedroom.   Shotgun is reported stolen Eureka
                     Police Department case number 3C05-3897.**

Exhibit 001-1005A.   Four live 12-gauge shells.

Exhibit 001-1006.    Miscellaneous live cartridges (eight 12-gauge
                     shot, four 12-gauge rifle slugs, 14 30-30,
                     opened box containing 30 9mm Combat 9 Hansen
                     Cartridge Company, open box containing 20 9mm
                     Winchester, and clear plastic bag containing
                     49 7.62x39mm).  **Cartridges were located on top
                     of the bed in the master bedroom.**

Exhibit 001-1007.    Green composition notebook wide-ruled.
                     Information inside notebook is in Spanish.
                     Per Agent Richardson, this notebook contains
                     pay and owes.   Located on top shelf of
                     headboard in master bedroom.

V V00021

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                          Page No. 13

Invest. Title: **VILLEGAS-VILLANUEVA, JOSE**        Invest. No. HC08-040

Exhibit 001-1008.        Black Motorola cellular telephone, silver US
                         Balance USX-500 digital scale (turned power on
                         and found it works), and indicia (Arcata Auto
                         Supply dated 03-06-2008 for Juan Lopez 502-
                         7212.  Located in southwest top drawer of
                         headboard in master bedroom.

Exhibit 001-1009.        Squirt hide-a-can.  Located in southwest top
                         drawer of headboard in master bedroom.

Exhibit 001-1009A.       Clear plastic sandwich bag containing 28.6
                         grams gross of suspected methamphetamine.  Top
                         tied in knot.

Exhibit 001-1010.        Two scales, indicia, miscellaneous paperwork,
                         and photographs.  One black Triton T2 120G x
                         0.1g digital scale (turned on and found it
                         works).  The other scale is a US Balance 350g
                         digital scale.  Located in bottom shelf in a
                         cardboard box located in closet of master
                         bedroom.

Exhibit 001-1011.        Resident  Alien  card  for  TOLEDO, Social
                         Security card for TOLEDO, Mexico passport for
                         TOLEDO, not a government document California
                         identification card for TOLEDO, and pink Sanyo
                         cellular telephone.  Located in black purse in
                         southwest corner of bedroom.

Exhibit 001-1012.        Miscellaneous paperwork and indicia.  Located
                         on  4th  shelf  in  bedroom  closet  next  to
                         bathroom.

Exhibit 001-2000.        Possible pay and owes and Coast Central Credit
                         Union checkbook for Juan Lopez Ontiveros.
                         Located in top drawer of night stand located
                         in living room (east wall).

Exhibit 001-3000.        Black plastic garbage can containing six bags
                         of marijuana and digital scale.  Located in
                         the closet of second empty bedroom closet.

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 14

Invest. Title:  VILLEGAS-VILLANUEVA, JOSE  |  Invest. No. HC08-040

Garbage can not taken but digital photographs were taken.

Exhibit 001-3000A.    Clear oven bag containing 692 grams gross of dried processed marijuana buds.

Exhibit 001-3000B.    Clear oven bag containing 70 grams gross of dried processed marijuana buds.

Exhibit 001-3000C.    Clear oven-type bag containing 616 grams gross of dried processed marijuana buds.

Exhibit 001-3000D.    Clear plastic bag containing 10 grams gross of dried processed marijuana buds.

Exhibit 001-3000E.    Clear plastic bag containing 48 grams gross of dried processed marijuana buds.

Exhibit 001-3000F.    Clear plastic bag containing 26 grams gross of marijuana and marijuana seeds.

Exhibit 001-3000G.    US Balance USN-6000 digital scale.

Exhibit 001-3001.     Black plastic garbage can containing 29 clear plastic bags of dried processed marijuana buds.  Located in the closet of second empty bedroom closet.  Garbage can not taken, but digital photographs were taken.

Exhibit 001-3001A.    Clear oven bag containing 452 grams gross of dried processed marijuana buds.

Exhibit 001-3001B.    Clear oven bag containing 458 grams gross of dried processed marijuana buds.

Exhibit 001-3001C.    Clear oven bag containing 450 grams gross of dried processed marijuana buds.

Exhibit 001-3001D.    Clear oven bag containing 448 grams gross of dried processed marijuana buds.

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION          Page No. 15

Invest. Title: VILLEGAS-VILLANUEVA, JOSE      Invest. No. HC08-040

Exhibit 001-3001E.   Clear oven bag containing 458 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001F.   Clear oven bag containing 458 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001G.   Clear oven bag containing 450 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001H.   Clear oven bag containing 454 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001I.   Clear oven bag containing 436 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001J.   Clear oven bag containing 454 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001K.   Clear oven bag containing 456 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001L.   Clear oven bag containing 420 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001M.   Clear oven bag containing 458 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001N.   Clear oven bag containing 458 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001O.   Clear oven bag containing 458 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001P.   Clear oven bag containing 462 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001Q.   Clear oven bag containing 458 grams gross of
                     dried processed marijuana buds.

Exhibit 001-3001R.   Clear oven bag containing 454 grams gross of
                     dried processed marijuana buds.

V V00024

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION                    Page No. 16

Invest. Title: **VILLEGAS-VILLANUEVA, JOSE**    Invest. No. HC08-040

Exhibit 001-3001S.    Clear oven bag containing 458 grams gross of
                      dried processed marijuana buds.

Exhibit 001-3001T.    Clear oven bag containing 458 grams gross of
                      dried processed marijuana buds.

Exhibit 001-3001U.    Clear oven bag containing 456 grams gross of
                      dried processed marijuana buds.

Exhibit 001-3001V.    Clear oven bag containing 456 grams gross of
                      dried processed marijuana buds.

Exhibit 001-3001W.    Clear oven bag containing 474 grams gross of
                      dried processed marijuana buds.

Exhibit 001-3001X.    Clear oven bag containing 462 grams gross of
                      dried processed marijuana buds.

Exhibit 001-3001Y.    Clear oven bag containing 460 grams gross of
                      dried processed marijuana buds.

Exhibit 001-3001Z.    Clear oven bag containing 458 grams gross of
                      dried processed marijuana buds.

Exhibit 001-3001Aa.   Clear oven bag containing 458 grams gross of
                      dried processed marijuana buds.

Exhibit 001-3001Ab.   Clear oven bag containing 458 grams gross of
                      dried processed marijuana buds.

Exhibit 001-3001Ac.   Clear oven bag containing 136 grams gross of
                      dried processed marijuana buds.

Exhibit 001-3002.     Ohaus triple-beam scale.  Located on top shelf
                      of second bedroom closet.

Exhibit 001-4000.     Three rental receipts from Six Rivers Property
                      Management for Jose (1911 Hilfiker #20, 140 N.
                      Pacific #8 (Rio Dell), and 1833 Pine Street
                      #5).   Located in blue Chevrolet pickup,

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
HUMBOLDT COUNTY DRUG TASK FORCE

INVESTIGATION REPORT
CONTINUATION          Page No. 17

Invest. Title:  VILLEGAS-VILLANUEVA, JOSE      Invest. No. HC08-040

California license 8M50022, driver's side door panel.  Pickup parked in garage.

Exhibit 001-5000.    Indicia and miscellaneous paperwork from suspect VILLEGAS-VILLANUEVA's wallet.

Exhibit 001-5001.    Maroon Motorola cellular telephone and black Apollo pager.  Located on suspect VILLEGAS-VILLANUEVA'S person.

Exhibit 001-6000.    CD-R disc, digital photographs taken.


Marvin Kirkpatrick      Date          Jack Nelsen          Date
Special Agent                         Special Agent SAS

MK:sa
d 03-20-08
t 03-26-08

V V00026

# Exhibit 5

**FILED**

MAR 24 2008

SUPERIOR COURT OF CALIFORI
COUNTY OF HUMBOLDT

COUNTY OF HUMBOLDT, STATE OF CALIFORNIA

SEARCH WARRANT                    NO. 6499

THE PEOPLE OF THE STATE OF CALIFORNIA, to any sheriff, policeman, or peace officer, proof by affidavit having been made before me by

**Special Agent Marvin Kirkpatrick**

that there is probable cause to believe the property described herein may be found at the locations set forth and that such property is seizable under 1524 P.C. in that it:

[ ] Was stolen or embezzled;

[X] Was used as the means of committing a felony;

[X] Is possessed by a person with the intent to use it as a means of committing a public offense; or is possessed by another to whom he may have delivered it for the purpose of concealing it or preventing its discovery;

[X] Is evidence, which tends to show a felony has been committed or a particular person has committed a felony;

[ ] Is evidence which tends to show sexual exploitation of a child, in violation of Penal Code Section 311.3 has occurred or is occurring.

**YOU ARE THEREFORE COMMANDED TO SEARCH:**

**THE PREMISES located at and described as:** 1911 Hilfiker Lane Apartment 20 Eureka California (Humboldt County). Further described as an apartment complex single story. The apartment complex is tan with white trim. Apartment 20 is the first one on the right when driving into 1911 Hilfiker Apartment Complex. The number of 20 are on the front door.

**- Humboldt County Drug Task Force Agents and Eureka Police Officers are standing by at this apartment for the issuance of this search warrant -**

Including all, appurtment buildings, attics, storage buildings, and any containers thereon which could contain any of the items sought.

THE CONTAINER(S) located at and described as: N/A

THE VEHICLE(S) described as:

1. Gold Jeep grand Cherokee California license 3SYB555

2. Silver Acura 4-door California license 4ZGT344.

3. Black Chevrolet Silverado pickup California license 8A63962.

4. Blue Chevrolet pickup California license 8M50022.

**Any other vehicle(s) on the described property and any vehicle(s) under the control of and or registered to Juan Lopez ONTIVEROS or Esmeralda TOLEDO as evident by keys, registration papers, ownership papers, or DMV documents.**

Including the passenger compartment, storage areas such as trunk and glove box, and any containers with the vehicle(s) that could contain any of the items sought.

THE PERSON(S) OF:

1. Juan Lopez ONTIVEROS date of birth 06-24-1971, Mexican male adult, 5-8, 180, black hair, brown eyes (currently detained at 1911 Hilfiker Lane Apartment 20 Eureka California).

2. Esmeralda TOLEDO date of birth 01-05-1981, Mexican female adult, (currently detained at 1911 Hilfiker Lane Apartment 20 Eureka California).

FOR THE FOLLOWING PROPERTY: Attachment "A"

and to seize it or any part thereof and retain such property in your custody subject to further order of this court, pursuant to Penal Code section 1536, except items of money, negotiable instruments, securities, and other items of value which are forfeitable under Health and Safety code section 11470 et seq.



GOOD CAUSE HAVING BEEN SHOWN BY AFFIANT, you may do the
following which bears my initials:

_____You may serve this warrant at any time of the day or
night, under penal code section 1533.


GIVEN under my hand and dated

this __17__ day of _____, 20____, at ____ __.M.


_____
Magistrate

Judge of the Superior Courts of the Humboldt Judicial District.

3

ATTACHMENT "A"

**MARIJUANA**, in all forms; scissors, scales, measuring and weighing devices frequently used to prepare marijuana for commercial distribution; garbage bags, zip-lock bags, paper bags and similar containers commonly used to package and store marijuana;

Items of personal property indicating sales of marijuana, such as buyer lists, sellers lists, and pay and owe sheets.

Computer hardware, software and data including, but not limited to central processing units (CPU's), hard disks, hard disk drives, floppy disk drives, tape drives, CD-ROM drives, display screens, keyboards, printers, modems, personal digital assistant's (PDA's), scanning devices, digital cameras / camcorders / VCR's, and other image capturing / reproducing devices, magnetic tapes, cassette tapes, and floppy disks found together or separately from one another, written documentation, whether typed or hand written, including, but not limited to, computer manuals and instructions for the use of any computers and their accessories as well as documentation containing passwords.

I seek permission to remove all computer related items as described above for examination at the Humboldt County Sheriff's Office, or other facility, because the contents of these items or containers are not readily apparent by visual inspection. The items may require the use of a projector or other equipment to see if it contains material described above. In the event that one or more of the items described above are located, it would take hours or even days to go through on the premises. This would lead to undue interference with the place to be searched and would represent an undue interference with my other assigned duties.

**Firearms;**

Items of personal property tending to identify the persons having control of the property and areas to be searched, including, but not limited to bills, receipts, address books, photographs, loan documents, passbooks, checkbooks, lease agreements, deeds, addressed envelopes, diaries and keys.

Officers shall be allowed to answer the telephone and return calls without revealing their true identity, and to review messages on any telephone answering device, and to recall and illuminate numbers displayed on any pager located within the areas to be searched.

Officers shall also be allowed to examine all property located
within the area(s) to be searched for manufacturer's serial
numbers or other owner applied serial numbers.

V V00071