1  BARRY J. PORTMAN
   Federal Public Defender
2  NED SMOCK
   Assistant Federal Public Defender
3  KERAMET REITER
   Law Clerk
4  555 - 12th Street
   Suite 650
5  Oakland, CA 94607-3627
   Telephone:  (510) 637-3500
6
   Counsel for Defendant VILLEGAS-VILLANUEVA
7

8

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA,        )   No. CR-08-0230 CRB
                                     )
13                  Plaintiff,       )   DEFENDANT'S REPLY TO UNITED
                                     )   STATES' RESPONSE TO
14  vs.                              )   DEFENDANT'S MOTION TO
                                     )   SUPPRESS EVIDENCE
15  JOSE LEOPOLDO VILLEGAS-          )
    VILLANUEVA,                      )
16                                   )
                    Defendant.       )
17  _____

18

19  I.     **INTRODUCTION**

20         The government contends that the warrantless entry and subsequent search of the

21  apartment at 1911 Hilfiker Lane were valid under the emergency exception to the warrant

22  requirement.  However, the government falls far short of meeting its burden of justifying either the

23  warrantless entry or the scope of the warrantless search.  Instead of forcibly entering the

24  apartment within minutes of arriving and performing a lengthy search, the officers should have

25  inquired further to determine whether there was any reasonable basis to believe there was an

26  immediate need to protect others or themselves from harm.

1    The government relies upon nine factors that purportedly support the officers' warrantless

2    entry into the apartment.  Two of these factors – a hang-up 911 call received by the emergency

3    dispatcher and a subsequent busy signal – are insufficient alone to justify a warrantless entry.  The

4    other seven factors culled together by the government – including officer observations that the

5    residents of the apartment had difficulty communicating in English and were hesitant to open the

6    door for officers – are not recognized justifications for a warrantless emergency entry.

7    Moreover, the factors and explanations now offered by the government to establish a reasonable

8    belief that there was an emergency do not comport with the documented behavior of the officers

9    at the time of the entry and search.

10    Once the officers forcibly entered the apartment, their search went well beyond what was

11    reasonable given the circumstances known to them.  Further, contrary to the government's

12    assertions, the plain feel doctrine does not apply to a pat down of a bed, and the smell of

13    marijuana does not allow for further warrantless searching.  Because the entry and search were

14    illegal, the inevitable discovery doctrine does not apply.  Finally, because Mr. Villegas-Villanueva

15    was subjected to a custodial interrogation before he was *Mirandized*, all statements made during

16    that interrogation must be suppressed.

17    **II.    ARGUMENT**

18    **A.    The EPD Dispatch Logs Provide Further Details about the Entry and Search and
         Contradict the Justifications Offered by the Government**

19    The CAD Event logs attached to the Declaration of Officer Kalis *(Gov't Resp. to Def.*

20    *Mot. Supp.*, *Exh. 1, V0052-V0054)* belie the government's contention that officers reasonably

21    believed there was an emergency at hand both before they entered the apartment and at the time

22    they began to search the apartment.  Those "CAD Call Information" printouts, which document

23    calls to and from the Eureka Police Department (EPD) dispatch center, provide the best available

24    timeline detailing the way the events at 1911 Hilfiker Lane unfolded.  What follows is a brief

25    chronology summarizing the relevant information in those printouts:

26

DEFENDANT'S MOTION TO SUPPRESS REPLY    2

1   **9:16:47 a.m.**   911 call ends with a hang up.

2   **9:16:57 a.m.**   Dispatch calls back and gets a busy signal.

3   **9:17:36 a.m.**   Dispatch calls back and gets a busy signal.

4   **9:26:44 a.m.**   Officer Altic is dispatched to the apartment.

5   **9:27:03 a.m.**   Officer Kalis is dispatched to the apartment.

6   **9:31:57 a.m.**   Officer Altic reports that he is beginning a "self-initiated" task

7   **9:32:16 a.m.**   Officer Kalis reports that he is on scene.

8   **9:33:01 a.m.**   Officer Altic reports that he has completed a "self-initiated" task.

9   **9:33:05 a.m.**   Officer Altic reports that he is on scene.

10  **9:37:13 a.m.**   Officer Altic reports that he is inside the apartment with a male and female and
                       has the male detained.  He indicates that the situation is under control and that no
11                     other units are needed.

12  **9:42:03 a.m.**   Officer Jones is dispatched to the apartment.

13  **9:44:53 a.m.**   Officer Altic calls dispatch to request medical assistance for a hand injury to Ms.
                       Toledo-Paz.
14
    **9:47:14 a.m.**   Officer Jones reports that he is on scene.
15
    **9:47:18 a.m.**   Officer Whitmer is dispatched and reports that he is on scene.
16
    **9:56:34 a.m.**   Officer Altic reports that the building is clear and that they found a large amount
17                     of marijuana.

18  **9:56:54 a.m.**   Officer Altic reports that a large amount of firearms have been found and he
                       request that the Humboldt County Drug Task Force respond to the scene.
19
            The printouts reveal that it was not until ten minutes after the 911 call from 1911 Hilfiker
20
    Lane that any EPD officer was dispatched to inquire about the well-being of the apartment
21
    residents.  The narrative section of the "CAD Call Information" printout indicates that the 911
22
    hang-up call occurred at 9:16:47 a.m.  A callback by the dispatcher at 9:16:57 a.m. got a busy
23
    signal.  Another callback at 9:17:36 a.m. got another busy signal.  *Gov't Resp. to Def. Mot.*
24
    *Supp.*, *Exh. 1, V00052.*  Officer Altic, identified in the printouts as Unit 89, was dispatched at
25
    9:26:44, ten minutes after the 911 call was made.  *Id.* at V00054.  If EPD personnel genuinely
26

1   believed this to be an emergency, an officer would have been dispatched immediately. The

2   officers did not arrive at the apartment until approximately 17 minutes after the 911 call ended, at

3   9:32:16 a.m.. *Id.*

4       When Officer Altic arrived at 1911 Hilfiker Lane, instead of immediately going to the

5   door of Apartment 20 to inquire about the well-being of the residents, he instead spent time

6   investigating a vehicle that was parked at the complex. The "CAD Call Information" printout

7   indicates that Officer Altic notified dispatch that he was "starting self-initiated" at 9:31:57 and

8   "ended self-initiated" at 9:33:01. *Id.* Defense investigation has revealed that Officer Altic was

9   notifying dispatch that he had decided to run the license plate on a vehicle that he saw,

10   presumably in front of the apartment complex. *Exhibit A, Declaration of Fredrick W.*

11   *Anderson at 2 ¶5.* After he investigated the vehicle, he reported back to dispatch that he was

12   "on scene" with the dispatched call about the 911 hang-up. Were it true that there was a genuine

13   belief that a dire emergency might be occurring inside, Officer Altic would not have paused to

14   investigate a vehicle before approaching the apartment.

15       The printouts also call into question the length of time the officers claim passed before

16   Ms. Toledo-Paz opened the door and before the officers forcibly entered the apartment.

17   Specifically, the printouts reveal that only four minutes passed between the time Officers Altic and

18   Kalis arrived at the residence in their vehicles and the time Officer Altic reported that he was

19   inside the apartment and had Mr. Villegas in custody. Officer Altic and Officer Kalis arrived at

20   the apartment in their vehicles at 9:33:05 a.m. and 9:32:16 a.m. respectively**.** *Gov't Resp. to*

21   *Def. Mot. Supp.*, *Exh. 1, V00054.* Four minutes later, at 9:37:10 a.m., Officer Altic radioed to

22   dispatch that he was inside the apartment with Mr. Villegas-Villanueva and Ms. Toledo Paz and

23   that he had Mr. Villegas-Villanueva detained. *Gov't Resp. to Def. Mot. Supp.*, *Exh. 1,*

24   *V00052.* During those four minutes, the officers (1) got out of their vehicles; (2) walked to the

25   door of the apartment; (3) listened at the door of the apartment; (4) knocked on the door; (5)

26   waited for a response; (6) Officer Kalis walked to the side door; (7) Ms. Toledo-Paz opened the

1  front door and Officer Altic spoke with her; (8) Mr. Villegas-Villanueva came forward and

2  Officer Altic spoke with him (9) Officer Altic went into the front door and ordered Mr. Villegas-

3  Villanueva to sit on a couch (10) Officer Altic walked in the direction of Ms. Toledo-Paz; (11)

4  Officer Altic cuffed Mr. Villegas-Villanueva; (12) Officer Altic searched the couch for weapons

5  and sat Mr. Villegas-Villanueva on the couch; (13) and Officer Altic found Ms. Toledo-Paz and

6  directed her into the living room.  *Gov't Resp. to Def. Mot. Supp.*, *Exh. 2* ¶¶3-11.

7  In their declarations, Officers Kalis and Altic describe knocking at the door as much as

8  two and a half minutes before the door was opened, then speaking to Ms. Toledo-Paz for

9  approximately 45 seconds, then speaking with Mr. Villegas-Villanueva, then waiting three to five

10  seconds to demand the door be opened, then going inside to detain the residents.  It is impossible

11  that more than three minutes and fifteen seconds of the four minutes were exhausted knocking on

12  the door and subsequently speaking with Ms. Toledo-Paz.  That would leave only 45 seconds for

13  all of the other eleven actions described above to have taken place.  It is clear that the officers

14  exaggerated the length of time before the door was opened and the length of time they spent

15  trying to speak with the residents of Apartment 20 before they entered.

16  Even more importantly, when Officer Altic called in to dispatch after his initial entry, he

17  notified dispatch using the shorthand "Code 4" that the situation was under control and no further

18  assistance was needed.  This call occurred <u>before</u> he performed what the government has framed

19  as an "emergency sweep" of the apartment.  Specifically, Officer Altic called in to dispatch at

20  9:37:10 a.m.: "Inside with male and female male detained C4."  *Gov't Resp. to Def. Mot. Supp.*,

21  *Exh. 1, V00052*.  Officer Altic's own Unit Status History Information printout indicates "Code 4"

22  at 9:37:13.  *Id.* at V00054.  The Eureka Police Department Communications Training Manual

23  explains that Code 4 is used to notify dispatch that:

24      No further assistance needed.  This code is broadcast when units at the scene of a call
        have the situation under control.  When other units on the way to the call hear the
25      "Code 4" and no additional information is given, the additional responding units may
        cancel their response.

26

1    *Exh. A.* In his declaration, Officer Altic reports that after detaining Mr. Villegas-Villanueva, he

2    "began to check the rest of the rooms in the apartment for persons in need of assistance." *Gov't*

3    *Resp. to Def. Mot. Supp.*, *Exh. 2* ¶12.

4    It makes no sense that although Officer Altic had determined once Mr. Villegas-

5    Villanueva was handcuffed that the situation was under control and no further assistance was

6    needed, he <u>also</u> reasonably believed that it was necessary to perform an emergency search in

7    order to protect officers and citizens from harm. Were it true that Officer Altic felt that he had a

8    potentially dangerous situation on his hands and that he had to search for others in need of

9    assistance, he would undoubtedly have behaved differently. He would have either requested

10   backup immediately, or at least waited to decide whether or not to request backup until after he

11   had investigated his purported concerns about others in the apartment. In fact, the Code 4 notice

12   to dispatch indicates that Officer Altic knew he had matters under control at that time and that

13   there was no emergency. Nevertheless, he proceeded to perform a thorough, warrantless

14   search. This was not an emergency sweep. It was an illegal search for evidence.

15   **B.    The Government Has Failed to Meet Its Burden of Justifying the Warrantless**
     **Entry of the Apartment**

16

17   The government only overcomes the presumption that a warrantless search of a private

18   home is illegal if the government both asserts and establishes that an exception to the warrant

19   requirement applies. *Mincey v. Arizona*, 437 U.S. 385, 390 (1980). The government has

20   asserted that an emergency exception to the warrant requirement applies in this case. *Gov't*

21   *Resp. to Def. Mot. Supp.* at 7. However, the government has failed to explain what objectively

22   reasonable basis the officers had for "concluding that there was an immediate need to protect

23   others or themselves from serious harm." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir.

24   2008).

25   **1.    The 911 Hang-Up Call Alone Did Not Justify the Warrantless Entry and**
     **Search of the Apartment**

26   The government suggests that when officers are dispatched to a private residence

1    following a 911 hang-up call, those officers need little, if any, more information before forcing

2    their way into the residence without a warrant.  *Gov't Resp. to Def. Mot. Supp.* at 10 ("The

3    defense's analysis overlooks the weight of the 911 call, and subsequent busy signal").  However,

4    a 911 hang-up call alone does not justify a warrantless entry into an apartment.

5        The government cites five cases in support of the proposition that a 911 hang-up call and

6    a subsequent busy signal carry great "weight" in determining whether officers justifiably conducted

7    a warrantless, emergency search.  *Id.*  However, only one of the cases the government cites even

8    involved a 911 hang-up call and a subsequent busy signal.  *See State v. Frankel*, 847 A.2d 561,

9    565-66, 568-69 (N.J. 2004).  This case is actually irrelevant, however, because it is a New

10   Jersey Supreme Court case applying a different, three-pronged analysis to determine whether an

11   emergency exception existed to justify a warrantless entry.  *Id.*  Of the four federal cases the

12   government cites, three do not even involve 911 hang-up calls; but instead callers who conveyed

13   specific details about an ongoing emergency to the dispatcher.  *See Russell*, 436 F.3d at 1091

14   (describing Mr. Russell's two 911 calls in which he described being shot in the foot);[1] *United*

15   *States v. Richardson*, 208 F3d 626, 627-28, 630 (7th Cir. 2004) (describing a 911 call in

16   which the caller alleged that a woman had been raped and murdered and her body could be

17   found at a specific address, which officers then searched based on the call); *United States v.*

18   *Holloway*, 290 F.3d 1331, 1338 (11th Cir. 2002) (describing two 911 calls in which the caller

19   alleged hearing gunshots and arguing at defendant's residence).  The final federal case the

20   government cites actually involves a 911 hang-up call, but each time the dispatcher returned this

21   hang-up call, someone at the residence answered the phone and then immediately hung up again.

22   *See United States v. Najar*, 451 F.3d 710, 720 (10th Cir. 2006).  In sum, the government fails

23   to cite any cases in support of its central argument that a 911 hang-up call followed by a busy

24   signal should be accorded significant weight in determining whether an emergency warrantless

25   _____

26        [1]  The government incorrectly claims that *Russell* "does not address 911 calls specifically." *Gov't Resp. to Def. Mot. Supp.* at 10.

1    entry was justified.

2         911 hang-ups are accorded so little weight because they are common, and more often

3    than not indicate that the caller mis-dialed.  The U.S. Department of Justice Office of Community

4    Oriented Policing Services has published a guide for local police which reports that a 911 hang-

5    up call followed by a busy signal is usually a sign that no emergency call was intended.  *See* Rana

6    Sampson, U.S. Dep't of Justice, Office of Cmty. Oriented Policing, "Misuse and Abuse of 911,"

7    *Problem Oriented Guides for Police Series*, No. 19, at 19 (2003),

8    http://www.cops.usdoj.gov/pdf/e06021603web.pdf at 19.[2]  According to the guide, local

9    dispatch centers receive thousands of 911 mis-dials per year.  *Id.* at 4.  For instance, area codes

10   that begin with a "91," such as Sacramento's 916 area code, are responsible for many 911 calls,

11   because callers accidentally press the "1" button twice.  *Id.*  Agencies that have examined hang-

12   up 911 calls report that a majority are due to caller mis-dialing.  *Id.*  A busy signal at a residence

13   subsequent to a 911 hang-up call is often an indication that there is *not* an emergency at the

14   residence from which the 911 call originated.  A call-back that is met with a busy signal is the

15   least likely to indicate that there is actually an emergency at the residence, because a busy signal

16   indicates that someone at the residence is able to use the phone and that the 911 hang-up might

17   have been a simple mis-dial.  According to the guide, in the vast majority of these 911 hang-ups

18   followed by a busy signal, no emergency call was intended.  *Id.* at 19.

19        A busy signal, then, is different from a situation where a resident hangs up repeatedly on a

20   911 dispatcher, as did the defendant in *Najar*.  A busy signal is also different from a 911 call-

21   back to a residence that is greeted with no answer at all.  Unlike a busy signal, these repeated

22   hang-ups, or failures to answer, might actually constitute objective indications of an emergency.

23   In the instant case, the 911 hang-up call followed by the busy signal did not indicate an

24   emergency.  A warrantless entry was unjustified on this basis.

25

26        [2]The Guide notes that "the opinions contained herein are those of the author(s) and do not
     necessarily represent the official position of the U.S. Department of Justice."

1   **2.    Officers Took No Meaningful Steps to Determine Whether an
             Emergency Existed; Therefore They Had No Justification for Their
2            Warrantless Entry**

3           In order to justify a warrantless emergency entry, the officers in this case needed to take

4   additional steps to develop an "objectively reasonable basis" to believe or conclude that an

5   emergency existed. *Snipe*, 515 F.3d at 951; *see also Russell*, 436 F.3d at 1092 (holding that

6   police must "take additional steps if they otherwise lack reasonable grounds to believe there is an

7   emergency"). The term "additional steps" refers to additional investigatory steps officers should

8   take in order to determine who might be in danger or whether an entry is justified. *Id.* at 1092.

9           For instance, in *Russell*, the court identified three cases in which officers took additional

10  investigative steps to determine whether or not there was an emergency justifying a warrantless

11  entry. 436 F.3d at 1092. In *United States v. Bradley*, 321 F.3d 1212, 1215 (9th Cir. 2003),

12  the police checked with neighbors about the location of a child before effecting an emergency

13  warrantless entry into the residence where they thought the child might be.[3]  In *United States v.*

14  *Martinez*, 406 F.3d 1160, 1165 (9th Cir. 2005), police responded to an interrupted 911 call,

15  found a bruised woman outside the house, and heard screaming inside the house; on the basis of

16  each of these observations, the officers effected an emergency warrantless entry. Finally, in

17  *United States v. Deemer*, 354 F.3d 1130, 1132 (9th Cir. 2003), the police responded to an

18  emergency call from a hotel in which the caller had said only: "911." The officers took the

19  additional step of interviewing the woman who answered the door before entering the motel

20  room. *Id.* In sum, where a 911 call conveys no information, or ambiguous information, or where

21  officers are not certain that an emergency situations exists, the officers must take additional steps

22  to investigate the situation, interview potential victims, and describe any urgent signs of an

23

24          [3] As the government notes, *Bradley* did not involve a 911 hangup call. *Gov't Resp. to Def.*
    *Mot. Supp.* at 11. However, the emergency exception to the warrant requirement is not limited to
25  cases involving 911 calls. The emergency exception rule that the totality of the circumstances must
    establish that an officer had an objectively reasonable belief in an imminent danger applies to any
26  emergency entry. *Snipe*, 515 F.3d at 951.

1    emergency.

2        In the instant case, the government suggests that the officers took the "additional steps" of

3    "knocking and announcing their presence, attempting to contact the occupants of the residence,

4    and explaining the reason for their presence and need to enter." *Gov't Resp. to Def. Mot. Supp.*

5    at 10. These acts by the officers do not constitute "additional steps" towards determining

6    whether an emergency existed. None of these actions involved gathering information or

7    investigating the existence of a possible emergency. In fact, announcing officer presence and

8    asserting that entry is necessary amounts to the very opposite of initiating an investigatory

9    conversation to determine whether anyone is in need of assistance.

10       **3.    The "Nine Factors" Cited by the Government Do Not Support an**
11              **Objectively Reasonable Belief that There was an Immediate Need to**
                **Protect Others or Themselves from Immediate Harm**

12       The government goes to great lengths to find nine factors it contends suggested that there

13   was an emergency requiring warrantless entry into Apartment 20. *Gov't Resp. to Def. Mot.*

14   *Supp.* at 1. None of these factors, taken individually or in combination, justified a reasonable

15   conclusion that an emergency was at hand requiring the dramatic step of entering the residence

16   without a warrant. Indeed, none of the factors are analogous to the facts in any federal case

17   upholding a warrantless emergency entry.

18       The weight to be accorded to the 911 hang-up and subsequent busy signals has been

19   discussed above. The third, fourth, fifth and ninth factors cited by the government are the claims

20   that Ms. Toledo-Paz saw the officers at the door but retreated into a bedroom, the residents

21   delayed "two minutes in answering the door," "left the chain on the door rather than opening it all

22   the way," and walked away from the door before the officers entered. *Gov't Resp. to Def. Mot.*

23   *Supp.* at 9.[4] The fact that the residents of the apartment at 1911 Hilfiker Lane hesitated to

24   _____

25       [4]Whether or not Ms. Toledo-Paz saw the officer and retreated into the bedroom is subject to
     dispute. *See Declaration of Leopoldo Villegas-Villanueva, Def. Mot. Supp., Exh. B at ¶ 2.*
26   Likewise, the "CAD Call Information" printouts described above refute the claim that there was a
     lengthy delay before the door was opened. Nevertheless, even if these claims are accepted as true,

1    welcome the officers into their home is not an indication of an emergency and does not justify a

2    warrantless entry.  Residents of a private home have a right to refuse to allow a warrantless

3    search of their home.  *See* U.S. Const. Amend IV ("The right of the people to be secure in their

4    ... houses ... against unreasonable searches and seizures, shall not be violated").  The exercise of

5    this constitutional right should not be construed as a suspicious activity or form the basis for a

6    warrantless entry.  *Gasho v. United States*, 39 F.3d 1420, 1431 (9th Cir. 1994) (citing *United*

7    *States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir.1978)).  It should come as no great surprise

8    that residents of an apartment confronted with people banging at both doors might not respond

9    immediately.  There are any number of reasons a person might not immediately respond to

10   banging at the door, including the need to finish a telephone call, wake up from a nap, or put on

11   presentable clothes.  These factors are not sinister signs of an emergency.  Moreover, the act of

12   turning away from officers is far less of a cause for concern than the typical signs of emergency

13   relied upon by courts upholding warrantless entries.

14       The sixth and seventh factors identified by the government provide absolutely no support

15   because language barriers prevented communication between the officers and the residents.  The

16   inability to communicate in English is not an indication of an emergency, nor does it justify a

17   warrantless entry.  The government acknowledges that Ms. Toledo-Paz could neither speak or

18   understand English.  The inability to communicate resulted in an absence of information, not a

19   basis for concluding there was an emergency.  The response in this situation should have been to

20   seek a Spanish speaker to overcome the language barrier.

21       With respect to the claim that Mr. Villegas-Villanueva refused to communicate with the

22   officers, it is entirely unclear how officers could conclude that Mr. Villegas-Villanueva both spoke

23   and understood English during the few seconds they interacted with him through a four inch gap in

24   the door.  According to the two officers, Mr. Villegas-Villanueva appeared to understand them

25   when they spoke to him and mumbled something "in English" that they could not understand.

26   _____

they are insufficient.

1   *Gov't Resp. to Def. Mot. Supp.*, *Exh. 1 ¶8; Exh. 2 ¶8.*  It strains credulity that these officers

2   could tell that Mr. Villegas-Villanueva could understand them even though they did not engage in

3   any dialogue and he allegedly failed to obey their commands.  It is even more difficult to believe

4   that although the two officers both say they could <u>not</u> understand the words Mr. Villegas-

5   Villanueva said to them, they could be confident that those incomprehensible words were in

6   English.  Furthermore, although the government asserts that Mr. Villegas-Villanueva "refused to

7   answer any of the officers' inquiries or provide them with information of any kind relating to the

8   911 call," Officer Altic does not claim to have asked any questions of Mr. Villegas-Villanueva

9   before he entered the apartment.  Specifically, Officer Altic reports in his declaration that he

10  "explained to Villegas-Villanueva why we were at the apartment and that we needed to come in

11  and check to see if anyone was in need of assistance due to the 911 call." *Gov't Resp. to Def.*

12  *Mot. Supp.*, *Exh. 2 ¶8.*[5]  When Mr. Villegas-Villanueva allegedly turned to walk away from him,

13  Officer Altic ordered him to open the door before he broke through the chain.  *Id.* at ¶10.

14          The language barrier here illustrates an important distinction from the situation in *Najar*,

15  the Seventh Circuit case repeatedly cited by the government.  In *Najar*, officers received a 911

16  hang-up call, after which someone at the residence hung up repeatedly when dispatch called

17  back.  *Najar*, 451 F.3d at 712.  The officers spent thirty minutes outside the home trying to get

18  the person they saw inside to open the door.  *Id.* at 719.  When a resident came to the door, he

19  denied that he had called 911 and denied that anyone else was inside the residence.  The Seventh

20  Circuit, in upholding the warrantless entry, relied heavily upon this fact:

21          The officers had independent corroboration (the earlier call from dispatch to the home
22          while they were present) that the call did come from Najar's residence. Therefore, it was
            eminently reasonable for them to conclude that Najar was either lying about making the
23          call or about being the only occupant.  Given the totality of the circumstances, the officers
            had reasonable grounds to believe someone inside the trailer may have been in need of
24

25          ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26      [5]This is consistent with Officer Altic's report, written the day after the arrest, which also does
    not describe any inquiries made of Mr. Villegas-Villanueva before the entry. *Def. Mot. Supp.,*
    *Supplemental Report of Officer Altic, Exh. A.*

1    emergency aid and immediate action was required.

2
3    *Id.* at 720.  In contrast, here the language barrier prevented the officers from having any

4    communication with the residents of Apartment 20.  Instead of seeking assistance from an

5    interpreter, the officers simply entered the apartment within less than a minute of initiating contact

6    with the occupants.

7         Finally, officers in the instant case allege that they were concerned about a possible

8    domestic violence situation at the apartment.  *See Gov't Resp. to Def. Mot. Supp.*, *Exh. 1* at ¶ 6

9    (noting concern for "the female subject's safety"); *Gov't Resp. to Def. Mot. Supp.*, *Exh. 2* at ¶

10   10 (noting concern "that there was a domestic violence situation ongoing").  Merely asserting a

11   concern that someone might be experiencing a domestic violence situation, without articulating

12   any facts to suggest that this might actually be the case, is an insufficient justification for a

13   warrantless emergency entry.  In fact, in instances where officers do no more than articulate a

14   concern about domestic violence, their entry into a home has rarely been held to be justified.

15   *See, e.g.*, *United States v. Davis*, 290 F.3d 1239 (10th Cir. 2002) (holding entry improper

16   where dispatcher reported a possible domestic disturbance; officer found woman to be unharmed

17   and man to be neither threatening nor aggressive and woman asked officers not to enter); *State*

18   *v. Keilen*, 649 N.W.2d 224 (N.D. 2002) (holding entry improper where neighbors had reported

19   loud noises from a nearby apartment, but officers heard no loud noises, just murmurs, and

20   occupants refused to answer the door).  Especially where the potential emergency involves a

21   domestic violence situation, and officers can visually confirm that both parties are unharmed, a

22   warrantless emergency entry is rarely justified.

23         In sum, none of the nine factors offered by the government justified the warrantless entry

24   into the apartment at 1911 Hilfiker Lane.  Instead of performing a meaningful investigation to

25   determine whether an actual emergency existed, officers were inside the house with Mr. Villegas-

26   Villanueva in handcuffs four minutes after they pulled up at the house.  Because the government

DEFENDANT'S MOTION TO SUPPRESS REPLY    13

1    has failed to establish that Detective Kalis and Officer Altic reasonably believed that an

2    emergency existed inside Apartment 20, the fruits of the subsequent entry and search must be

3    suppressed.

4    **C.    The Government Has Failed to Meet Its Burden of Justifying the Warrantless
         Search of the Apartment**

5

6        Even if this court determines that the officers' initial entry into the apartment at 1911

7    Hilfiker Lane was legal, the scope of the search still exceeded the legitimate scope of a

8    warrantless emergency search.  Accordingly, the evidence discovered during the lengthy search

9    of the apartment at 1911 Hilfiker Lane must be suppressed.

10       **1.    The Post-Entry Search Went Well Beyond the Recognized Scope of an
             Emergency Sweep, Particularly Given the Circumstances Known to the
             Officers at the Time**

11

12       An emergency sweep should be a quick search, limited to the need to protect officers and

13   citizens from harm.  *United States v. Black*, 482 F.3d 1035, 1039 (9th Cir. 2007); *Snipe*, 515

14   F.3d at 951.  Indeed, just as a "protective sweep" incident to an in-home arrest is "is narrowly

15   confined to a cursory visual inspection of those places in which a person might be hiding," a

16   warrantless emergency search is both cursory and intended to ensure that no one is hiding or in

17   danger.  *Maryland v. Buie*, 494 U.S. 325, 327 (1990) (defining a protective sweep);[6] *Black*,

18   482 F.3d at 1039 (noting the "quick sweep" officers made while looking for anyone inside the

19   apartment pursuant to a warrantless emergency search); *Russell*, 436 F.3d at 1093 (noting that

20   the sweep took "less than two minutes" and focused on looking for people pursuant to a

21   warrantless emergency search); *Martin v. City of Oceanside*, 360 F.3d 1078, 1082 (9th Cir.

22

23       [6] The government argues that the Supreme Court's language from *Buie* regarding searches
     incident to arrests in people's homes does not control the analysis of the appropriate scope of a

24   warrantless emergency search.  *Gov't Rep. to Def. Mot. Supp.* at 13.  This is an obvious point; *Buie*
     concerned the appropriate scope of a search incident to arrest in a person's home, 494 U.S. at 327,

25   and not the scope of a search incident to an objectively reasonable emergency, *Snipe*, 515 F.3d at
     951.  Nonetheless, the *Buie* definition of a protective sweep provides a helpful benchmark for the kind

26   of quick sweep, targeted towards citizen and officer protection, which the emergency exception to the
     warrant requirement might justify.

1    2004) (noting the officers left the residence "shortly" after they saw the woman inside was "not in

2    trouble" after having entered without a warrant pursuant to the emergency exception).  In the

3    instant case, the officers exceeded the scope of a quick emergency search, both by searching the

4    apartment <u>after</u> learning that the two adults were present and unharmed, and by searching over a

5    longer period of time than was justified.

6        When the officers first entered the apartment at 1911 Hilfiker Lane, they immediately

7    detained the two adult residents in the living room. *Gov't Rep. to Def. Mot. Supp., Exh. 1* ¶ 11;

8    *Exh. 2* ¶ 11.  The emergency entry should have concluded at this point, if it was even legal in the

9    first place.  Indeed, as set forth above, Officer Altic concluded that there was no emergency after

10   detaining Mr. Villegas-Villanueva but <u>before</u> performing what the government now frames as an

11   emergency search.  *See supra* Section A.  Officer Altic called in to dispatch that the situation was

12   under control and that no further assistance was needed.  Exh. A.  This conclusion on his part

13   made sense - he had the two individuals he claims to have believed might have been involved in a

14   domestic dispute detained in the living room at the time.  It goes without saying that there was no

15   longer any need at this point to search "the areas of the house likely to include individuals in

16   harm's way." *Snipe*, 515 F.3d at 954.  Once an officer has confirmed that no one is injured in

17   such a situation, his right to search evaporates.  For instance, in *Martin v. City of Oceanside,*

18   360 F.3d 1078, 1082 (9th Cir. 2004), the court noted that as soon as the officers identified the

19   potential domestic violence victim and confirmed that she was "not in trouble," they "left the

20   residence."

21       Nonetheless, the officers continued to sweep for more than fifteen minutes – much more

22   than the "two minutes" the officers searched in *Russell*, and well beyond the scope of the "quick"

23   search upheld in *Black.*  Officer Altic searched for more than seven minutes after he had radioed

24   the dispatcher that the situation was under control.  *Gov't Rep. to Def. Mot. Supp., Exh. 1* at

25   V00052 (noting officers were inside at 9:37:10 and medical assistance was requested at 9:44:53).

26   After seven minutes of searching inside the house, Officer Altic apparently made his first radio

1   call, requesting medical assistance for an injury he had just noticed to the female resident's hand.

2   *Id.*; *Gov't Rep. to Def. Mot. Supp., Exh. 2* at ¶ 17. After making this medical call, Officer Altic

3   searched for another eleven minutes before radioing that the building was clear. *Gov't Rep. to*

4   *Def. Mot. Supp., Exh. 1* at V00052 (noting building clear at 9:56:34). An eighteen-minute

5   sweep is far from the kind of quick sweep justified by an emergency exception to the warrant

6   requirement. Indeed, Officer Altic "swept" for seven minutes before he noticed that the female

7   resident, about whose safety he was allegedly concerned, was potentially in need of medical

8   assistance.

9          The government offers two unsatisfactory reasons for the officers' extended search of the

10  apartment at 1911 Hilfiker Lane, after Mr. Villages-Villanueva and Ms. Toledo-Paz had been

11  detained. First, the government contends that Officer Altic and Detective Kalis were justified in

12  continuing to search the apartment at 1911 Hilfiker Lane, because, "upon entering" the

13  apartment, the officers were "still unaware of the identity or location of the emergency caller."

14  *Gov't Rep. to Def. Mot. Supp.* at 14. This contention implies that the officers were looking for

15  some other adult in the house who might have called 911. However, the officers had already

16  identified one adult male and one adult female in the house. Indeed, Officer Altic had particularly

17  expressed his hypothesis that the 911 call had concerned a domestic violence altercation between

18  this very man and this very woman. *Gov't Rep. to Def. Mot. Supp.*, *Exh. 2* at ¶ 10. There are

19  no indications either from the officers' descriptions of their observations, or from their hypotheses

20  about what kind of emergency might have been ongoing at the apartment, that there were other

21  residents hiding elsewhere.

22         Second, the government also contends that the officers remained confused about whether

23  an emergency existed, because Ms. Toledo-Paz did not appear to speak English, and Mr.

24  Villegas-Villanueva "mumbled something to the officers ... they could not understand." *Id.* at ¶ 7;

25  *Gov't Rep. to Def. Mot. Supp.* at 14. Apparently the government is suggesting that the officers

26  were unaware of the identity or location of the emergency caller because of communication

barriers, not because they reasonably believed there was some mysteriously missing or hiding

third adult person who might have called 911.  Communication barriers do not constitute

reasonable grounds for a fear that someone is hiding or in danger.

**2.     The "Plain Feel Doctrine" Does Not Apply to a Search of an Inanimate Object Within a Private Home**

Officers who are legitimately present inside a residence without a warrant are limited to

searching for and seizing evidence in plain view, or evidence whose incriminatory nature is

"immediately apparent."  *United States v. Stafford*, 416 F.3d 1068, 1076 (9th Cir. 2005).  The

government argues that this visual, "plain view doctrine" should incorporate a tactile, "plain feel

doctrine," so as to justify Officer Altic's search under the covers of the bed.  *Gov't Rep. to Def.*

*Mot. Supp.* at 16.  The government can find no support for this position in case law, and cites no

precedent applying the "plain feel doctrine" to an emergency search.  Indeed, the Supreme Court

has explicitly limited the "plain feel doctrine" to searches conducted as part of a *Terry* pat down

of a person, conducted by an officer for the specific purpose of searching for weapons on the

body of that person.  *Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993).  Despite government

allegations to the contrary, this doctrine has never been applied to warrantless searches of

inanimate objects within private homes.  Even in the narrow context of a legitimate *Terry* pat

down, the Ninth Circuit has severely limited the scope of the "plain feel" search.  *See United*

*States v. Miles*, 247 F.3d 1009, 1015 (9th Cir. 2001) (holding that officer exceeded the scope

of a plain feel search when he conducted a *Terry* pat down, felt a box in the suspect's pocket,

shook the box, and determined there were bullets inside; suppressing the fruits of the illegal

search).[7]

An officer has no right to pat down inanimate objects during a warrantless, plain view

---

[7] Ironically, the government cites this case for the proposition that the plain feel doctrine applies at least in the instance of a *Terry* frisk and possibly in other situations as well.  *Gov't Rep. to Def. Mot. Supp*. at 16.

1    search.  The terms of the plain view doctrine are clear; the doctrine limits officers to searching

2    what they can see through pure visual inspection.  *See, e.g.*, *Harris v. United States*, 390 U.S.

3    234, 236 (1968) (holding that "*objects falling in the plain* view of an officer who has a right to

4    be in the position to have that view are subject to seizure and may be introduced in evidence"

5    (emphasis added)).

6        In the instant case, the fact that Officer Altic might have been able to immediately feel a

7    gun under the blankets on the bed in Apartment 20 at 1911 Hilfiker Lane is irrelevant.  *See Gov't*

8    *Rep. to Def. Mot. Supp.* at 16 (noting that *Terry* pat downs depend on the "assumption that law

9    enforcement officers are able to recognize weapons immediately by tactile observation").  The

10   officer had no right to pat down or otherwise feel a *bed* as part of a plain view search.  Therefore,

11   anything Officer Altic felt, regardless of whether he knew what he was feeling, exceeded the

12   scope of a plain view search and must be suppressed.

13       **3.    The Smell of Marijuana May Constitute Probable Cause to Seek a**
14       **Warrant, But it Does Not Justify a Warrantless Search of a Residence**

15       The government argues that "the detection of the smell of marijuana by a law enforcement

16   officer familiar with the odor ... is sufficient to establish probable cause for a search."  *Gov't Rep.*

17   *to Def. Mot. Supp.* at 17.  The government's position, therefore, is that Officer Altic was justified

18   in expanding the scope of the claimed emergency search to return to an area he had already

19   cleared because he had smelled what he believed to be marijuana there.  This contention, which is

20   supported with cases addressing vehicle searches, reflects a misunderstanding of the relevant legal

21   principles.

22       Individuals have a greater expectation of privacy in their homes than in more public places

23   or containers, such as cars.  *See Kyllo v. United States*, 533 U.S. 27, 31 (2001).  This stronger

24   expectation of privacy in the home justifies more powerful Fourth Amendment protections,

25   including a presumption against warrantless entries of any sort into private homes.  *Id.*  For this

26   reason, the smell of marijuana might justify a warrantless search a car, but it does not justify a

1   warrantless search of a private home.  *See, e.g.*, *United States v. Barron*, 472 F.2d 1215, 1217

2   (9th Cir. 1973) (describing a search of a car, pursuant to a stop during which the officer smelled

3   marijuana).

4       Indeed, three of the four cases the government cites for the contention that the smell of

5   marijuana establishes probable cause for a warrantless search concern searches of cars, rather

6   than searches of private homes.  *See id.*; *United States v. Leazar*, 460 F.2d 982, 984 (9th Cir.

7   1972) (describing a search of a car after an officer smelled marijuana emanating from the car);

8   *Fernandez v. United States*, 321 F.2d 283, 285 (9th Cir. 1963) (describing a search of a car

9   stopped at an immigration checkpoint after the officers smelled marijuana).  In the one case the

10  government cites that does involve a search of a home, the Ninth Circuit concluded that the

11  search for and seizure of the marijuana was *not* justified by the officer having smelled marijuana.

12  *United States v. Curran*, 498 F.3d 30, 34 (9th Cir. 1974).  Instead, the court held that a

13  previous tip about the house constituted probable cause for the search and an exigent

14  circumstance – the likelihood the evidence would be destroyed – justified the warrantless nature

15  of the search.  *Id.*  In other words, the government does not cite a single case that establishes that

16  smell of marijuana provides a basis to expand a warrantless emergency search of a private home.

17      In the instant case, Officer Altic smelled marijuana, continued what he claims was an

18  emergency search, then returned to the area he had cleared to look for the marijuana.  *See Gov't

19  Rep. to Def. Mot. Supp.* at 18 (noting Officer Altic returned to the laundry room and searched

20  further after having searched through the entire house).  The smell of marijuana might have

21  justified a request for a search warrant, but it did not justify an expanded search.  Therefore,

22  Officer Altic's continuing search of the apartment after he smelled marijuana was unjustified, and

23  the fruits of this continuing warrantless search must be suppressed.

24  **D.    The Inevitable Discovery Doctrine Does Not Apply**

25      If information is obtained during an illegal entry or an illegal search, but the government

26

1    can prove that the "information ultimately or inevitably would have been discovered by lawful

2    means ... the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444 (1984). This is

3    the "inevitable discovery doctrine." The government contends that the firearms would have been

4    inevitably discovered during the execution of a search warrant based upon the observation and

5    smell of marijuana in the residence. However, the government has failed to prove that the initial,

6    warrantless entry into the apartment at 1911 Hilfiker Lane was justified. *See supra* Section B.

7    Because the initial entry was illegal, none of the evidence could possibly have been legally

8    discovered and used as probable cause for a search warrant to search the apartment. Therefore,

9    the inevitable discovery doctrine does not apply. Likewise, even if this court concludes that the

10   initial entry was legal, the subsequent search exceeded the scope of the emergency doctrine. *See*

11   *supra* section C. The officers should never have looked beyond the living room once they

12   insured that the Mr. Villegas-Villanueva and Ms. Toledo-Paz were safe. Because the subsequent

13   search exceeded any justifiable scope of either an emergency search or the plain view doctrine,

14   none of the evidence subsequently discovered could have been used in a search warrant affidavit.

15   Therefore, again, the inevitable discovery doctrine does not apply.

16   **E.    Because the Statements Attributed to Mr. Villegas-Villanueva Resulted from an**
17   **Illegal Search and Un-*Mirandized* Interrogation, They Too Must be Suppressed**

18          The officers who questioned Mr. Villegas-Villanueva only had access to him in the first

19   instance because they entered his home without a warrant or justification. Therefore, the

20   statements Mr. Villegas-Villanueva made to Agent Fagetan should be suppressed as the fruits of

21   an illegal entry and search. *United States v. Reid*, 226 F.3d 1020, 1025 (9th Cir. 2000) (holding

22   that evidence recovered following an illegal entry into a home is inadmissible and must be

23   suppressed).

24          Further, Mr. Villegas-Villanueva's statements must be suppressed because he was

25   detained and interrogated in violation of the Fifth Amendment. *Miranda v. Arizona*, 384 U.S.

26   436, 478-79 (1966). The government appears to concede that Mr. Villegas-Villanueva was in

1    custody at the time he interacted with Agent Fagetan.  The only question to be resolved, then, is

2    whether the statements identified by the government came in response to interrogation.  Agent

3    Fagetan and Mr. Villegas-Villanueva agree on some specific factual details of their conversation:

4    they were sitting in the living room; they made "small talk" for a number of minutes; they

5    discussed scorpion artwork on the walls of the living room; and they discussed the possibility of

6    cooperation.  *Gov't Resp. to Def. Mot. Supp., Exh. 3* at ¶¶ 6, 7, 13; *Def. Mot. Supp., Exh. B*

7    at ¶¶ 5, 7.  However, Mr. Villegas-Villanueva's declaration differs from Agent Fagetan's on at

8    least one key point: Mr. Villegas-Villanueva remembers Agent Fagetan telling him he was going

9    to be in a lot of trouble for the things officers had found in the apartment.  *Def. Mot. Supp., Exh.*

10   *B* at ¶ 6.  Agent Fagetan claims that Mr. Villegas-Villanueva simply volunteered that he was "in

11   deep shit." Given Mr. Villegas-Villanueva's declaration that Agent Fagetan discussed the

12   evidence against him, the sentences he might face, and the possibility of cooperation, the idea that

13   Mr. Villegas-Villanueva actually "offered ... statements spontaneously" is difficult to believe.

14   *Gov't Resp. to Def. Mot. Supp.* at 22.  Indeed, as soon as Mr. Villegas-Villanueva was notified

15   of his right to an attorney, he exercised this right, indicating that he did not want to speak with

16   police or FBI agents without the advice of an attorney.  *Def. Mot. Supp., Exh. B* at ¶ 8.

17   **F.    A Number of Unresolved Factual Disputes Necessitate an Evidentiary Hearing**

18

19          At oral argument on the instant motion, the defense will be requesting that a date for an

20   evidentiary hearing be set to resolve key factual disputes raised in the pleadings.  These factual

21   disputes have direct bearing on the question of whether the officers who entered the apartment at

22   1911 Hilfiker Lane had an objectively reasonable belief that there was an emergency situation

23   therein that would justify their warrantless entry.  These factual disputes also have direct bearing

24   on the legality of the search the officers conducted after they entered the apartment, as well as the

25   questioning of Mr. Villegas-Villanueva by law enforcement after his arrest.

26          Mr. Villegas-Villanueva's moving papers "allege facts which are sufficiently definite, clear,

DEFENDANT'S MOTION TO SUPPRESS REPLY    21

1  and specific to enable the trial court to conclude that contested issues of fact exist." *United*

2  *States v. Ramirez-Garcia*, 269 F.3d 945, 947 (9th Cir. 2001) (ord. & opinion).  Among the

3  factual disputes that must be resolved are the length of time that passed before the occupants of

4  1911 Hilfiker, Apartment 20 opened the door to the apartment; whether the female occupant

5  walked out of the bedroom door, then went back inside the bedroom and closed the door; and

6  whether Agent Fagetan interrogated Mr. Villegas-Villanueva before he allegedly acknowledged

7  that the firearms and drugs in the apartment were his.  Accordingly, "[a]n evidentiary hearing must

8  be held." *Id.*; *see also United States v. Walczak*, 783 F.2d 852, 856 (9th Cir. 1986) ("An

9  evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are

10  sufficiently definite, specific, detailed, and nonconjectural to enable to court to conclude that

11  contested issues of fact going to the validity of the search are in issue.").

12  **III.    CONCLUSION**

13

14      For the foregoing reasons, this Court should suppress all evidence recovered in the

15  search of 1911 Hilfiker Lane, Apartment 20, as well as the statements made by Mr. Villegas-

16  Villanueva while he was in custody.

17  Dated: July 30, 2008                    Respectfully submitted,

18
19                                        BARRY J. PORTMAN
                                      Federal Public Defender

20
21                                        /s/ Ned Smock

22                                        NED SMOCK
23                                        Assistant Federal Public Defender

24

25

26

# Exhibit A

1  BARRY J. PORTMAN
   Federal Public Defender
2  NED SMOCK
   Assistant Federal Public Defender
3  555 - 12th Street
   Suite 650
4  Oakland, CA 94607-3627
   Telephone:  (510) 637-3500
5
   Counsel for Defendant Villegas-Villanueva
6

7

8               IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,          )    No. CR-08-0230 CRB
                                       )
12                  Plaintiff,         )    DECLARATION OF FREDRICK W.
                                       )    ANDERSON
13  vs.                                )
                                       )
14  JOSE LEOPOLDO VILLEGAS-            )
    VILLANUEVA,                        )
15                                     )
                    Defendant.         )
16  _____

17

18      I, Fredrick W. Anderson, declare the following to be true under penalty of perjury:

19  1.  I am an investigator with the Federal Public Defender Office in the Northern District of

20      California.

21  2.  On July 29, 2008, I had a telephone conversation with Tawnie Hansen, a communications

22      supervisor with Eureka Police and Fire Dispatch, during which I asked Ms. Hansen to explain

23      the meaning of codes used in the CAD Call Information forms attached to Exhibit 1 of the

24      Government's Opposition brief.

25  3.  Ms. Hansen told me that "Code 4" was generally used by officers to indicate that no further

26      assistance is needed, all is well, and/or the situation is under control.  Ms. Hansen told me that

1    she would fax a document out of a training manual with the actual verbiage for "Code 4" as

2    that term is used in police communications with dispatch.  That document is attached hereto.

3  4.  Ms. Hansen told me that she could not independently understand why the terms "Started

4    Self-Initiated" or "Ended Self-Initiated" were used in the context of this call, that it would

5    require further clarification, and that she would get back to me.

6  5.  I spoke with Ms. Hansen by telephone again on July 30, 2008.  Ms. Hansen told me that she

7    had determined why the CAD Call Information sheet for Officer Altic indicated that he had

8    "Started Self-Initiated" at 9:31:57, and "Ended Self-Initiated" at 9:33:01, just four seconds

9    before he reported that he was "On Scene".  Ms. Hansen told me that she had spoken with

10   the dispatcher who communicated with Officer Altic that day, and that the dispatcher's

11   recollection was that Officer Altic had stopped before approaching the apartment at 1911

12   Hilfiker to perform a vehicle investigation on a car that was parked in front of the apartment

13   complex.  That investigation involved running the vehicle's license plate.  When he decided to

14   initiate that investigation, Officer Altic called in to dispatch that he was starting a self-initiated

15   task.  Once Officer Altic completed the vehicle investigation, he radioed in to dispatch that he

16   was ending a self-initiated task.  At the end of this "self-initiation", he reported that he was on

17   scene for the dispatched call.

18

19

20   __July 30, 2008__                              __/s/ Fredrick W. Anderson__
     DATED                                          FREDRICK W. ANDERSON

21

22

23

24

25

26

Anderson Declaration                              2

# CODES

In order to communicate the greatest amount of information in the least amount of radio time, law enforcement has developed codes. We have codes for the alphabet, codes for crimes and police activities, codes to get information into CAD, and a myriad of abbreviations and acronyms that all must be learned to make sense of our day-to-day operations. You are truly learning another language and do not be discouraged at the amount you have to learn. Some must be memorized, but most will be picked up just by sitting and listening.

**Code Four:**       No further assistance needed. This code is broadcast when units at the scene of a call have the situation under control. When other units on the way to the call hear the "Code 4" and no additional information is given, the additional responding units may cancel their response.